# No. 14-5019

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,

Plaintiff-Appellee

v.

THE UNITED STATES,

Defendant-Appellant

ON APPEAL FROM THE JUDGMENT OF THE
UNITED STATES COURT OF FEDERAL CLAIMS
No. 07-648T; Judge Marian Blank Horn

OPENING BRIEF FOR THE UNITED STATES

KATHRYN KENEALLY
  *Assistant Attorney General*

ROBERT W. METZLER          (202) 514-3938
ARTHUR T. CATTERALL        (202) 514-2937
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

  *February 20, 2014*

# TABLE OF CONTENTS

**Page**

Table of contents ......................................................................i

Table of authorities ................................................................v

Statement of related cases .....................................................x

Glossary .................................................................................xi

Jurisdictional statement ......................................................xii

Statement of the issues .........................................................1

Statement of the case ............................................................2

    A.    Overview...................................................................2

    B.    Factual backdrop......................................................3

    C.    Statutory and regulatory backdrop .........................5

    D.    The dividend guarantees ........................................9

          1.    Background .................................................9

          2.    Adoption of the December 1995 dividend guarantees................................................11

          3.    Strategic disclosure to state regulators......................14

          4.    Subsequent dividend guarantees.................16

          5.    Actual payment of dividends on post-1983 policies ........................................................19

    E.    Tax reporting.........................................................20

    F.    IRS disallowance ..................................................22

    G.    Proceedings below ...............................................22

11131499.1

**Page**

1.   The parties' main arguments.......................................23

2.   Supplemental briefing on former I.R.C. § 809 ............26

3.   Issuance of the district court's opinion in
     *New York Life*.................................................................27

4.   The CFC's opinion ......................................................28

Summary of argument ...........................................................................30
Argument:

I.   The CFC erred in holding that the guarantees fixed the
     fact of liability under the all-events test ...............................34

         Standard of review .......................................................34

A.   Assuming that the dividend guarantees gave rise to
     "obligations," such obligations were not fixed at year-
     end .........................................................................................35

1.   The obligations under the guarantees
     could be fixed at year-end only if the annual-
     dividend obligation with respect to at least
     one post-1983 policy was also fixed at that time.........35

2.   The annual-dividend obligation did not
     become fixed with respect to any policy until the
     policy's anniversary date in the following year...........37

     a.   *Hughes Properties* and *General
          Dynamics*.............................................................37

11131499.1

Page

   b. Like the claim-filing requirement in *General Dynamics*, the "in-force" requirement was a condition precedent to the annual-dividend obligation with respect to paid-up policies ........................... 40

  3. The CFC's analysis does not withstand scrutiny ........ 42

  4. In *New York Life*, the Second Circuit squarely rejected the argument advanced by MassMutual regarding the annual-dividend obligation *vis-à-vis* paid-up policies ........................................ 47

    a. Background of the case ....................................... 47

    b. The Second Circuit's opinion ............................. 49

  5. Summary ................................................................. 54

B. The dividend guarantees did not give rise to "obligations" in any meaningful sense .................................. 55

  1. Like the proverbial tree falling in the forest, an undertaking does not give rise to an "obligation" if there is no obligee around to enforce it .................... 55

  2. That the companies disclosed the dividend guarantees to state regulators does not alter the illusory nature of the guarantees ............................... 59

II. The CFC erred in holding that the annual dividends were rebates or refunds within the meaning of Treas. Reg. § 1.461-4(g)(3) ............................................................. 61

    Standard of review ...................................................... 61

11131499.1

**Page**

A.  The IRS's interpretation of its own regulation is
    entitled to deference..................................................62

    1.  Treas. Reg. § 1.461-4(g)(3) is ambiguous.....................62

    2.  The IRS's interpretation of the regulation
        satisfies the conditions for deference..........................63

B.  In any event, the IRS's interpretation of the regulation
    is superior to MassMutual's................................................66

    1.  Nothing in the text or history of the economic-
        performance regulations suggests that the term
        "rebate or refund" therein includes policyholder
        dividends ....................................................66

    2.  The CFC's analysis is flawed ......................................69

Conclusion ...........................................................71
Addendum
Statutory and regulatory appendix .......................................72
Certificate of service...................................................84
Certificate of compliance................................................85

- iv -

# TABLE OF AUTHORITIES

**Cases:**                                                                              **Page(s)**

*Abbott Laboratories v. United States,*
    573 F.3d 1327 (Fed. Cir. 2009)............................ 61, 63, 64, 66

*Am. Express Co. v. United States,*
    262 F.3d 1376 (Fed. Cir. 2001)................................................64

*Auer v. Robbins,*
    519 U.S. 452 (1997) ..............................................................64

*Bennett Paper Corp. v. Commissioner,*
    699 F.2d 450 (8th Cir. 1983) ..........................................52, 53

*Bowen v. Georgetown Univ. Hospital,*
    488 U.S. 204 (1988) ........................................................64, 66

*Bowles v. Seminole Rock & Sand Co.,*
    325 U.S. 410 (1945) ........................................................62, 63

*Burnham Corp. v. Commissioner,*
    90 T.C. 953 (1988), *aff'd,* 878 F.2d 86 (2d Cir. 1989)......43, 44

*Burnham Corp. v. Commissioner,*
    878 F.2d 86 (2d Cir. 1989)..........................................49, 51-54

*Caltex Oil Venture v. Commissioner,*
    138 T.C. 18 (2012) ................................................................69

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,*
    400 F.3d 1352 (Fed. Cir. 2005)........................................63, 64

*Champion Spark Plug Co. v. Commissioner,*
    30 T.C. 295 (1958),
    *aff'd*, 266 F.2d 347 (6th Cir. 1959) (per curiam)...................57

*Eastman Kodak Co. v. United States,*
    534 F.2d 252 (Ct. Cl. 1976) ..................................................46

*Gold Coast Hotel & Casino v. United States,*
    158 F.3d 484 (9th Cir. 1998) ............................................7, 34

*In re Harvard Industries, Inc.,*
    568 F.3d 444 (3d Cir. 2009)...................................................34

*Heidelberg Harris, Inc. v. Loebach,*
    145 F.3d 1454 (Fed. Cir. 1998)..............................................44

*Interex, Inc. v. Commissioner,*
    321 F.3d 55 (1st Cir. 2003)...................................................34

11131499.1

## Cases (cont'd): Page(s)

*John Hancock Fin. Servs., Inc. v. United States,*
378 F.3d 1302 (Fed. Cir. 2004)...............................................9

*Long Island Care at Home v. Coke,*
551 U.S. 158 (2007) ..........................................................63-65

*Massachusetts Mutual Life Ins. Co. v. United States,*
103 Fed. Cl. 111 (2012) .......................................................2

*Mayo Found. for Med. Educ. and Research v. United States,*
131 S. Ct. 704 (2011) ..........................................................65

*Nat'l Life Ins. Co. and Subs. v. Commissioner,*
103 F.3d 5 (2d Cir. 1996)..........................................8, 10, 50

*New York Life Ins. Co. v. United States,*
780 F. Supp. 2d 324 (S.D.N.Y. 2011) ........27-28, 32, 45, 47-48

*New York Life Ins. Co. v. United States,*
724 F.3d 256 (2d Cir. 2013),
*petition for cert. filed,*
82 U.S.L.W. 3453, 3459
(U.S. Jan. 14, 2014) (No. 13-849) ...............49-51, 53-54, 56-58

*Produce Reporter Co. v. Commissioner,*
18 T.C. 69 (1952) ..............................................................58

*Resale Mobile Homes, Inc. v. Commissioner,*
965 F.2d 818 (10th Cir. 1992) ............................................34

*Roberto v. Dept. of Navy,*
440 F.3d 1341 (Fed. Cir. 2006)...........................................62

*Robinson v. Shell Oil Co.,*
519 U.S. 337 (1995) ...........................................................62

*Tesoro Hawaii Corp. v. United States,*
405 F.3d 1339 (Fed. Cir. 2005)...........................................62

*Trinity Constr. Co. v. United States,*
424 F.2d 302 (5th Cir. 1970) ..............................................44

*United States v. General Dynamics Corp.,*
481 U.S. 239 (1987) .............................37-40, 42, 49-50, 54, 58

*United States v. Hughes Properties, Inc.,*
476 U.S. 593 (1986) .................................................37-40, 49

11131499.1

## Cases (cont'd):          Page(s)

*Washington Post Co. v. United States,*
   405 F.2d 1279 (Ct. Cl. 1969) ........................................ 36, 58
*Willoughby Camera Stores, Inc. v. Commissioner,*
   125 F.2d 607 (2d Cir. 1942) ........................................ 57-58

## Statutes:

Deficit Reduction Act of 1984, Pub. L. No. 98-369,
   98 Stat. 494 ................................................................. 7

   § 211(a) ........................................................................ 8
   § 216(b) ........................................................................ 7

Internal Revenue Code (26 U.S.C.):

   § 61(a) ....................................................................... 67
   § 63(a) ....................................................................... 67
   § 72(e) .................................................................. 24, 30
   § 83(a) ....................................................................... 52
   § 83(c)(1) ................................................................... 52
   § 83(h) ....................................................................... 52
   § 461(e) ..................................................................... 67
   § 461(h) ......................................................... 2, 20, 23
   § 461(h)(1) .................................................................. 6
   § 461(h)(2)(C)(ii) ...................................................... 43
   § 461(h)(2)(D) ............................................................ 7
   § 461(h)(3) .................................................................. 6
   § 461(h)(4) .................................................................. 6
   § 481 ........................................................................... 7
   § 801(b) .................................................................. 5, 67
   § 803 ......................................................................... 67
   § 804 ......................................................................... 67
   § 804(1) ....................................................................... 5
   § 805(a)(3) .............................................................. 5, 67

11131499.1

**Statutes (cont'd):**                                             **Page(s)**

§ 808(b) ........................................................................... 70

§ 808(c) ..................................................................... 5, 9, 50-51

§ 808(f) .......................................................................... 7, 10

§ 7422 ................................................................................. 2

26 U.S.C. § 811(b)(1) (1982) ........................................................ 5

26 U.S.C. (2000):

§ 809 ......................................................................... 26, 29, 70

§ 809(a)(1) ........................................................................... 8

§ 809(a)(3) ........................................................................... 8

§ 809(c)(1) ........................................................................... 9

§ 809(d) .............................................................................. 9

§ 809(e) .............................................................................. 9

§ 809(f)(3) ........................................................................... 9

28 U.S.C.:

§ 1295(a)(3) ........................................................................ xii

§ 1491(a)(1) ........................................................................ xii

§ 2107(b) ........................................................................... xii

**Regulations:**

Treas. Reg. (26 C.F.R.):

§ 1.461-1(e)(1)(i) .................................................................. 67

§ 1.461-4 ............................................................................. 6

§ 1.461-4(d)(6)(ii) ................................................................. 69

§ 1.461-4(g) ......................................................................... 66

§ 1.461-4(g)(1)(i) .................................................................... 6

§ 1.461-4(g)(2) ....................................................................... 6

§ 1.461-4(g)(3) ............................................. 2, 6, 23, 25, 61-62, 64-69, 71

11131499.1

**Regulations (cont'd):**                                    **Page(s)**

§ 1.461-4(g)(5) .................................................................. 67
§ 1.461-4(g)(7) ............................................................ 6, 65
§ 1.461-4(g)(8), example 2 ............................................... 68
§ 1.461-4(k)(3) ................................................................... 7
§ 1.461-5 ................................................................... 66, 68
§ 1.461-5(b)(1)(ii) ............................................................. 6
§ 1.461-5(c) ....................................................................... 6
§ 1.461-5(e), example 1 .................................................... 68

**Miscellaneous:**

H.R. Conf. Rep. No. 98-861 (1984) ................................ 68

H.R. Rep. No. 98-432, Part II (1984) ....................... 65, 70

H.R. Rep. No. 99-426 (1985) ............................................ 8

IRS Field Service Advisory, 1994 WL 1865978
    (Apr. 28, 1994) .......................................................... 65

IRS Field Service Advisory, 1998 WL 1984267
    (Aug. 24, 1998) .......................................................... 65

*Life Insurance Company Taxation: An Overview of the*
    *Mutual-Stock Differential*, in LIFE INSURANCE
    TAXATION: THE MUTUAL VS. STOCK DIFFERENTIAL
    (Graetz ed. 1986) ...................................................... 70

Rev. Rul. 2011-29, 2011-49 I.R.B. 824 ..................... 36, 59

S. Rep. No. 99-313 (1986) ................................................ 8

T.D. 8408, 1992-1 C.B. 155 ........................................... 69

11131499.1

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for the appellant state that (1) no other appeal in or from the same civil action or proceeding in the lower court has previously been before this Court or any other appellate court; and (2) counsel is not aware of any case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

11131499.1

# GLOSSARY

CFC – United States Court of Federal Claims

DOI – Massachusetts Department of Insurance

I.R.C. – Internal Revenue Code

1984 Act – Deficit Reduction Act of 1984

11131499.1

# JURISDICTIONAL STATEMENT

Massachusetts Mutual Life Insurance Company ("MassMutual") timely filed claims for refund of federal income tax with respect to its 1995, 1996, and 1997 taxable years. (A1028.) In its capacity as the successor to Connecticut Mutual Life Insurance Company ("ConnMutual"), MassMutual also timely filed a claim for refund with respect to ConnMutual's 1995 taxable year. (A1031.) The IRS took no action on the MassMutual claims and denied most of the ConnMutual claim. (A1028, 1031.) MassMutual timely filed suit on those claims in the United States Court of Federal Claims ("CFC"), which had jurisdiction under 28 U.S.C. § 1491(a)(1).

The CFC entered judgment in favor of MassMutual on September 18, 2013. (A1-2.) That judgment was a final order, resolving all claims of all parties. The United States filed a notice of appeal on November 14, 2013, within 60 days after entry of judgment. (A1750.) *See* 28 U.S.C. 2107(b). This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

11131499.1

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

No. 14-5019

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,

Plaintiff-Appellee

v.

THE UNITED STATES,

Defendant-Appellant

ON APPEAL FROM THE JUDGMENT OF
THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 07-648T; Judge Marian Blank Horn

OPENING BRIEF FOR THE UNITED STATES

## STATEMENT OF THE ISSUES

Life insurance companies are entitled to deduct policyholder

dividends "paid or accrued" during the taxable year.  MassMutual and

ConnMutual followed the industry practice of declaring policyholder

dividends in one year and then paying those dividends in the next year

to policyholders whose policies were still in force on the policy

anniversary date falling within the later year.  In an attempt to

accelerate a portion of their deductions for such dividends, the

- 1 -

companies adopted board resolutions in the years of declaration purporting to "guarantee" the payment of a portion of the declared dividends during the next year.  The issues presented on appeal are:

1.     Whether the CFC erred in holding that the dividend guarantees established the fact of liability for payment of the specified amounts under the all-events test of federal income tax law.

2.     Whether the CFC erred in holding that policyholder dividends qualify for the "recurring item" exception to the economic-performance requirement of 26 U.S.C. ("I.R.C." or "Code") § 461(h) as "rebate[s], refund[s], or similar payment[s]" within the meaning of 26 C.F.R. ("Treas. Reg.") § 1.461-4(g)(3).

## STATEMENT OF THE CASE

### A.     Overview

This is a tax refund case under I.R.C. § 7422.  After a 2-day trial, the CFC ruled in favor of the taxpayers (two life insurance companies), holding that they had properly claimed deductions for certain policyholder dividends in the years they were declared rather than in the succeeding year of payment.  (A3-85.)  *See Massachusetts Mutual Life Ins. Co. v. United States*, 103 Fed. Cl. 111 (2012).  The court

11131499.1

ultimately entered a judgment reflecting approximately $86 million of overpaid tax. (A1-2.)

## B.     Factual backdrop

MassMutual is a mutual life insurance company, as was ConnMutual prior to its merger into MassMutual on February 29, 1996. (A451.)  Mutual insurance companies have no stockholders; instead, they are owned by, and are operated for the benefit of, their policyholders, who elect the board of directors. (A452, 897-898.)

Mutual life insurance companies, like "stock" life insurance companies, issue both participating and non-participating policies. (A392.)  A participating policy entitles the holder to share in any divisible surplus of the company. (A691.)  "Divisible surplus" is the portion of the company's surplus – which in turn is defined generally as the excess of the company's assets over its reserves and other liabilities, determined annually – that the board of directors approves for distribution to participating policyholders in the form of policyholder dividends. (A690.)  Divisible surplus is allocated among the policyholders in accordance with a "dividend scale" developed by the

11131499.1

company's management and actuaries and approved by the board. (A452.)

Life insurance companies generally declare policyholder dividends near the end of one year for payment in the next year. (A453.) The dividends are paid to participating policyholders whose policies are in force on the policy anniversary date falling within the year of payment. (A453.) In order for a policy to be in force on its anniversary date, the premiums on the policy must be paid through that date. (A453.) A policy is no longer in force after it is surrendered (*i.e.*, for its cash value), even if the surrendering policyholder had previously paid the premiums on the policy to a date beyond the surrender date (*e.g.*, to the date that would have been the next anniversary date of the policy). (A1352-1353.)

Although MassMutual and ConnMutual followed industry practice in declaring policyholder dividends for a given year in the latter part of the preceding year, MassMutual actually paid or credited[1] policyholder dividends a month in advance of the policy anniversary date (the "cut-

---

[1] A policyholder dividend may be "credited," for instance, against the next year's premium on the policy. (A453.)

- 4 -

11131499.1

off date").[2]  (A1196.)  Accordingly, for policies with January anniversary dates, MassMutual paid or credited the annual dividend in December of the (preceding) year of declaration.  (A1196.)

## C.  Statutory and regulatory backdrop

Life insurance companies are entitled to deduct policyholder dividends in computing their taxable income for federal tax purposes. I.R.C. §§ 801(b), 804(1), 805(a)(3).  Prior to 1984, companies were allowed to take into account year-end reserves for policyholder dividends payable in the following year in determining the amount of the current-year deduction.  *See* 26 U.S.C. § 811(b)(1) (1982).  Under revisions to the statutory scheme enacted in 1984, however, policyholder dividends payable after the close of the current year are deductible in the current year only to the extent they have "accrued" as of the close of that year.  I.R.C. § 808(c).

---

[2] In essence, MassMutual treated the cut-off date as the policy anniversary date.  Thus, if a policyholder surrendered his policy in the interim between the cut-off date and the anniversary date, MassMutual did not seek to recoup the just-paid dividend from the surrendering policyholder.  (A1196.)

- 5 -

As a general matter, an obligation accrues when (1) all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy (the "all-events test"), and (2) "economic performance" occurs with respect to the obligation. I.R.C. § 461(h)(1), (4). In the case of payment obligations described in paragraphs (g)(2) through (g)(7) of Treas. Reg. § 1.461-4, economic performance generally is deemed to occur when payment is made to the person to whom the obligation is owed. *See* Treas. Reg. § 1.461-4(g)(1)(i). Under this general rule, then, such payment obligations ("paragraph (g) liabilities") are not accruable prior to the year of payment. If, however, a paragraph (g) liability qualifies for the "recurring item" exception to the economic-performance requirement, it is deemed to accrue in the year in which it satisfies the all-events test, but only to the extent it is paid during the first 8-½ months of the following year. *See* I.R.C. § 461(h)(3); Treas. Reg. § 1.461-5(b)(1)(ii). Paragraph (g) liabilities include, *inter alia*, "rebate[s], refund[s], or similar payment[s]," Treas. Reg. § 1.461-4(g)(3), and "[o]ther liabilities," Treas. Reg. § 1.461-4(g)(7). The former are eligible for the recurring-item exception; the latter are not. *See* Treas. Reg. § 1.461-5(c).

- 6 -

The 1984 legislation that eliminated the reserve method of
accounting for policyholder dividends also included a "fresh start"
provision, pursuant to which companies were granted relief from the
rule that would normally require them to "recapture" their existing
reserves as income.  Deficit Reduction Act of 1984, Pub. L. No. 98-369,
§ 216(b), 98 Stat. 494, 758 ("1984 Act"); *see* I.R.C. § 481.  In 1986,
however, Congress effectively nullified the benefit of the fresh-start
provision for companies that, in response to the new accrual
requirement, "change[d]…[their] business practices" in order to accrue –
and therefore accelerate the deduction for – policyholder dividends
payable after the close of the taxable year on existing (*i.e.*, pre-1984)
policies.[3]  *See* I.R.C. § 808(f).  The relevant committee reports cited
"guaranteeing of policy dividends on termination" as one example of a
"change[ ] in business practices that would result in an accelerated

---

[3] Although the economic-performance requirement for accrual was
also enacted in 1984, most paragraph (g) liabilities (which would
include policyholder-dividend obligations (A1000)) incurred prior to
1992 were not subject to that requirement and therefore did not have to
satisfy the recurring-item exception thereto in order to be deductible
prior to the year of payment. *See Gold Coast Hotel & Casino v. United
States*, 158 F.3d 484, 487 n.5 (9th Cir. 1998) (citing Treas. Reg. § 1.461-
4(k)(3)); *see also* I.R.C. § 461(h)(2)(D).

- 7 -

11131499.1

policyholder dividends deduction" (thus triggering the 1986 "clawback"
provision). H.R. Rep. No. 99-426, at 947 (1985); S. Rep. No. 99-313, at
966 (1986) (A795); *see Nat'l Life Ins. Co. and Subs. v. Commissioner*,
103 F.3d 5, 6 (2d Cir. 1996) (explaining that, under the taxpayer's
practice of guaranteeing dividends on termination, "if a policy
terminated three months before the anniversary date…, the
policyholder would be entitled to seventy-five percent (*i.e.*, nine-
twelfths) of the dividend for that policy year").

    The 1984 legislation also added former section 809 to the Code.
1984 Act § 211(a), 98 Stat. at 720, 733. Under that provision, mutual
life insurance companies were required to reduce their deduction for
policyholder dividends by the "differential earnings amount," which was
determined by multiplying the company's "average equity base" for the
year by the "differential earnings rate" for the year. 26 U.S.C.
§ 809(a)(1), (3) (2000). In simplified terms, mutual companies were
adversely affected by former section 809 only if the industry-wide
average earnings rate for domestic mutual companies for the year was

- 8 -

less than approximately 90 percent of a rolling average of the earnings rates of the 50 largest domestic stock life insurance companies.[4]

### D. The dividend guarantees

#### 1. Background

In early 1995, MassMutual began exploring strategies for accelerating its policyholder-dividend deductions from the year of payment to the prior year of declaration (*i.e.*, strategies for "accruing" declared dividends in the year of declaration).[5] (A250-251.) In particular, the company considered an "individual pro rata dividend guaranty on termination" – a method recognized in the 1986 legislative

---

[4] The differential earnings rate was equal to the excess of the "imputed earnings rate" for the year over a provisional "average mutual earnings rate" (which was subject to recomputation when the actual "average mutual earnings rate" for the year could be determined). *See* 26 U.S.C. § 809(c)(1), (e), (f)(3) (2000). Formulaically, the imputed earnings rate was fixed at approximately 90.55 percent of the "current stock earnings rate," *i.e.*, 90.55 percent of the aforementioned rolling average. *See* 26 U.S.C. § 809(d) (2000); *John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d 1302, 1303-1304 (Fed. Cir. 2004).

[5] As indicated *supra* at pp. 4-5, for policies with January anniversary dates, MassMutual actually paid or credited the annual dividend in December of the (preceding) year of declaration. Per I.R.C. § 808(c), MassMutual deducted those dividends in the year in which they were paid, and the timing of those deductions is not at issue in this case. (A29 n.11, A1201.)

- 9 -

11131499.1

history as achieving partial accrual, *see supra* pp. 7-8 – and an

"aggregate dividend guaranty." (A267.) Under the individual approach,

the company would change its current practice by paying surrendering

policyholders a pro rata portion of the dividends they would have

received had they continued to hold their policies through the next

policy anniversary date. (A250.) *See National Life*, 103 F.3d at 6.

Under the aggregate approach, "[n]o guarantee [would be] made to any

individual policyholder;" instead, the company would guarantee that a

specified portion of the dividends declared at the end of a given year

"would, in the aggregate, be paid to policyholders" in the next year.

(A285.) The amount guaranteed would be an amount that, based on

MassMutual's historical policy-termination (or "lapse") rates of 5 to 6

percent, "would be virtually certain [to] be paid in any event," *i.e.*, even

without the guarantee. (A285, 1202-1203, 1395.)

    MassMutual ultimately chose the aggregate approach and

implemented it in late 1995 for 1996 dividends. (A456.) In order to

avoid the possible implication of I.R.C. § 808(f) (the "clawback"

provision applicable to accelerated dividends on pre-1984 policies), the

company decided to limit the guarantee to dividends payable on policies

- 10 -

issued after 1983. (A286, 1202.) ConnMutual, in consultation with MassMutual (with whom it had already agreed to merge), adopted essentially the same plan, also in late 1995. (A12-13, 270, 297, 1343.)

### 2. Adoption of the December 1995 dividend guarantees

In October 1995, MassMutual's board approved a dividend scale resulting in an apportionment of $517.3 million of annual dividends to its participating policies for 1996 ("1996 dividend scale"). (A211, 456.) To calculate the amount of 1996 dividends to be "guaranteed," the company determined the portion of the declared amount that was allocable to post-1983 policies ($217.3 million), multiplied that portion by 85 percent, and rounded up the resulting amount ($184.7 million) to $185 million. (A456.) The 85-percent figure was chosen so that, in light of its historical lapse rates, MassMutual could be "virtually certain that the guarantee c[ould] be met with no actual additional cost to the company," *i.e.*, through normal payment of the declared annual dividends during the following year. (A287.) As MassMutual's chief actuary explained, because only about one-third of the policy lapses that occur during a given year occur prior to the policy's anniversary date for that year (thereby rendering the policyholder ineligible for that year's

- 11 -

annual dividend), it would have taken a lapse rate of at least 45 percent to prevent MassMutual from paying at least 85 percent of the declared annual dividends in the ordinary course of business. (A1394.) When asked whether he could think of any factual scenario in which lapse rates would be high enough to result in such a shortfall, one of MassMutual's expert witnesses posited a "total breakdown of our financial system" or "a nuclear war." (A1507-1508.)

MassMutual's board adopted the dividend guarantee in December 1995, pursuant to which the company

> absolutely and irrevocably commit[ted] and guarantee[d] that, of the total apportionment from its surplus funds for [1996],…it will pay or cause to be applied during 1996, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $185 million;….

(A214.) The "Terms of the Annual Dividend Guarantee" adopted by the board provided in relevant part as follows (A216-217):

> 4.1. During each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall pay or apply annual policyholder dividends to its policyholders in accordance with its usual practices and procedures. The Company's adoption of an Annual Dividend Guarantee for any year shall not affect any individual policyholder's right to receive, or the Company's obligation to pay or apply, the annual policyholder dividend otherwise due

11131499.1

to that individual policyholder on the applicable anniversary date.

 4.2. Prior to December 31st of each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall determine whether it actually has paid or applied annual policyholder dividends with respect to post-1983 policies in an amount at least equal to the specified amount of Guaranteed Dividends.

  * * *

 4.4. If the amount of Guaranteed Dividends specified exceeds the amount of annual policyholder dividends that the Company actually has paid or applied during the year (plus the amount that the Company determines will be paid or applied through December 31st of the year) with respect to post-1983 policies, then the Company shall be obligated to pay or apply an additional amount of policyholder dividends, equal to such excess, with respect to post-1983 policies.

 4.5. Such excess shall be apportioned among the post-1983 policies still in force in proportion to the annual policyholder dividends otherwise paid or applied with respect to such policies during the year.

  * * *

ConnMutual's board approved the company's 1996 dividend scale in November 1995, resulting in an apportionment of $302.5 million of annual dividends to its participating policies for 1996.  (A200, 454.)  To calculate the amount of its "Tax Guarantee," the company determined the portion of the declared amount that was allocable to post-1983 policies ($114.9 million), multiplied that portion by 85 percent, and

- 13 -

rounded the resulting figure down to $97 million.  (A455.)  The wording
of ConnMutual's dividend guarantee, adopted by its board in December
1995 for 1996 dividends, was substantially similar to that of
MassMutual's dividend guarantee.  (A13, 203-207.)

### 3.    Strategic disclosure to state regulators

Although Bill Fisher, an in-house attorney at MassMutual
specializing in insurance regulatory matters, concluded that there was
no need to disclose the dividend guarantee to the Massachusetts
Division of Insurance ("DOI") or to seek DOI's approval, MassMutual
decided to "send them a letter informing them" of the guarantee "[f]or
tax purposes," *i.e.*, to "buttress[ ] [the] argument that the guaranty is
meaningful."  (A258, 265, 276, 1351-1352.)  MassMutual also prepared a
letter "that the DOI might send us in response."  (A279.)  First,
however, MassMutual representatives met with DOI representatives to
"discuss the reasons for the dividend acceleration" and to see "how
[they] would react to [the] letter."  (A279, 457.)  At the meeting, the
MassMutual representatives "explained that the company was adopting
the guarantee for federal income tax purposes."  (A457.)  That
explanation is consistent with an internal MassMutual memo stating

- 14 -

that "[t]he sole purpose behind the guarantee is to allow MassMutual to 'accrue' a portion of the guaranteed dividends for tax purposes." (A266.)

Shortly after the meeting with the state regulators, MassMutual sent a letter to Kevin McAdoo of the DOI regarding "the final version of the draft letter that we discussed with you at our recent meeting." (A218.) One day later, McAdoo signed and returned (on DOI letterhead) the acknowledgment letter drafted by MassMutual. (A224.) MassMutual did not disclose the dividend guarantee in its annual statement for the year, nor did it disclose the guarantee to its field (sales) force or its policyholders. (A1353-1354.)

ConnMutual disclosed its dividend guarantee to its state (Connecticut) regulators in a letter discussing several matters. (A208-209.) The letter states that ConnMutual and MassMutual were adopting the dividend guarantees "[a]s a measure to provide further assurance to our respective policyholders regarding the financial strength and strategic benefits generated by the merger." (A209.) Aside from a one-sentence reference in a footnote in its 1995 annual statement filed with its regulators, however, ConnMutual did not disclose the guarantee to its field force or its policyholders. (A210,

- 15 -

1353-1354.)  The footnote, after stating that "[d]ividends are not guaranteed per policy terms," provides that "[t]he Board of Directors has further guaranteed that in 1996, a total of no less than $97.0 million will be paid or applied in the aggregate as dividends on certain life insurance and annuity contracts issued before January 1, 1996."  (A210.)

### 4. Subsequent dividend guarantees

In October 1996, MassMutual's board approved a dividend scale resulting in an apportionment of $877.3 million of annual dividends to its participating policies for 1997 ("1997 dividend scale").  (A225-226, 458.)  To calculate the amount of 1997 dividends to be "guaranteed," the company determined the portion of the declared amount that was allocable to post-1983 policies ($365 million), multiplied that portion by 85 percent, and rounded the resulting figure down to $310 million.  (A458.)  The December 1996 board resolution "guaranteeing" that amount, as well as the "Terms of the Annual Dividend Guarantee" adopted by the board at that meeting, are substantially identical to their December 1995 counterparts.  (A14, 230-232, 458.)

- 16 -

Shortly after the December 1996 board action, MassMutual sent a disclosure letter to Mr. McAdoo of the DOI that was similar to the December 1995 disclosure letter.  (A233.)  The letter explained that the significant increase in the amount of the guarantee as compared to the prior year was primarily attributable to the intervening merger of ConnMutual into MassMutual.  (A233.)  Instead of sending an acknowledgment letter back to MassMutual, McAdoo faxed back a copy of MassMutual's letter bearing the stamp "APPROVED."  (A237.)  The fax cover sheet states:  "Just wanted to give you a 'piece of paper' for your file.  If this approval is inadequate, let me know and we can do a letter."[6]  (A236.)  MassMutual did not disclose the December 1996 dividend guarantee in its annual statement for the year, nor did it disclose the guarantee to its sales force or its policyholders.  (A1353-1354.)

In October 1997, MassMutual's board approved a dividend scale resulting in an apportionment of $939 million of annual dividends to its

_____

[6] McAdoo testified that he did not mean to signify approval of the dividend guarantee, but rather acknowledgement of his receipt of the letter.  (A546, 557.)

11131499.1

participating policies for 1998 ("1998 dividend scale"). (A238-239, 459.) To calculate the amount of 1998 dividends to be "guaranteed," the company determined the portion of the declared amount that was allocable to post-1983 policies ($425.3 million), multiplied that portion by 85 percent, and rounded the resulting figure down to $360 million. (A460.) The December 1997 board resolution "guaranteeing" that amount, as well as the "Terms of the Annual Dividend Guarantee" adopted by the board at that meeting, are substantially identical to their December 1995 and December 1996 counterparts. (A16, 243-245, 459-460.)

Shortly after the December 1997 board action, MassMutual sent a disclosure letter to Robert Dynan of the DOI that was similar to the December 1995 and December 1996 disclosure letters. (A246.) Although the record does not contain any response by Dynan to the December 1997 letter, he noted on similar MassMutual disclosure letters for later years that "[t]his was done for tax reasons." (A594-595, 609.) MassMutual did not disclose the December 1997 dividend guarantee in its annual statement for the year, nor did it disclose the guarantee to its sales force or its policyholders. (A1353-1354.)

- 18 -

### 5.   Actual payment of dividends on post-1983 policies

MassMutual and ConnMutual actually paid or credited, in the aggregate, $319.8 million of annual dividends with respect to post-1983 policies under their respective 1996 dividend scales, including $196.4 million paid or credited between January 1, 1996 and September 15, 1996.  (A460-462.)  The aggregate total, $319.8 million, was approximately 96.27 percent of the aggregate amount allocated to post-1983 policies under the 1996 dividend scales, and exceeded the aggregate "guaranteed" amount by $37.8 million.  (A455-456, 462.)

MassMutual actually paid or credited $354.7 million of annual dividends with respect to post-1983 polices under its 1997 dividend scale, including $204.25 million paid or applied between January 1, 1997 and September 15, 1997.  (A461-462.)  The total amount paid or applied, $354.7 million, was approximately 97.18 percent of the amount allocated to post-1983 policies under the 1997 dividend scale, and exceeded the "guaranteed" amount by $44.7 million.  (A458, 462.)

MassMutual actually paid or credited $415.1 million of annual dividends with respect to post-1983 polices under its 1998 dividend scale, including $238.6 million paid or applied between January 1, 1998

- 19 -

11131499.1

and September 15, 1998.  (A461-462.)  The total amount paid or applied, $415.1 million, was approximately 97.6 percent of the amount allocated to post-1983 policies under the 1998 dividend scale, and exceeded the "guaranteed" amount by $55.1 million.  (A460, 462.)

### E.    Tax reporting

In determining its 1995 taxable income, MassMutual treated the $118,975,383 of annual dividends that it paid between January 1, 1996 and September 15, 1996 with respect to post-1983 policies as having accrued in 1995 by virtue of its December 1995 dividend guarantee and the recurring-item exception to the economic-performance requirement of I.R.C. § 461(h).  (A461.)  Accordingly, MassMutual included that amount in the deduction for policyholder dividends it claimed on its 1995 return.  (A461.)  In determining ConnMutual's 1995 taxable income (*i.e.*, as successor to ConnMutual), MassMutual likewise treated the $77,425,125 of annual dividends paid between January 1, 1996 and September 15, 1996 with respect to post-1983 policies issued by ConnMutual as having accrued in 1995 by virtue of ConnMutual's December 1995 dividend guarantee and the recurring-item exception. (A460-461.)  Accordingly, MassMutual included that amount in the

- 20 -

deduction for policyholder dividends it claimed on ConnMutual's 1995 return. (A461.)

In determining its 1996 taxable income, MassMutual treated the $204,255,392 of annual dividends that it paid between January 1, 1997 and September 15, 1997 with respect to post-1983 policies as having accrued in 1996 by virtue of its December 1996 dividend guarantee and the recurring-item exception. (A461.) MassMutual included the amount by which the 1996 accrual exceeded the combined MassMutual-ConnMutual 1995 accrual – representing an increase of $7,854,784 – in the deduction for policyholder dividends it claimed on its 1996 return. (A461.)

In determining its 1997 taxable income, MassMutual treated the $238,628,598 of annual dividends that it paid between January 1, 1998 and September 15, 1998 with respect to post-1983 policies as having accrued in 1997 by virtue of its December 1997 dividend guarantee and the recurring-item exception. (A461.) MassMutual included the amount by which the 1997 accrual exceeded the 1996 accrual – representing an increase of $34,373,306 – in the deduction for policyholder dividends it claimed on its 1997 return. (A461.)

11131499.1

## F.    IRS disallowance

After auditing MassMutual's 1995-1997 returns and

ConnMutual's 1995 return, the IRS proposed adjustments based in part

on its determination that, notwithstanding the dividend guarantees, the

companies were not entitled to accrue in those years annual

policyholder dividends paid in the succeeding years.  (A1027, 1029.)

MassMutual, acting on its own behalf and as successor to ConnMutual,

ultimately waived the applicable restrictions on assessment and

collection for the years at issue but reserved the right to seek refunds.

(A1027-1028, 1030.)  It then timely filed the requisite administrative

refund claims, which the IRS largely denied (in the case of the

ConnMutual claim) or failed to act upon (in the case of the MassMutual

claims).  (A1028, 1031.)

## G.    Proceedings below

Having exhausted its administrative remedies, MassMutual

timely filed suit on its refund claims in the CFC.  Although the

complaint included additional years and issues, MassMutual

subsequently filed an amended complaint limited to the dividend-

accrual issue and certain computational issues.  (A1024-1041.)  In a pre-

11131499.1

trial joint filing, the parties described the dividend-accrual issue as
comprising two sub-issues: (1) Whether the dividend guarantees
established, for federal income tax purposes, the fact of the companies'
liability to pay the specified amounts in the succeeding years; and
(2) whether the policyholder dividends at issue constituted "rebate[s],
refund[s], or similar payment[s]" within the meaning of Treas. Reg.
§ 1.461-4(g)(3) so as to qualify for the recurring-item exception to the
economic-performance requirement of I.R.C. § 461(h). (A102-103.) The
court heard testimony over two days in December 2009 and heard
closing arguments in May 2010.

**1.    The parties' main arguments**

Regarding the efficacy of the dividend guarantees, MassMutual
argued that they "defined a group of policyholders that, in the
aggregate, were entitled to receive the [guaranteed amount] in the
following year," *viz.*, the "more than 100,000 policyholders [who] had
already paid their premiums through their next anniversary date in the
following year." (A657-658.) It further argued that "courts have held
that a resolution of a company's board of directors…can establish the
fact of a liability" for these purposes. (A658.) Regarding the "rebate or

11131499.1

refund" issue, it argued that "[c]ourts, including the Federal Circuit, have long recognized that mutual insurance company policyholder dividends are rebates of premiums." (A669.) It further asserted that the dividends at issue "are treated as returns of premium" "for individual income tax purposes," since policyholder dividends "are generally not treated as income to policyholders…[under I.R.C. § 72(e)] until… aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder (the "cross-over point')," and "no policies covered by [the] dividend guarantees had reached the cross-over point during the years before the Court." (A670.)

The Government attacked the dividend guarantees on multiple fronts. First, it argued that the guarantees had no economic effect and no non-tax business purpose, and therefore must be disregarded for tax purposes under the economic-substance doctrine of federal tax law. (A714-727.) Next, it argued that, even if they are respected for tax purposes, each guarantee was contingent on the payment of the declared annual dividend on at least one post-1983 policy during the next year, which in turn was contingent on at least one post-1983 policy remaining in force on its anniversary date in that year – a condition

- 24 -

precedent that, regardless how statistically certain its occurrence was at the close of the year in which the guarantee was adopted, could not in fact occur until the following year.  (A728-734.)  Finally, the Government argued that the guarantees did not give rise to true obligations at all (contingent or otherwise), since the companies did not communicate them to their policyholders, and the state regulators likely would not have enforced them.  (A742-748.)

On the classification issue, the Government argued that policyholder dividends are not "rebate[s], refund[s], or similar payment[s]" within the meaning of Treas. Reg. § 1.461-4(g)(3), but rather are "a return of a share of the profits that result from the company's favorable experience."  (A752.)  It noted that the cases cited by MassMutual suggesting otherwise did not involve the regulation at issue, and that, in any event, other cases (likewise arising in different contexts) recognize that "policyholder dividends are not mere rebates or refunds of premiums."  (A751-752.)  Regarding the tax rules that allow policyholders to apply dividends against their tax basis before recognizing any income, the Government asserted that "[a] recovery of tax basis is not a refund or a rebate in the usual sense."  (A753.)

- 25 -

## 2. Supplemental briefing on former I.R.C. § 809

At the request of the court, the parties filed supplemental briefs in August 2010 addressing, *inter alia*, the relevance of former I.R.C. § 809[7] and its legislative history to the "rebate or refund" issue. (A890-891.) The parties essentially agreed that former section 809 "disallowed a portion of the mutual companies' policyholder-dividend deductions on the theory that it was analogous to a return on equity, like the nondeductible dividends paid to the shareholders of stock companies." (A914; *see* A896.) As MassMutual noted, however, "[i]n practice, the required calculations under Code section 809 rarely resulted in a reduction of mutual life insurance companies' policyholder dividends deductions," which, according to MassMutual, "implied that [the return on equity] component was insignificant at best." (A901.)

The Government argued that, notwithstanding the theoretical underpinnings of former section 809, Congress "never believed that a [mutual company policyholder] dividend's components could be separated or that former Code § 809 would separate them in a way that

---

[7] *See* pp. 8-9 & note 4, *supra*.

11131499.1

reflected economic reality." (A915.) Instead, the provision was "designed to produce a politically desired allocation of the overall life insurance company tax burden between the stock and mutual segments of the industry." (A918 n.9 [internal quotation marks omitted].) Accordingly, the fact that former section 809 did not reduce mutual companies' deductions for policyholder dividends in 1995, 1996, or 1997 did not support MassMutual's inference that no portion of the dividends at issue represented a return on equity. (A914-915.)

### 3. Issuance of the district court's opinion in *New York Life*

In April 2011, the District Court for the Southern District of New York issued its opinion in *New York Life Ins. Co. v. United States*, 780 F. Supp. 2d 324 (S.D.N.Y. 2011), another case involving the timing of deductions for policyholder dividends.[8] As is most relevant to this case, the court there held that annual policyholder dividends paid in January (*i.e.*, on policies with January anniversary dates) but "credited" to the policyholders' accounts in December of the preceding year were not

---

[8] The Second Circuit affirmed *New York Life* after the court issued its opinion in this case. *See* pp. 47-54, 56-58, *infra*.

11131499.1

deductible until the year of payment.[9]  The court observed that, "under the terms of the Policies, even if a policyholder had paid all premiums due, New York Life had no obligation to pay him an Annual Dividend if he surrendered the Policy on the day before the Policy anniversary." *Id.* at 328.  The court further stated that "[t]he Second Circuit has firmly rejected the position that a company's internal recordkeeping practices can fix liability for purposes of the all events test." *Id.*

### 4.  The CFC's opinion

The CFC ruled in favor of MassMutual on both the "fixed liability" issue and the "rebate or refund" issue.  Regarding the former, the court stated that, "[f]or the group of policyholders with paid-up policies, no event but the passage of time would occur before those policyholders would receive their annual dividend and, thus, be eligible for the minimum guaranteed dividends."  (A35.)  "Therefore," the court reasoned, "plaintiff's Dividend Guarantees did not impose conditions precedent on the payment of the guaranteed amount of policyholder dividends."  (A37.)  The court noted the *New York Life* decision but

---

[9] In this context, the words "paid" and "credited" clearly are not synonymous. *Cf.* note 1, *supra.*

11131499.1

declined to follow it. (A37 n.16.) As for the circumstances under which the dividend guarantees were adopted, the court stated that "it does not appear…from the case law" that "notice of a Board's resolutions" – *i.e.*, disclosure to the intended beneficiaries – is "an important element for consideration." (A38.) The court also remarked that, "[a]lthough the [Government] raised the possibility that plaintiff's regulators might have been unlikely to enforce the dividend guarantees," the Government "does not demonstrate how this would prevent plaintiff from establishing the fact of liability." (A40.)

Turning to the "rebate or refund" issue, the court first looked to dictionary definitions, which, in its estimation, "support plaintiff's view that a return of premium would be considered a rebate." (A61.) It then concluded that "[t]he industry view," in turn, "supports the plaintiff's position that policyholder dividends are a return of premium." (A62.) The court also found it significant that the Federal Circuit "has addressed policyholder dividends in other contexts and used the term rebates." (A65.) Since "none of plaintiff's policyholder dividends deductions were ultimately reduced for the tax years at issue under [former I.R.C.] § 809," it followed, the court reasoned, that "plaintiff's

- 29 -

policyholder dividends are in the nature of the price rebates identified by the Federal Circuit." (A71.) The court also deemed that conclusion to be consistent with the tax treatment of policyholder dividends from the recipient's standpoint under I.R.C. § 72(e). (A71-74.) *See* p. 24, *supra*.

In a final passage, the court rejected the Government's argument that the dividend guarantees should be disregarded for tax purposes under the economic-substance doctrine. (A75-84.) The court noted that "[b]ecause the issue in plaintiff's case is the timing of when to take the deductions, the case is unique from transactions that typically raise economic substance concerns, or regarding alleged sham transactions." (A80.)

This appeal followed.

## SUMMARY OF ARGUMENT

In 1984, Congress eliminated the means by which life insurance companies had deducted policyholder dividends in the year prior to payment – the reserve method – in favor of the stricter "accrual" standard. Congress understood that, in order to accelerate any of their policyholder-dividend deductions under the new law, insurers would

- 30 -

have to change their business practices from the prevailing "all or nothing" industry custom, pursuant to which the insurer has no obligation to pay any portion of the annual dividend allocated to a policy if the policy is surrendered for its cash value prior to the dividend payment date. MassMutual and ConnMutual, however, sought to accelerate a large portion of their annual policyholder-dividend deductions without having modified the "all or nothing" paradigm one whit. The CFC's validation of this flouting of congressional intent is erroneous on multiple grounds.

1.     The means employed by the companies to end-run the 1984 Act – so-called aggregate dividend "guarantees" – failed to accomplish their purpose by their very terms. Because each company's aggregate dividend "obligation" under the guarantees was entirely derivative of its individual dividend obligations to the relevant policyholders, the group obligation could not have been fixed (and therefore accruable) at year-end unless at least one individual obligation was likewise fixed at that time. Although the CFC held that the companies' obligations to pay the declared annual dividends were fixed at year-end with respect to each policy that, as of December 31, was paid-up through the following year's

- 31 -

dividend payment date, that holding misapprehends the significance –

in terms of the controlling all-events test – of the fact that neither

company was under any obligation to pay the dividend unless the policy

remained in force on (*i.e.*, was not surrendered for its cash value prior

to) that date.  The CFC's holding cannot be reconciled with the Supreme

Court's most recent pronouncement on the all-events test, and it is

directly contrary to the Second Circuit's reasoning in its recent

affirmance of the district court's decision in *New York Life*.  Indeed, if

the CFC's holding were correct, then the companies would have been

entitled to accelerate their deductions for dividends payable on the

paid-up policies cited by the CFC without regard to any dividend

guarantee, which MassMutual concedes is not the case.

2.     The dividend guarantees were also defective on a more

fundamental level:  they did not give rise to bona fide obligations in the

first place.  An undertaking expressed in a board resolution that is not

communicated to its intended beneficiaries can hardly be considered an

"obligation" in the ordinary sense of the word.  Nor did the companies'

contrived disclosure of the dividend guarantees to their state regulators

provide the missing substance.  Indeed, MassMutual undermined its

- 32 -

claim that such disclosure was meaningful – and that the guarantees themselves were meaningful – by emphasizing below the companies' near certainty that the guaranteed amounts would be distributed in the ordinary course of business, thus highlighting the corresponding unlikelihood that the state regulators would ever have occasion to "enforce" the guarantees. Because the companies were statistically certain that they would pay the guaranteed amounts without regard to any guarantee, those guarantees were illusory.

3.     Even if the dividend guarantees represented true obligations of the companies, and even if those obligations were fixed at year-end under the all-events test, the companies' quest for accelerated dividend deductions would founder on the shoals of the economic-performance requirement, which generally precludes the accrual of payment obligations prior to actual payment. In implementing the recurring-item exception set forth in the statute, the IRS provided relief for payments in the nature of rebates or refunds, and MassMutual claims that the policyholder dividends at issue fall under that category. The CFC, finding for MassMutual on this issue, failed to recognize that an agency's interpretation of its own regulation is entitled to deference.

- 33 -

Moreover, in interpreting the regulation, the CFC relied on legally irrelevant factors at the expense of the surrounding text of the regulation, the surrounding provisions in the regulatory scheme, and the history of its promulgation.

For the foregoing reasons, the decision of the CFC is wrong and should be reversed.

## ARGUMENT

### I

### The CFC erred in holding that the guarantees fixed the fact of liability under the all-events test

### Standard of review

Whether a trial court properly applied the all-events test presents a question of law that is subject to *de novo* review. *See In re Harvard Industries, Inc.*, 568 F.3d 444, 450 (3d Cir. 2009); *Interex, Inc. v. Commissioner*, 321 F.3d 55, 58 (1st Cir. 2003); *Gold Coast Hotel & Casino v. United States*, 158 F.3d 484, 487 (9th Cir. 1998); *Resale Mobile Homes, Inc. v. Commissioner*, 965 F.2d 818, 821 (10th Cir. 1992).

- 34 -

**A.  Assuming that the dividend guarantees gave rise to "obligations," such obligations were not fixed at year-end**

**1.  The obligations under the guarantees could be fixed at year-end only if the annual-dividend obligation with respect to at least one post-1983 policy was also fixed at that time**

Pursuant to the dividend guarantees, the companies undertook to guarantee that annual policyholder dividends paid during the following year with respect to post-1983 policies on their anniversary dates would amount to at least (roughly) 85 percent of the portion of divisible surplus that had been allocated to those policies.  The guarantees expressly provided, however, that they "shall not affect any individual policyholder's right to receive, or the Company's obligation to pay or apply, the annual policyholder dividend otherwise due to that individual policyholder on the applicable anniversary date."  (A216.) Thus, the group obligation under each dividend guarantee was entirely derivative of the company's obligation under individual post-1983 policies to pay declared annual dividends in the following year (the "annual-dividend obligation").  That is why, as MassMutual conceded below, a guarantee obligation could be "fixed" as of December 31 of the year in which the guarantee was adopted only if, on the same date,

- 35 -

there was an identifiable group of one or more holders of post-1983 policies with respect to which the annual-dividend obligation was likewise fixed.[10]  (A883-885.)

According to MassMutual, the requisite identifiable group each year consisted of holders of post-1983 policies with respect to which, as of December 31, the premium obligation had been satisfied at least through the following year's policy anniversary date ("paid-up policies").[11]  The Government, on the other hand, maintains that the annual-dividend obligation with respect to any such policy did not arise unless the policy remained outstanding on its next anniversary date, which would not occur if the policyholder chose to surrender the policy prior to that date for its cash surrender value.

---

[10] That the number and identities of the group members were likely to change over the course of the following year would not prevent the year-end accrual of the group obligation.  *See Washington Post Co. v. United States*, 405 F.2d 1279, 1284 (Ct. Cl. 1969); *see also* Rev. Rul. 2011-29, 2011-49 I.R.B. 824 (revoking a 1976 revenue ruling in which the IRS had stated that it would not follow *Washington Post*).

[11] We do not limit this term to post-1983 polices that were "paid-up" in the technical sense, *i.e.*, policies on which no further premiums were due for the life of the policy.

- 36 -

### 2. The annual-dividend obligation did not become fixed with respect to any policy until the policy's anniversary date in the following year

#### a. *Hughes Properties* and *General Dynamics*

The Supreme Court's most recent pronouncements on when a liability becomes fixed for purposes of the all-events test appear in two cases from the 1980s that were decided less than a year apart. *See United States v. Hughes Properties, Inc.*, 476 U.S. 593 (1986); *United States v. General Dynamics Corp.*, 481 U.S. 239 (1987). As demonstrated below, *General Dynamics* is the more apposite of the two cases.

In *Hughes Properties*, the Court held that the taxpayer-casino was entitled to deduct its annual incremental obligation with respect to "progressive" jackpots that, under Nevada law, it was required to pay out eventually. The Court rejected the Government's argument that the final "event" that fixed the casino's liability with respect to any such jackpot was the winning pull of the lever, holding instead that "the event creating liability…was the last play of the machine before the end of the fiscal year, since that play fixed the jackpot amount irrevocably." 476 U.S. at 602-603. Moreover, that "there existed no person who could

- 37 -

11131499.1

assert any claim to those funds" at the end of any particular year was irrelevant; "[t]he obligation is there, and whether it turns out that the winner is one patron or another makes no conceivable difference as to basic liability." *Id.* at 601, 602. Finally, the Court held that the "extremely remote and speculative possibility…that the jackpot might never be won" – because, for instance, "a casino may go out of business, or surrender or lose its license, or go into bankruptcy" – "does not prevent accrual," since it is "[t]he existence of an absolute liability [that] is necessary," not "absolute certainty that it will be discharged by payment." *Id.* at 601, 605-606 (internal quotation marks omitted).

In *General Dynamics*, the Court held that the taxpayer was not entitled to deduct additions to reserve accounts that reflected its obligation to reimburse medical expenses that, as of the close of the year, employees had incurred but had yet to seek reimbursement for by filing a claim. The Court "disagree[d] with the legal conclusion of the courts below that the last event necessary to fix the taxpayer's liability was the receipt of medical care by covered individuals," noting that the company was "liable to pay for covered medical services *only* if properly documented claims forms were filed." 481 U.S. at 244; *see id.* n.4 ("We

- 38 -

11131499.1

conclude that, as a matter of law, the filing of a claim was necessary to create liability."). This filing requirement was "not a mere technicality"; rather, it was "a true condition precedent to liability." *Id.* at 244 & n.5. Nor was the failure to file a claim "the type of 'extremely remote and speculative possibility'" that the Court had held in *Hughes Properties* "did not render an otherwise fixed liability contingent." *Id.* at 244-245. Stated in terms of the all-events test, "[m]ere receipt of services for which, in some instances, claims will not be submitted does not, in our judgment, constitute the last link in the chain of events creating liability." *Id.* at 245.

Whereas *Hughes Properties* establishes that a payment obligation need not be owed to an identifiable person – and need not be free from all doubt as to its ultimate satisfaction – in order to be fixed for purposes of the all-events test, *General Dynamics* establishes that a payment obligation is not necessarily fixed even though a potential obligee has taken some action that renders him preliminarily eligible to receive the payment, subject only to some other condition that is within his exclusive control. The instant case clearly fits the *General Dynamics* fact pattern; each potential obligee has taken some action

- 39 -

(payment of all premiums owing on the policy at least through its next
anniversary date) that renders him preliminarily eligible to receive the
payment (the declared annual dividend), subject only to some other
condition that is within his exclusive control (forgoing the right to
surrender the policy for its cash value prior to the next anniversary
date).  In contrast, the Government's grounds for disputing the fact of
the annual-dividend obligation with respect to paid-up policies do not
include the factors addressed in *Hughes Properties* – *viz.*, the lack of an
identifiable obligee or the possibility of default by the obligor.
Accordingly, *General Dynamics* provides the better frame of reference
for analyzing that obligation under the all-events test.

> **b.** **Like the claim-filing requirement in *General
> Dynamics*, the "in-force" requirement was a
> condition precedent to the annual-dividend
> obligation with respect to paid-up policies**

Under *General Dynamics*, if the remaining condition to the
annual-dividend obligation with respect to any given paid-up policy –
the requirement that the policy remain outstanding on its next
anniversary date – was "not a mere technicality," but instead was
"crucial to the establishment of liability," such that it was a "true
condition precedent," 481 U.S. at 244 & n.5, then the obligation did not

- 40 -

become fixed until that condition was satisfied.  While the distinction between conditions precedent, on one hand, and conditions subsequent (which excuse the performance of an already fixed obligation), on the other, can be a fine one, the law of contracts provides a practical rule-of-thumb:  If "it can be seen from the circumstances that the event must ordinarily occur before performance of the duty can be expected," then the event should be considered a condition precedent.  Restatement (Second) of Contracts § 224 cmt. e & illus. 8 (1981); *see id*. cmt. b (noting that "a duty may be conditioned upon the failure of something to happen rather than upon its happening, and in that case its failure to happen is the event that is the condition [precedent]."[12]

Although there undoubtedly are cases where it is difficult to determine whether "the event must ordinarily occur" (or not occur, as the case may be) "before performance of the duty can be expected," Restatement § 224 cmt. e, this is not one of them.  Nothing in the

---

[12] The Restatement does not use the terms "condition precedent" and "condition subsequent"; instead, conditions precedent are referred to as "conditions," and conditions subsequent "are dealt with in connection with the rules on discharge in § 230."  Restatement (Second) of Contracts § 224 reporter's note (1981).

11131499.1

participating policies at issue even remotely suggests that a

policyholder who had paid his premiums through the next policy

anniversary date could expect to receive the declared annual dividend if

he surrendered the policy for its cash value prior to that date. Nor did

the companies' business practices create any such expectation. To the

contrary, "it can be seen from the circumstances" of this case (*id*.) that

only if the policy was still outstanding on its anniversary date (or,

stated negatively, only if the policyholder had not surrendered the

policy for its cash value prior to that date) could performance of the

duty – *i.e.*, payment of the dividend – be expected. To paraphrase the

Court in *General Dynamics*, the mere advance payment of premiums on

policies that, in some instances, will be surrendered prior to the next

anniversary date does not constitute the last link in the chain of events

fixing the obligation to pay the declared annual dividend. *See* 481 U.S.

at 245.

### 3. The CFC's analysis does not withstand scrutiny

In holding that the annual-dividend obligation with respect to

paid-up policies was fixed at year-end, the CFC erroneously found (A37)

that the holders of those policies "were certain to receive the [declared

11131499.1

annual] dividend…subject only to the passage of time." The court's reference to "the passage of time" derives from *Burnham Corp. v. Commissioner*, 90 T.C. 953, 956 (1988), *aff'd*, 878 F.2d 86 (2d Cir. 1989), in which the Tax Court, explaining the concept of conditions precedent in the context of the all-events test, stated that "[a] taxpayer is…prevented from obtaining the benefit of a deduction for an expense that" is subject to a condition precedent, *i.e.*, for which "he has NO liability to pay until some event, other than the passage of time, occurs." *See* A32, 35. At issue in *Burnham* was the extent to which a taxpayer could accrue its obligation under a settlement agreement to make monthly payments for the longer of 4 years or the remainder of the claimant's life, which was actuarially projected as 16 years.[13] The Tax Court rejected the IRS's attempt to bifurcate the obligation into a fixed piece (the initial 4 years of payments) and a contingent piece (any additional payments), holding that the claimant's death was a condition subsequent that could only affect the amount of, rather than the fact of,

---

[13] The agreement pre-dated the enactment of the economic-performance requirement. *See* I.R.C. § 461(h)(2)(C)(ii).

11131499.1

the unitary obligation arising under the settlement agreement. 90 T.C. at 958.

Whatever one thinks of the Tax Court's implicit finding in *Burnham* that a survivorship condition to a payment obligation entails a mere "passage of time" for purposes of the all-events test (*i.e.*, is not a condition precedent that would preclude the obligation from being fixed),[14] the CFC's extension of that conceit to the "in-force" condition attending the annual-dividend obligation with respect to paid-up policies is untenable. Notably, the CFC did not directly address how its "passage of time" characterization of that condition could be reconciled with the fact that a holder of a paid-up policy could surrender the policy

---

[14] Compare *Burnham* with *Trinity Constr. Co. v. United States*, 424 F.2d 302, 305 (5th Cir. 1970) (holding that a company's contractual obligation to pay the six remaining annual premiums on its former employees' insurance policies was not currently deductible; since the obligation was "contingent on [the former employees] being alive at the due date of each of those remaining installments,…all of the events that would determine the fact of [the company's] liability…had not occurred"); *cf. Heidelberg Harris, Inc. v. Loebach*, 145 F.3d 1454, 1459 (Fed. Cir. 1998) (citing Restatement (Second) of Contracts § 224 cmt. b (1981) for the proposition that "'the mere passage of time, *as to which there is no uncertainty*, is not a condition [precedent]'") (emphasis added).

- 44 -

for its cash value prior to its anniversary date. That omission is particularly glaring when one considers that the court was not writing on a clean slate; just months earlier, the district court in *New York Life* had recognized that an "in-force" condition – whereby "even if a policyholder had paid all premiums due," there was "no obligation to pay him an Annual Dividend if he surrendered the Policy on the day before the Policy anniversary"– amounted to a condition precedent that precluded the accrual of the policyholder-dividend obligation at issue there. 780 F. Supp. 2d at 328.[15]

The fallacy of the CFC's conclusion that the annual-dividend obligation was fixed with respect to paid-up policies is borne out by its logical consequences. If that obligation were fixed at year-end, and the possibility that the policyholder would subsequently surrender the policy for its cash value prior to the next anniversary date were merely a condition subsequent, then it would follow that each company would be entitled to accrue that obligation at year-end (and deduct the

---

[15] After the Government notified the CFC of the district court's *New York Life* opinion, the CFC requested, and the parties provided, written submissions regarding the opinion and its effect on the fixed-liability issue. (A94-95, entries 91-96.)

11131499.1

dividend in that year) *without the need for any dividend guarantee.*  But
MassMutual acknowledges that the companies are not entitled to such
accelerated deductions – which, perforce, means that the obligation to
pay those dividends was not fixed at year-end for purposes of the all-
events test – independent of the dividend guarantees.  (A651, 1200.)
Indeed, without differentiating between policies that were paid-up
through their next anniversary date as of year-end and those that were
not, it candidly admitted below that, "absent a guarantee," it could not
deduct annual dividends until the year of payment because, prior to
that time, "it is not known which particular policies will be in force on
their next anniversary date."  (A651.)  If an obligation is not sufficiently
fixed to support its own deductibility, then it cannot be sufficiently fixed
to support a deduction by proxy, *i.e.*, by purportedly establishing an
identifiable group of "policyholders [who] were certain to receive the
[annual] dividend and, therefore, qualify for the guaranteed dividend."
(A37.)[16]

---

[16] *Cf. Eastman Kodak Co. v. United States*, 534 F.2d 252, 259-260
(Ct. Cl. 1976) (holding that company's payroll-tax obligation on properly
accrued year-end wages that were payable in the following year

(continued…)

11131499.1

### 4. In *New York Life*, the Second Circuit squarely rejected the argument advanced by MassMutual regarding the annual-dividend obligation *vis-à-vis* paid-up policies

#### a. Background of the case

As indicated above, the district court in *New York Life* addressed a dividend-accrual issue not long before the CFC decided this case.  The taxpayer there paid annual dividends on policy anniversary dates, but it credited policyholder accounts in advance of payment on the later of (1) 30 days before the anniversary date of the policy, or (2) the date by which all premiums necessary to keep the policy in force through the anniversary date had been paid.  780 F. Supp. 2d at 326; *see* note 9, *supra*.  At issue was whether the company was entitled to current-year deductions for dividends credited in December but paid in the following January, *i.e.*, dividends on policies with January anniversary dates ("January dividends").[17]

---

(…continued)
"became fixed and certain as an automatic consequence of the definite and legal obligation to pay the 'year-end' wages").

[17] In contrast, MassMutual's payment of annual dividends on policies with January anniversary dates actually occurred in the

(continued…)

11131499.1

Although the district court concluded that the company's obligation to pay the January dividends did not become fixed under the terms of the policies until the January anniversary dates, *see supra* p. 45, it remarked that the company "d[id] not argue…otherwise." 780 F. Supp. 2d at 328. The court then rejected what it understood to be the company's argument: that the act of crediting policyholder accounts in December was the act that fixed the obligation. In essence, the court held that, for purposes of the all-events test, the company's "internal recordkeeping practices" could not displace the terms of the policies themselves. *Id*. That is the aspect of the district court's opinion on which the CFC focused in concluding that the case before it required "a different result." (A37 n.16.)

After the CFC issued its opinion in this case, the Second Circuit affirmed the district court's decision in *New York Life*, and in so doing removed any doubt regarding the pertinence of that case to MassMutual's claim that the annual-dividend obligation with respect to

(…continued)
preceding December, and it deducted those amounts in the earlier year on that basis. *See* note 5, *supra*.

- 48 -

11131499.1

paid-up policies was fixed at year-end. *See New York Life Ins. Co. v. United States*, 724 F.3d 256 (2d Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3453, 3459 (U.S. Jan. 14, 2014) (No. 13-849). That is because the taxpayer in *New York Life* expressly argued on appeal that payment of the necessary premiums prior to year-end, rather than the crediting of policyholder accounts, was the event that fixed its obligation to pay the January dividends – precisely the argument advanced by MassMutual (and accepted by the CFC) in the context of the annual-dividend obligation with respect to paid-up policies. *See id*. at 263 n.10. In addition to rejecting that argument, the court distinguished its 1989 decision affirming *Burnham*, in which the court – in some unfortunate dicta – had expanded the scope of the Tax Court's reasoning far beyond the survivorship condition at issue in that case. *See Burnham Corp. v. Commissioner*, 878 F.2d 86, 88-89 (2d Cir. 1989).

### b. The Second Circuit's opinion

The court began by reviewing *Hughes Properties* and *General Dynamics* and noting the taxpayer's "assert[ion] that the last 'event' for purposes of the all-events test occurred when, in the taxable year, the January policyholders paid the final premium sufficient to keep their

policies in force through their anniversary dates in January." 724 F.3d at 263. That argument, the court observed, "overlooks that 'the last link in the chain of events creating liability'…did not occur until January of the following year," since "[n]owhere do the policies provide that New York Life is obligated to pay an Annual Dividend if a policyholder chooses to cash in her policy before the anniversary date." *Id.* (quoting *General Dynamics*, 481 U.S. at 245). In short, "[j]ust as the taxpayer [in *General Dynamics*] was 'liable to pay for covered medical expenses *only* if properly documented claims forms were filed,' 481 U.S. at 244,…so too was New York Life liable to pay the Annual Dividend *only* if a policyholder kept her policy in force through its anniversary date." 724 F.3d at 264.

In response to the taxpayer's argument that affirmance of the district court's decision would render the phrase "or accrued" in I.R.C. § 808(c) superfluous, the court remarked that one "need look no further than our decision in *National Life Insurance Co. v. Commissioner*, 103 F.3d 5 (2d Cir. 1996)," "[t]o see why this argument is unpersuasive." 724 F.3d at 264. As indicated *supra* at p. 8, the taxpayer there adopted a practice whereby "a policyholder who terminated her policy before its

11131499.1

anniversary date was nonetheless guaranteed and entitled to receive a pro rata monthly share of the annual dividend…provided that her premium payments were current at the date of termination." *Id.* This practice, the court observed, "demonstrates how a liability for policyholder dividends may 'accrue' under Section 808(c) and be deductible in advance of payment…without running afoul of the all-events test." *Id.* at 265.[18]

The court then turned its attention to *Burnham*. The *Burnham* court, having concluded that "[t]he Tax Court properly determined that the event necessary to fix the fact of Burnham's liability" to the claimant was the execution of the settlement agreement, went on to

---

[18] In a footnote, the court found the case before it "distinguishable – if at the margins" from the instant case based on its mistaken belief that the companies' annual-dividend obligations were similar to the one at issue in *National Life*. 724 F.3d at 265 n.12. The court appears to have been under the impression that any MassMutual or ConnMutual policyholder who had paid his premium through the next policy anniversary date was entitled to receive the annual dividend, *even if he later surrendered the policy prior to that date. See id.* But the CFC recognized that that was not the case, *see* A35 (referring to the "passage of time" required for actual payment of the dividend), and MassMutual has never claimed otherwise. (A250, 1352-1353.) In any event, the court added that, "[t]o the extent that the reasoning of the *Mass. Mutual* court is at odds with ours,…we respectfully disagree with that court's approach." 724 F.3d at 265 n.12.

11131499.1

express its "disagree[ment] with the Commissioner's argument that

Burnham's liability to [the claimant] past the first forty-eight months

depended on the occurrence of an event":

> We do not believe that [the claimant's] continued survival
> should be viewed as an "event" for purposes of the all events
> test. An "event," as we understand that word, is ordinarily
> something which marks a change in the status quo….Since
> [the claimant's] survival is merely a continuation of the
> status quo, we do not see it as an "event" in this context.…

878 F.2d at 88. This "status quo" gloss on the all-events test – which, to

our knowledge, has never been adopted by any other court (or any other

panel of the Second Circuit) – is ill-conceived; indeed, under the

*Burnham* court's novel approach, all obligations that are subject to

"earn-out" requirements would be fixed at the outset under the all-

events test on the theory that such requirements simply represent

maintenance of the status quo. *See id*. at 89 (expressing disagreement

with *Bennett Paper Corp. v. Commissioner*, 699 F.2d 450 (8th Cir.

1983));[19] *cf.* I.R.C. § 83(a), (c)(1), (h) (delaying service-provider's income

---

[19] *Bennett Paper Corp*. involved additions to a profit-sharing plan
that were determined in 1974 but actually contributed in 1975; if a
credited employee were no longer employed on the contribution date,
his portion would revert to the company. The court held that the
company could not deduct the additions in 1974, since its "liability is

(continued…)

11131499.1

inclusion – and service-recipient's corresponding deduction – where the service-provider's "rights to full enjoyment of [property transferred by the service-recipient] are conditioned upon the future performance of substantial services").

Not surprisingly, the taxpayer in *New York Life* "seize[d] upon [the "status quo"] language [in *Burnham*] and argue[d] that, with respect to its dividend accrual for January policyholders, once a policyholder paid her final premium, mere continuation of the status quo would result in the company's liability for the Annual Dividend." 724 F.3d at 265. The court, charitably distinguishing this aspect of *Burnham* rather than disavowing it as dicta, stated in relevant part:

> [W]e see New York Life's liability for the Annual Dividend as depending upon an actual *choice* by the third-party policyholder: her decision not to redeem her policy for cash, for example, and invest her money elsewhere. In *Burnham*, by contrast, no third-party choice was at issue; the payee's survival was hardly a result of a choice, at least not in any ordinary sense. Even acknowledging that many New York Life policyholders might not daily or monthly reevaluate whether to surrender their policy, a significant decision is

(…continued)
not fixed until all the conditions for payment are met, including the employee remaining an employee until payment is made." 699 F.2d at 453.

- 53 -

> committed to them.  Thus, the mere "continuation of the status quo" at issue in *Burnham* is unlike continuation of the status quo for New York Life.

*Id.* at 266.[20]  The court further opined (*id.*) that "a reading of *Burnham* that permits deduction in a taxable year of a liability that is dependent on a third party's investment decision in the following year would run afoul of the rule of *General Dynamics*,…the far closer analogue to the facts presented here."

### 5.    Summary

The Second Circuit's *New York Life* opinion confirms that the companies' annual-dividend obligations with respect to paid-up policies were not fixed at year-end.  And MassMutual concedes that the viability of its accrual argument with respect to the dividend guarantees is wholly dependent on the year-end status of the annual-dividend obligation *vis-à-vis* those paid-up policies.  Accordingly, even assuming that the guarantees gave rise to true obligations, those obligations were

---

[20] In the Government's view, the *Burnham* court's "status quo" gloss on the all-events test is unfounded and contrary to law, thus obviating any need for this Court to adopt the distinction drawn by the *New York Life* court in order to hold for the Government here.  In any event, the distinction drawn by the *New York Life* court is convincing in its own right.

11131499.1

not fixed at year-end and therefore were not effective to accelerate the companies' deductions for policyholder dividends.

## B. The dividend guarantees did not give rise to "obligations" in any meaningful sense

The preceding section establishes that, assuming the dividend guarantees gave rise to true obligations on each company's part, those obligations could not have been fixed in the years in which the guarantees were adopted, since they were entirely derivative of a corresponding annual-dividend obligation that did not become "fixed" with respect to any policy until the following year's policy anniversary date. In the alternative, the Government submits that the "obligations" under the dividend guarantees were illusory and, accordingly, could not support an accrual in any event.

### 1. Like the proverbial tree falling in the forest, an undertaking does not give rise to an "obligation" if there is no obligee around to enforce it

Memorializing one's "obligation" to take some action for the benefit of others is an empty gesture if the undertaking is not communicated to the persons who are to benefit from it. Absent such disclosure, the undertaking will remain entirely voluntary, as there will be no stakeholders to answer to should the endeavor fall short or never

- 55 -

materialize.  That is the situation here; although the companies proclaimed in the dividend guarantees that they were "absolutely and irrevocably obligated to pay or apply…in all events" annual dividends on post-1983 policies in the following year in the amount specified in the guarantee (A215), they did not inform their policyholders of this undertaking.  Accordingly, the guarantees did not give rise to "obligations" in the ordinary sense of the word, and they should not be treated as having done so for purposes of the all-events test either.

*New York Life* provides support for the notion that a board resolution cannot form the basis of an "obligation" for purposes of the all-events test if its intended beneficiaries do not have some kind of expectation – whether arising from notification of the board's action, prior representations by the company, or otherwise – regarding the benefit conveyed by the resolution.[21]  The taxpayer in *New York Life*

---

[21] Indeed, the court went a step further, flatly stating that "a board's resolution cannot convert a voluntary expense into an accrued liability for federal income tax purposes."  724 F.3d at 268.  The Government submits that this Court need not decide that question – *viz.*, whether a board resolution, without more, can *ever* form the basis of a fixed obligation for purposes of the all-events test – in order to rule in favor of the Government in this case.

11131499.1

sought to accrue (in addition to its "January dividend" obligation discussed above) what the court referred to as its "minimum dividend liability" with respect to certain policies: the lesser of the annual dividend or a separately calculated "termination dividend" that was payable in the event the policy terminated during the year (including by reason of the policyholder's surrender of the policy for its cash value). As the relevant policies did not mention this termination dividend, the company pointed to annual board resolutions as the source of its obligation to pay these amounts, citing *Willoughby Camera Stores, Inc. v. Commissioner*, 125 F.2d 607 (2d Cir. 1942), and *Champion Spark Plug Co. v. Commissioner*, 30 T.C. 295 (1958), *aff'd*, 266 F.2d 347 (6th Cir. 1959) (per curiam), for the proposition that "an 'irrevocable' board resolution may fix a liability so as to satisfy the all-events test." 724 F.3d at 268.

The *New York Life* court found *Willoughby* and *Champion Spark Plug* to be inapposite. In particular, the employees in *Willoughby* "were told upon hiring that they would receive the bonus" that was the subject of the board resolution, and the employee in *Champion Spark Plug* "had been informed upon hiring that he would be eligible for" the life

- 57 -

insurance benefit that the payments authorized by the board resolution were intended to replace. 724 F.3d at 268.[22] In contrast, the *New York Life* court saw "no basis" for finding that the policyholders there had any kind of expectation regarding the board-approved termination dividends. *Id.* The MassMutual and ConnMutual policyholders likewise had no expectation regarding the board-approved dividend guarantees.[23] *Cf. General Dynamics*, 481 U.S. at 244 ("Employees were informed that submission of satisfactory proof of the charges claimed would be necessary to obtain payment under the plans."); *Washington Post Co. v. United States*, 405 F.2d 1279, 1281 (Ct. Cl. 1969) (noting that the *Post* "announced to the dealers at a meeting the creation of the

---

[22] Moreover, the employees in *Willoughby* had knowledge of the December board resolutions that fixed the aggregate amount of bonuses to be paid in the following year. *See* 125 F.2d at 609; *see also Produce Reporter Co. v. Commissioner*, 18 T.C. 69, 73-75, 76-77 (1952), *aff'd on another issue*, 207 F.2d 586 (7th Cir. 1953).

[23] Although ConnMutual included a one-sentence reference to its dividend guarantee in a footnote to its 1995 financial statements filed with state regulators, such a footnote "could easily be overlooked" even by a trained insurance investigator (A376), as is made abundantly clear by the reproduction of the relevant page contained in the record. (A210.) In any event, ConnMutual would not have filed the report until the following year.

11131499.1

[profit-sharing] Plan,…and announced the amount which [it] determined to accrue for the year just ending," and that "[i]t has been [the *Post*'s] practice to make subsequent announcements at [its] annual Christmas party for its dealers"); Rev. Rul. 2011-29, 2011-49 I.R.B. 824, 824 ("*X* communicates the general terms of the bonus program to employees when they become eligible and whenever the program is changed.").

2.    **That the companies disclosed the dividend guarantees to state regulators does not alter the illusory nature of the guarantees**

Lest we miss the forest for the trees (to continue the metaphor), we stress that disclosure of the dividend guarantees to the policyholders would not have somehow imbued those guarantees with substance. That is, the preceding discussion regarding the significance of disclosure assumes that the disclosed board resolution entails a substantive undertaking in the first place, *i.e.*, one that implicates some kind of action, or at least a realistic possibility of action, that would not have occurred absent the resolution. Given historically stable lapse rates, however, the stated objective of the dividend guarantees – *i.e.*, payment of annual dividends in the following year on post-1983 policies

- 59 -

in an amount equal to approximately 85 percent of the portion of divisible surplus that had been allocated to those policies – was already virtually certain to occur in the ordinary course of the companies' business operations, independent of any "guarantee" to that effect. Accordingly, the guarantees did not represent a substantive undertaking on either company's part, and, just as disclosure to the policyholders would not have altered that reality, the companies' addition of a nominal enforcement mechanism through disclosure to their state regulators likewise did not cure this defect.

That the disclosure of the dividend guarantees to state regulators was itself an empty gesture is evident from MassMutual's own arguments below, which reinforce the chimerical nature of the guarantees.  For instance, in questioning the relevancy of the Government's contention that the state regulators were unlikely to enforce the guarantees, MassMutual trumpeted the fact that "there is absolutely no evidence in the record to suggest that enforcement of the dividend guarantees would ever be required," in part because the possibility that "the guaranteed minimum amount of policyholder dividends w[ould] not [be] paid in the ordinary course" was "remote."

- 60 -

(A683.)  Similarly, in response to what it perceived to be the Government's "impl[ication] that the [Massachusetts] DOI should have devoted substantial resources to vigilantly monitoring [MassMutual's] compliance with the dividend guarantees," MassMutual noted that "the guaranteed minimum amount of policyholder dividends was almost certain to be paid under [MassMutual's] regular dividend scale" and remarked that "[i]n light of this fact, which [MassMutual] made clear to the DOI, it is not surprising that the DOI did not devote regulatory resources to *something that was virtually self-enforcing*."  (A873 n.10 [emphasis added].)  It is difficult to imagine a "guarantee" with less substance.

## II

### The CFC erred in holding that the annual dividends were rebates or refunds within the meaning of Treas. Reg. § 1.461-4(g)(3)

#### Standard of review

The interpretation of an agency regulation presents a question of law that is subject to *de novo* review.  *E.g., Abbott Laboratories v. United States*, 573 F.3d 1327, 1330 (Fed. Cir. 2009).

11131499.1

## A. The IRS's interpretation of its own regulation is entitled to deference

### 1. Treas. Reg. § 1.461-4(g)(3) is ambiguous

The rules of statutory construction apply to the interpretation of agency regulations as well. *Roberto v. Dept. of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006). As is the case with statutes, the starting point for interpreting a regulatory provision is its plain meaning. *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414-415 (1945)). Thus, the first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

In terms of this case, the initial inquiry is whether the term "rebate, refund, or similar payment" in Treas. Reg. § 1.461-4(g)(3) plainly and unambiguously includes or excludes policyholder dividends paid by mutual life insurance companies. Neither party claimed below that the plain language of the regulation forecloses the other party's position, nor did the CFC make such a finding. By definition, then, the regulation is ambiguous on this point.

11131499.1

## 2.   The IRS's interpretation of the regulation satisfies the conditions for deference

Where an agency regulation is ambiguous, deference to the agency's interpretation is appropriate if that interpretation "is not 'plainly erroneous or inconsistent with the regulation.'" *Abbott Labs.*, 573 F.3d at 1331 (quoting *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (Fed. Cir. 2005), in turn quoting *Seminole Rock*, 325 U.S. at 414).  Indeed, "an agency's interpretation of its own regulation is entitled to a level of deference even 'broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own.'" *Abbott Labs.*, 573 F.3d at 1330 (quoting *Cathedral Candle*, 400 F.3d at 1363-1364); *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (citing "the principle that an agency's interpretation of its own regulations is controlling," subject to plain error or inconsistency) (internal quotation marks omitted).  Such deference is appropriate "'even when that interpretation is offered in the very litigation in which the argument in favor of deference is made,'" provided that the court has "'no reason to suspect that the interpretation does not reflect the agency's fair and considered

- 63 -

judgment on the matter in question.'" *Abbott Labs.*, 573 F.3d at 1331 (quoting *Cathedral Candle*, 400 F.3d at 1364, in turn quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)); *see Long Island Care*, 551 U.S. at 171. Finally, "'[i]n the context of tax cases, the government's reasonable interpretation of its own regulations and procedures are entitled to particular deference.'" *Abbott Labs.*, 573 F.3d at 1333 (quoting *Am. Express Co. v. United States*, 262 F.3d 1376, 1383 (Fed. Cir. 2001)).

There is no hint in the CFC's opinion (nor did MassMutual contend below) that the IRS's interpretation of Treas. Reg. § 1.461-4(g)(3) as *not* applying to policyholder dividends is plainly erroneous or inconsistent with the regulation. Indeed, given the fact that the regulation makes no mention of policyholder dividends, it is difficult to conceive of any possible justification for a finding of plain error or inconsistency. Accordingly, the IRS's interpretation is controlling, provided it "reflect[s] the agency's fair and considered judgment on the matter in question," *i.e.*, it is not merely a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Auer*, 519 U.S. at 462 (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212 (1988)).

- 64 -

That the IRS has "struggled with" the policyholder-dividend issue "indicates that [its] interpretation of [the] regulation reflects its considered views." *Long Island Care*, 551 U.S. at 171. At least as far back as 1994, the IRS recognized the competing interpretations of Treas. Reg. § 1.461-4(g)(3) as applied to policyholder dividends. *See* IRS Field Service Advisory, 1994 WL 1865978 (Apr. 28, 1994) ("Given that, in theory, policyholder dividends may represent in part a return on equity and in part a price adjustment, we believe that the policyholder dividend liabilities at issue are appropriately classified as § 1.461-4(g)(7) 'other liabilities,' § 1.461-4(g)(3) 'rebates and refunds,' or some combination of the two.");[24] IRS Field Service Advisory, 1998 WL 1984267 (Aug. 24, 1998) (noting that Chief Counsel's conclusions regarding the policyholder-dividend issues considered therein were subject to "the assumption[ ] that," *inter alia*, "the liability is

---

[24] That the IRS ultimately settled on an interpretation of its own regulation that excludes policyholder dividends altogether from the category of "rebates or refunds" is entirely reasonable, given that "there is no precise way to segregate a policyholder dividend…into [its] various components." H.R. Rep. No. 98-432, Part II, at 1422 (1984) (A963); *see infra* pp. 69-70; *cf. Mayo Found. for Med. Educ. and Research v. United States*, 131 S. Ct. 704, 715 (2011) ("Regulation, like legislation, often requires drawing lines.").

- 65 -

characterized as a rebate," but noting elsewhere Chief Counsel's

"belie[f] [that] it is possible to characterize the liability to pay

policyholder dividends either as a rebate or as an 'other' liability"); *see*

*also Abbott Labs.*, 573 F.3d at 1333 (referring to "IRS internal Field

Service Advice memoranda" that, "while not definitive, at least suggest

the interpretation now explicitly embraced"). Clearly, the IRS's

interpretation of Treas. Reg. § 1.461-4(g)(3) in this case represents

"more than an agency's convenient litigating position." *Bowen*, 488 U.S.

at 213. Accordingly, that interpretation is entitled to deference.

## B. In any event, the IRS's interpretation of the regulation is superior to MassMutual's

### 1. Nothing in the text or history of the economic-performance regulations suggests that the term "rebate or refund" therein includes policyholder dividends

Even without regard to deference, the IRS's interpretation of the

regulatory term "rebate, refund, or similar payment" as *not* including

policyholder dividends should prevail as the better of the competing

interpretations. First, the surrounding language of § 1.461-4(g)(3), the

surrounding provisions of § 1.461-4(g), and even an example in § 1.461-

5 (relating to the recurring-item exception) support the IRS's

- 66 -

interpretation by negative inference.  As for surrounding language,

§ 1.461-4(g)(3) contains references to "adjustment[s] to gross receipts or

total sales," "adjustment[s] or addition[s] to cost of goods sold," and

"reduction[s] in the price of goods or services to be provided in the

future," none of which has any natural application to policyholder

dividends.[25]  As for surrounding provisions, § 1.461-4(g)(5) specifically

refers to liabilities "aris[ing] out of the provision to the taxpayer of

insurance"; one would think that § 1.461-4(g)(3) would likewise contain

a specific reference to insurance if it were intended to cover policyholder

dividends.[26]  And the only example in § 1.461-4(g)(8) that pertains to

rebates or refunds involves a company (X) that "manufactures and sells

hardware products" and "enters into agreements that entitle each of its

distributors to a rebate (or a discount on future purchases) from X

---

[25] Even the regulation's reference to "deduction[s] from gross income" is technically inapplicable to policyholder dividends, which are the subject of "life insurance deductions" from "life insurance gross income."  *See* I.R.C. §§ 801(b), 803, 804, 805(a)(3); *cf.* I.R.C. §§ 61(a), 63(a).

[26] *Cf.* I.R.C. § 461(e); Treas. Reg. § 1.461-1(e)(1)(i) (providing accrual rule for, *inter alia*, amounts paid as dividends by "a mutual savings bank not having capital stock represented by shares" to its depositors).

11131499.1

based on the amount of purchases made by the distributor from X during any calendar year." Treas. Reg. § 1.461-4(g)(8), example 2. Finally, an example in § 1.461-5 (recurring-item exception) involving § 1.461-4(g)(3) refers to a company that "manufactures and distributes video cassette recorders" and "offers to refund the price of a recorder to any purchaser not satisfied with the recorder." Treas. Reg. § 1.461-5(e), example 1.

The IRS's interpretation is also supported by both legislative and regulatory history, again by negative inference. The only mention of rebates or refunds in the legislative history of the 1984 Act appears in the conference report, which authorized the Treasury Department to promulgate a rule whereby utilities that receive natural gas supplier refunds and pass them on to their customers "may deduct such refunds in the year the refund is included in the income of the utility," notwithstanding that the customer refunds occur in the following year. H.R. Conf. Rep. No. 98-861, at 876 (1984). On the regulatory side, the only reference to the "rebate or refund" provision in the preamble to the final regulations pertains to comments received by the IRS regarding its decision not to include in the proposed regulations the special rule for

- 68 -

utilities authorized by the aforementioned conference report. *See* T.D.
8408, 1992-1 C.B. 155, 160.

### 2. The CFC's analysis is flawed

Aside from failing to accord deference to the IRS's interpretation
of its own regulation, the CFC's interpretive analysis is flawed in
several respects. First, the court gave undue weight to industry usage;
since Treas. Reg. § 1.461-4(g)(3) is not specific to the insurance
industry, the meaning of the term "rebate or refund" therein should not
be determined by reference to usage that is specific to that industry. *Cf.*
*Caltex Oil Venture v. Commissioner*, 138 T.C. 18, 35-36 (2012) (rejecting
taxpayer's industry-specific argument regarding IRS's interpretation of
the "3-½ month" rule of Treas. Reg. § 1.461-4(d)(6)(ii) and noting that
the regulation "is not an exception [to the economic-performance
requirement] that is specific to the oil and gas industry").

In addition, although the court recognized that policyholder
dividends may be considered rebates or refunds only "to the extent they
are returns of premium and not [the equivalent of] shareholder's
earnings" (A71), it erred in holding (*id.*) that, because "none of plaintiff's
policyholder dividends deductions were ultimately reduced for the tax

- 69 -

years at issue under 26 U.S.C. § 809, plaintiff's policyholder dividends
are in the nature of…price rebates." As Congress recognized when it
enacted former § 809, "there is no precise way to segregate a
policyholder dividend or other payment into [its] various components,"
*viz.*, "price rebates, policyholder benefits and returns of company
profits." H.R. Rep. No. 98-432, Part II, at 1422 (1984) (A963); *see* I.R.C.
§ 808(b) (defining the term "policyholder dividend" to include, *inter alia*,
"excess interest"). Indeed, § 809 was "intended to produce a politically-
desired allocation of the overall life insurance company tax burden
between the stock and mutual segments of the industry." Michael J.
Graetz, *Life Insurance Company Taxation: An Overview of the Mutual-
Stock Differential*, in LIFE INSURANCE TAXATION: THE MUTUAL VS. STOCK
DIFFERENTIAL, at I-1 n.2 (Graetz ed. 1986) (A974); *see* H.R. Rep. No. 98-
432 at 1423 (A964) (noting the committee's "anticipat[ion] that [the
initial] 16.5-percent [imputed earnings] rate will result for 1984 in the
mutual segment of the industry bearing 55 percent of the aggregate
industry tax burden" and expressing the committee's "belie[f] that this
[allocation] is appropriate in the light of a number of factors").

11131499.1

Finally, the court's reliance on tax rules that allow policyholders to apply dividends against their tax basis before recognizing any income (A71-74), is conceptually unsound. Such an approach would have the effect of treating dividends from the same pool of money differently for purposes of Treas. Reg. § 1.461-4(g)(3) depending on the identity of the recipient, something the drafters of the regulation could not have intended.

## CONCLUSION

The judgment of the Court of Federal Claims should be reversed.

Respectfully submitted,

KATHRYN KENEALLY
  *Assistant Attorney General*

/s/ Arthur T. Catterall

ROBERT W. METZLER        (202) 514-3938
ARTHUR T. CATTERALL      (202) 514-2937
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

FEBRUARY 2014

- 71 -

# In the United States Court of Federal Claims

## No. 07-648 T

**MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY, on its own
behalf, and Massachusetts Mutual Life
Insurance Company, as successor to
Connecticut Mutual Life Insurance
Company**

**JUDGMENT**

   **v.**

**THE UNITED STATES**

   Pursuant to the court's Opinion, filed January 30, 2012, the parties' stipulation for entry of judgment, filed September 17, 2013, and the court's Order, filed September 17, 2013,

   IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the plaintiff recover of and from the United States as follows:

| Plaintiff | Federal Income Tax Year | Overpayment |
|---|---|---|
| Connecticut Mutual Life Insurance Co. | 1995 | Overpayment of federal income tax of $27,130,472.00 and previously paid, assessed interest of $3,319,517.23, plus statutory interest, to be reduced by the following offsets for prematurely allowed netting benefits for the specified Connecticut Mutual Life Insurance Co. federal income tax years- (a) for 1992, $116,940.62 as of 10/10/11 and $13.06 as of 10/17/11; (b) for 1993, $137,273.45 as of 10/10/11 and $26.76 as of 10/17/11; and (c) for 1994, $199,701.64 as of 10/10/11 and $35.56 as of 10/17/11. |
| Massachusetts Mutual Life Insurance Co. | 1995 | Overpayment of federal income tax of $37,497,430.00 and previously paid, assessed interest of $25,321,768.62, plus statutory interest, to be reduced by the following offsets for prematurely allowed netting benefits for the specified Massachusetts Mutual Life Insurance Co. federal income tax years- (a) for 1981, $717,787.54 as of l0/10/11 and $127.96 as of 10/17/11; (b) for 1982, $288,483.46 as of 10/10/11 and $53.83 as of 10/17/11; (c) for 1992, $114,481.43 as of 11/14/11; and (d) for 1993, $417,176.43 as of 11/14/11. |
| Massachusetts Mutual Life Insurance Co. | 1996 | Overpayment of federal income tax of $2,747,886.00, plus statutory interest, to be reduced by the following offsets for prematurely allowed netting benefits for this tax period- (a) $1,329,462.46 as of 10/10/11 and (b) $263.80 as of 10/17/11. |

| Massachusetts Mutual Life Insurance Co. | 1997 | Overpayment of federal income tax of $12,025,025.00, previously paid, assessed interest of $464,828.50, and restored credits of $6,473,740.86 ($5,940,681.00 with a March 15, 2001 effective date and $533,059.86 with a September 13, 2002 effective date), plus statutory interest. |
|---|---|---|

This judgment is without prejudice to plaintiff's rights, if any, to assert interest netting claims as described below and the Government's rights to assert any and all available defenses to such claims- (a) interest netting claims for additional overpayment interest for nonsuit tax periods based on netting overpayment interest for nonsuit tax periods against finally determined underpayment interest for suit tax periods; (b) interest netting claims for refunds or credits of previously paid, assessed interest for nonsuit tax periods based on netting underpayment interest for nonsuit tax periods against overpayment interest for suit tax periods; and (c) interest netting claims for additional overpayment interest for suit tax periods based on netting overpayment interest for suit tax periods against finally determined underpayment interest for suit and/or nonsuit tax periods.

The parties shall bear their own costs, including any possible attorneys' fees and other expenses.


                                              Hazel C.  Keahey
                                              Clerk of Court

**September 18, 2013**            By:    s/ Debra L.  Samler
                                              Deputy Clerk


NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.

# In the United States Court of Federal Claims

**No. 07-648T**
**Filed: January 30, 2012**

| | |
|---|---|
| * * * * * * * * * * * * * * * | * |
| **MASSACHUSETTS MUTUAL LIFE** | * |
| **INSURANCE COMPANY,** | * |
| | * **Federal Tax; Federal Tax** |
| **Plaintiff,** | * **Deductions; 26 U.S.C. § 461(h),** |
| | * **"All Events Test;" Treasury** |
| **v.** | * **Regulation § 1.461.4; Policyholder** |
| | * **Dividends.** |
| **UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * | * |

     **B. John Williams, Jr.**, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C. With him were **Alan J.J. Swirski** and **Melissa L. Galetto**, Skadden, Arps, Slate, Meagher & Flom LLP, of counsel.

     **Robert Stoddart**, Trial Attorney, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C. for the defendant. With him were **G. Robson Stewart**, Assistant Chief, Court of Federal Claims Section, United States Department of Justice, **David I. Pincus**, Chief, Court of Federal Claims Section and **John A. DiCicco**, Acting Assistant Attorney General, Tax Division.

# O P I N I O N

## HORN, J.

     "While in some cases, 'timing is everything,' here timing is the only thing...."[1]

### FINDINGS OF FACT

     The plaintiff, Massachusetts Mutual Life Insurance Company (MassMutual), on behalf of itself, and as successor to Connecticut Mutual Life Insurance Company (ConnMutual), brought this claim to recover funds allegedly overpaid to the Internal

---

[1] Vulcan Basement Waterproofing of Illinois, Inc. v. NLRB, 219 F.3d 677, 688 (7th Cir. 2000) (quoting N.L.R.B. v. Joy Recovery Tech. Corp., 134 F.3d 1307, 1314 (7th Cir. 1998)).

Revenue Service (IRS) for the tax years 1995, 1996 and 1997,[2] when the IRS disallowed certain policyholder dividend deductions made pursuant to Board Resolutions in December 1995, 1996, and 1997, respectively. These Resolutions established a minimum amount of dividends that would be paid out to certain policyholders the following year (the Dividend Guarantees). As noted by the plaintiff, and not objected to by the defendant, "[p]laintiff is entitled to policyholder dividend deductions; the only issue is when." Plaintiff continued, "[i]t is undisputed that the dividends are deductible. The parties disagree solely about timing."

A trial was held and post-trial briefings on the legal and factual issues raised in this case were filed by both parties. After a review of the trial transcripts, the testimony, the exhibits entered into the record and the submissions filed by the parties, the court makes the following findings of facts. MassMutual is a mutual life insurance company with its principle place of business in Springfield, Massachusetts. For the tax years 1995, 1996, and 1997, MassMutual was an accrual basis taxpayer, and timely filed its federal income tax return for each tax year at issue. In the fall of 1995, the Boards of Directors of MassMutual and ConnMutual approved a merger of the two companies. The merger was effective February 29, 1996, with MassMutual emerging as the surviving entity and succeeding to all of ConnMutual's rights and liabilities. Prior to the merger, ConnMutual was a mutual life insurance company with its principal place of business in Hartford, Connecticut. In 1995, ConnMutual was an accrual basis taxpayer, which also had timely filed its federal income tax return for the 1995 tax year.[3]

According to the Joint Stipulations of Fact, mutual life insurance companies, such as MassMutual and ConnMutual, operate for the benefit of their policyholders. Mutual life insurance companies typically issue two types of insurance policies, participating policies and non-participating policies. A participating policy is an insurance policy that is eligible to receive a share of any annual distribution of surplus, as declared by the Board of Directors of a mutual life insurance company. A non-participating policy does not receive a share of the annual distribution of surplus. Each year, mutual life insurance companies calculate their surplus, i.e., assets less reserves[4] and other

---

[2] The plaintiff's original complaint alleged additional grounds for recovery of federal income tax overpayment for additional tax years. The plaintiff, however, ultimately indicated it would not proceed on a number of the issues alleged in the complaint, specifically the claims raised regarding plaintiff's tax years from 1988 through 1994. The parties subsequently filed a stipulation for partial dismissal for plaintiff's claims regarding tax years 1988 through 1994, which have been dismissed.

[3] The court's reference to plaintiff refers to the post-merger entity. When the court identifies MassMutual or ConnMutual, the court is referring only to the specifically identified entity.

[4] As defined by Black's Law Dictionary, a reserve is "[f]unds set aside to cover future expenses, losses, claims, or liabilities. Sums of money an insurer is required to set aside as a fund for the liquidation of future unaccrued and contingent claims, and claims

liabilities. The mutual life insurance company's Board of Directors then approves the amount of surplus, known as the divisible surplus, to be returned to holders for participating policies, or participating policyholders. A sample MassMutual participating policy, included as a Joint Exhibit, stated: "Each year we determine how much money can be paid as dividends. This is called divisible surplus. We then determine how much of this divisible surplus is to be allocated to this [participating] policy."[5] A mutual life insurance company's divisible surplus is distributed to participating policyholders, consistent with the dividend scale developed by the company's management, and approved by the Board of Directors.

Mutual life insurance companies typically declare policyholder dividends at the end of each year. Dividends are then payable to participating policyholders whose policies are in force as of the anniversary date of their policy. An insurance policy is in force if the premiums for the policy are paid through its anniversary date. A policy that is not in force has lapsed. A lapse rate, usually expressed as a percentage, is the number of life insurance policies that lapsed within a given period, divided by the number of policies in force at the beginning of that period. Participating policyholders may choose to have their policyholder dividends applied to the following year's premium or purchase additional insurance instead of receiving the dividend.

Policyholder dividends are generally not taxable to the policyholder until the aggregate dividends paid to a policyholder exceed the aggregate premiums paid by the policyholder. The point at which the aggregate dividends paid to a policyholder exceed the aggregate premiums paid by the policyholder is known as the cross-over point.

**1995 Tax Year**

<u>1995 MassMutual Dividend Guarantee</u>

On October 9, 1995, the Board of Directors of MassMutual approved the 1996 dividend scale recommended by MassMutual's Dividend Policy Committee. The 1996 dividend scale resulted in the apportionment of $517.3 million to all MassMutual's participating policies. In order to determine the amount of dividends to be guaranteed, MassMutual first calculated the dividends it expected to pay policyholders of post-1983 policies, pursuant to its 1996 dividend scale, $217.3 million, and then set the

---

accrued, but contingent and indefinite as to amount." Black's Law Dictionary 1307-08 (6th ed. 1990).

[5] The parties stipulated that "the language relating to policyholder dividends in Joint Exhibit 3 does not differ in any material respect from the language relating to policyholder dividends in all MassMutual policies outstanding in 1996, 1997, or 1998 that are at issue in this case." A sample ConnMutual participating policy also was included as a Joint Exhibit, and the parties similarly stipulated that "language relating to policyholder dividends in Joint Exhibit 2 does not differ in any material respect from the language relating to policyholder dividends in all ConnMutual policies outstanding in 1996 that are at issue in this case."

guaranteed amount at 85% of that amount, or $184.7 million. The final guaranteed amount was rounded up to $185.0 million.

MassMutual, and as described below, ConnMutual, chose to apply the Dividend Guarantees only to policies issued after December 31, 1983 because of unfavorable tax consequences that would have resulted from also applying the Dividend Guarantees to the policies issued before January 1, 1984. Under Section 216(b)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 758 (1984), life insurance companies were allowed a fresh start for then-existing policies as a benefit for the change in tax treatment in the deduction of policyholder dividends from a reserve basis to an accrual basis.[6] "The 'fresh start' for the change in policyholder dividend accounting was intended to mitigate the detriment caused taxpayers by the statutory change in such accounting; to the extent the detriment caused by the statutory change is mitigated in fact by a company's own change in business practices, the 'fresh start' was not intended to give a company additional tax benefits." Staff of the Joint Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 611 (Comm. Print 1984). Therefore, pursuant to 26 U.S.C. § 808(f),[7] acceleration

---

[6] Section 216(b)(1) states: "Except as provided in paragraph (2), in the case of any insurance company, any change in the method of accounting (and any change in the method of computing reserves) between such company's first taxable year beginning after December 31, 1983, and the preceding taxable year which is required solely by the amendments made by this subtitle shall be treated as not being a change in the method of accounting (or change in the method of computing reserves) for purposes of the Internal Revenue Code of 1954." Although Section 216(b)(1) of the Deficit Reduction Act of 1984 is not codified in the Tax Code, reference to Section 216(b)(1) appears at 26 U.S.C. § 801, note (2006). Moreover, 26 U.S.C. § 808(f), discussed below, specifically addresses the impact of the fresh start adjustment on policyholder dividends. See 26 U.S.C. § 808(f) (2006). Subsection (f) is titled: "Coordination of 1984 fresh-start adjustment with acceleration of policyholder dividends deduction through change in business practice." Id.

[7] 26 U.S.C. § 808(f) states:

> Coordination of 1984 fresh-start adjustment with acceleration of policyholder dividends deduction through change in business practice.
>
> (1) In general.--The amount determined under paragraph (1) of subsection (c) for the year of change shall (before any reduction under paragraph (2) of subsection (c)) be reduced by so much of the accelerated policyholder dividends deduction for such year as does not exceed the 1984 fresh-start adjustment for policyholder dividends (to the extent such adjustment was not previously taken into account under this subsection).
>
> (2) Year of change.--For purposes of this subsection, the term "year of change" means the taxable year in which the change in business practices

which results in the accelerated policyholder dividends deduction takes effect.

(3) Accelerated policyholder dividends deduction defined.--For purposes of this subsection, the term "accelerated policyholder dividends deduction" means the amount which (but for this subsection) would be determined for the taxable year under paragraph (1) of subsection (c) but which would have been determined (under such paragraph) for a later taxable year under the business practices of the taxpayer as in effect at the close of the preceding taxable year.

(4) 1984 fresh-start adjustment for policyholder dividends.--For purposes of this subsection, the term "1984 fresh-start adjustment for policyholder dividends" means the amounts held as of December 31, 1983, by the taxpayer as reserves for dividends to policyholders under section 811(b) (as in effect on the day before the date of the enactment of the Tax Reform Act of 1984) other than for dividends which accrued before January 1, 1984. Such amounts shall be properly reduced to reflect the amount of previously nondeductible policyholder dividends (as determined under section 809(f) as in effect on the day before the date of the enactment of the Tax Reform Act of 1984).

(5) Separate application with respect to lines of business.--This subsection shall be applied separately with respect to each line of business of the taxpayer.

(6) Subsection not to apply to mere change in dividend amount.--This subsection shall not apply to a mere change in the amount of policyholder dividends.

(7) Subsection not to apply to policies issued after December 31, 1983.--

(A) In general.--This subsection shall not apply to any policyholder dividend paid or accrued with respect to a policy issued after December 31, 1983.

(B) Exchanges of substantially similar policies.--For purposes of subparagraph (A), any policy issued after December 31, 1983, in exchange for a substantially similar policy issued on or before such date shall be treated as issued before January 1, 1984. A similar rule shall apply in the case of a series of exchanges.

(8) Subsection to apply to policies provided under employee benefit plans.--This subsection shall not apply to any policyholder dividend paid or accrued with respect to a group policy issued in connection with a plan to

of pre-1984 policyholder dividends, could result in the recapture of the fresh start benefit the life insurance company received for the pre-1984 policies. To avoid the recapture of the "fresh start" benefit, MassMutual and ConnMutual limited the Dividend Guarantees to only post-1983 policyholders. In explaining why the Dividend Guarantees only applied to post-1983 policies, Margaret Sperry, the former chief compliance officer of MassMutual, testified at trial: "If a company changed its practices with regard to dividends in order to accelerate the tax deduction of dividends on that pre-[19]84 population, the population that got the fresh start, then there would be an adjustment and the company would…have to pay additional tax."

Ms. Sperry testified that, prior to 1995, MassMutual "was very aware of the difference between book and tax accounting on dividends…." She further stated that MassMutual "wanted to align the economics of what was going on, which was reflected in our financial reporting, align the tax accounting with that financial reporting…." In 1995, Ms. Sperry stated she consulted with the accounting firm KPMG and their tax counsel at the time, Steptoe & Johnson LLP, about a dividend guarantee. According to Ms. Sperry

> what the guarantee did was it aligned a portion of our [MassMutual] dividends with the economics of what's going on where the board would have declared the amounts of divisible surplus reflective of the earnings of the company in 1995 and prior years, and by accruing that amount of dividends associated with the guarantee in 1995, you have alignment mapping the tax accounting, financial reporting, where the liability was firmly established, and the economics of what was going on.

In November 1995, MassMutual representatives met with representatives from the Massachusetts Division of Insurance, including the Insurance Commissioner, Linda Ruthardt and Assistant Commissioner, Kevin McAdoo. MassMutual explained to the Massachusetts Division of Insurance representatives that it intended to implement a dividend guarantee for MassMutual's post-1983 policyholders. MassMutual further explained that the reason MassMutual had informed the Massachusetts Division of Insurance was to ensure that the Massachusetts Division of Insurance did not have any objections to the dividend guarantee. The parties agree, at that meeting the Division of Insurance did not raise any objections to the dividend guarantee. Subsequent to the November 1995, meeting, on December 7, 1995, MassMutual sent a letter to the Massachusetts Division of Insurance informing the Massachusetts Division of Insurance of MassMutual's intention to adopt the dividend guarantee. The letter stated in part that MassMutual

> intends to guarantee absolutely and irrevocably that it will pay a specified amount of the total annual dividend apportionment determined as of

---

> provide welfare benefits to employees (within the meaning of section 419(e)(2)).

26 U.S.C. § 808(f).

December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996.

The purpose of this letter is to inform you of this anticipated guarantee so that you will be fully informed concerning Mass Mutual's dividend practices.

Attached to the letter was a draft copy of the 1995 Mass Mutual Dividend Guarantee.

On December 8, 1995, Assistant Commissioner McAdoo of the Massachusetts Division of Insurance responded to MassMutual's December 7, 1995, letter, stating in part, "[t]hank you for informing the Division of Massachusetts Mutual Life Insurance Company's ('MassMutual') intention to guarantee absolutely and irrevocably the payment of a specified amount of the total annual dividend apportionment determined as of December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996." Mr. McAdoo also stated, "[i]t is our understanding that you will monitor the payment of annual dividends during 1996 to assure that the guaranteed aggregate amount is paid in accordance with the 'Terms of the Annual Dividend Guarantee.' We intend to instruct the examiners who perform MassMutual's Examination to verify that the guaranteed aggregate amount is paid in accordance with the 'Terms of the Annual Dividend Guarantee.'" Consequently, MassMutual concluded that no Massachusetts state regulator, in his or her official capacity, objected to the legality of the 1995 MassMutual Dividend Guarantee.

At the December 13, 1995, MassMutual Board of Directors meeting, the Board of Directors stated it was guaranteeing a minimum amount of $185.0 million in policyholder dividends to be paid to post-1983 policyholders in the following year. The MassMutual Board of Directors voted:

That the Company hereby absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1996 and ending December 31, 1996, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 9, 1995, it will pay or cause to be applied during 1996, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $185 million; and that the Executive Vice President, Corporate Financial Operations be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1996 to assure that such guaranteed amount is so paid or applied.

The 1995 MassMutual Dividend Guarantee stated, in part:

4.1.    During each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall pay or apply annual policyholder dividends to its policyholders in accordance with its usual practices and procedures. The Company's adoption of an Annual Dividend Guarantee

for any year shall not affect any individual policyholder's right to receive, or the Company's obligation to pay or apply, the annual policyholder dividend otherwise due to that individual policyholder on the applicable anniversary date.

4.2.    Prior to December 31st of each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall determine whether it actually has paid or applied annual policyholder dividends with respect to post-1983 policies in an amount at least equal to the specified amount of Guaranteed Dividends.

4.3.    If the Company determines that it actually has paid or applied annual policyholder dividends with respect to post-1983 policies in an amount at least equal to the amount of Guaranteed Dividends specified, then the Company's Executive Vice President – Corporate Financial Operations shall certify that the Company has satisfied its obligations imposed under the Annual Dividend Guarantee.

4.4.    If the amount of Guaranteed Dividends specified exceeds the amount of annual policyholder dividends that the Company actually has paid or applied during the year (plus the amount that the Company determines will be paid or applied through December 31st of the year) with respect to post-1983 policies, then the Company shall be obligated to pay or apply an additional amount of policyholder dividends, equal to such excess, with respect to post-1983 policies.

4.5    Such excess shall be apportioned among the post-1983 policies still in force in proportion to the annual policyholder dividends otherwise paid or applied with respect to such policies during the year.

4.6    Such excess shall be paid or applied with respect to post-1983 policies during the year in accordance with the apportionment made pursuant to the preceding paragraph.

4.7    The Company's Executive Vice President – Corporate Financial Operations shall certify that such payments or applications have been made and that the Annual Dividend Guarantee has been properly implemented.

For the 1995 tax year, the guaranteed amount of dividends to be paid was 85% of the dividends MassMutual expected to pay to its post-1983 policyholders with policies still in force pursuant to its 1996 dividend scale. The 85% figure was set at a level that MassMutual believed was virtually certain to be paid. At trial, Isadore Jermyn,[8] the

---

[8] Mr. Jermyn testified at trial both as an employee of the plaintiff and as an expert witness. When asked about Mr. Jermyn's credibility to testify both as an employee and an expert, counsel for the defendant indicated if Mr. Jermyn stated "something is a fact I

Senior Vice President and Chief Actuary of MassMutual, explained, "the intent was to choose an amount where the probability or the possibility that in fact a second amount of dividends would have to be paid in order to bring the total dividends up to the guarantee would be extremely remote." According to plaintiff's expert, Louis Lombardi, a second round of payments would have required a "total breakdown of our financial system," or some "unforeseeable cataclysmic event." In order for a second round of payments to be triggered, plaintiff's expert Lombardi testified that, based on his analysis, a 16% policy lapse rate would be required.

According to Mass Mutual's Chief Actuary, Mr. Jermyn, MassMutual's lapse rate was in the 5 to 6 percent range during the mid to late 1990s and the lapse rate was fairly stable. Mr. Jermyn added that "[i]t would be very unusual for those lapse rates to get up above 10 percent." Mr. Jermyn testified, however, that he believed the lapse rate would have to "be of the order of 50 percent" in order for a second round of payments to occur, and not just the 15% lapse rate assumed by Mr. Lombardi. Mr. Jermyn explained that for policies that lapse, typically one third of the policies lapse prior to their policy anniversary and two thirds of the policies lapse after the policy anniversary. Mr. Jermyn also stated that the majority of policies lapse after the policy anniversary because the policyholder still receives the full dividend even if the policy lapses after the policy anniversary date. Therefore, Mr. Jermyn reasoned, "you're going to need a 15 percent [of policies] to lapse before the anniversary, you need at least three times that to lapse in aggregate, so at least 45 percent, and I've sort of said roughly 50 percent need to lapse in order to result in less than 85 percent of the normal dividend being paid."

As of December 31, 1995, at least some of the MassMutual's post-1983 policies were paid through their anniversary date in the following year, including 78,569 post-1983 policies with anniversary dates of January, February, or March. Between January 1, 1996 and September 15, 1996, MassMutual paid $118,975,383.00 in policyholder

wouldn't question him if he has knowledge to know that it's a fact…he [Mr. Jermyn] would be like any other fact witness, and to the extent he's being an expert all experts can have their conclusions questioned, and they're persuasive only to the extent that the logic is good." The court notes that simply because an expert witness is an employee of a party "does not disqualify his testimony, but would merely be a factor to be taken into consideration by the jury in weighing the creditably of his testimony." Megarry Bros., Inc. v. United States, 404 F.2d 479, 487 (8th Cir. 1968); see also Den Norske Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 58 (1st Cir. 1996); Scheidt v. Klein, 956 F.2d 963, 968 n.4 (10th Cir. 1992); Dunn v. Sears, Roebuck & Co., 639 F.2d 1171, 1174 (5th Cir.), modified on other grounds, 645 F.2d 511 (5th Cir. 1981). The United States Court of Appeals for the Federal Circuit has stated that "a witness's pecuniary interest in the outcome of a case goes to the probative weight of testimony, not its admissibility," and cited the holding of Den Norske Bank AS v. First Nat'l Bank of Boston that "interests of expert witnesses who were employees of plaintiff affected the weight of their testimony, not its admissibility." Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1465 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 923 (1998).

dividends to its post-1983 policyholders. During 1996, MassMutual monitored the payment of post-1983 policyholder dividends, and on December 12, 1996, MassMutual determined that the $185.0 million had been satisfied with post-1983 policyholder dividends paid through November 30, 1996. Under the 1996 dividend scales, MassMutual and ConnMutual paid a total of $319.8 million in dividends to post-1983 policyholders, which exceeded the combined amount of the 1995 ConnMutual Dividend Guarantee and the 1995 MassMutual Dividend Guarantee by $37.8 million. No second round of payments was required for the 1995 MassMutual Dividend Guarantee.

<u>1995 ConnMutual Dividend Guarantee</u>

Similar to MassMutual, ConnMutual adopted a dividend guarantee in 1995. In a November 6, 1995, letter to the Connecticut Department of Insurance, J. Brinke Marcuccilli, ConnMutual's Senior Vice President and Chief Financial Officer, indicated that ConnMutual intended to adopt the dividend guarantee in a measure to provide further assurance to ConnMutual's policyholders "regarding the financial strength and strategic benefits generated by the merger…." In that same letter, ConnMutual informed the Connecticut Insurance Department of ConnMutual's intent to adopt a dividend guarantee and disclose the guarantee in its 1995 Annual Statement. The relevant portion of the letter stated:

> As a measure to provide further assurance to our respective policyholders regarding the financial strength and strategic benefits generated by the merger, both CML [ConnMutual] and MM [MassMutual] will be supplementing its 1996 dividend scale action with an unconditional guarantee as to a portion of its current dividend provisions. In our year end balance sheets, we will segregate the applicable portion of our dividend liability, and include appropriate footnote disclosure explaining the scope and nature of the guarantee.

No state regulator, including any Connecticut state regulator, in his or her official capacity, objected to the legality of the 1995 ConnMutual Dividend Guarantee.

On November 27, 1995, the ConnMutual Board of Directors voted to approve the 1996 dividend scale. The 1996 dividend scale resulted in the apportionment of $302.5 million to all ConnMutual's participating policies. On December 8, 1995, the ConnMutual Board of Directors stated it was guaranteeing a minimum amount of $97.0 million in policyholder dividends to post-1983 policyholders the following year. At the December 8, 1995, meeting, the ConnMutual Board of Directors voted that:

> Supplementing the 1996 Dividend Scale vote was taken at the November 27, 1995, meeting of this Board, the Company hereby absolutely and irrevocably commits and guarantees that, of the total apportionment for the period beginning January 1, 1996 and ending December 31, 1996, it will pay or cause to be applied in all events, annual dividends in 1996, for participating individual life and annuity policies issued after December 31,

1983, in the amount of at least $97 million; and

That the Chief Financial Officer is hereby charged with monitoring the payment of annual dividends during 1996 to assure that the total guarantee is paid as applied in accordance with the <u>Connecticut Mutual Life Insurance Company 1996 Annual Dividend Guarantee Policy</u>.

(emphasis in original). To determine the amount of dividends to be guaranteed, ConnMutual first calculated the dividends it expected to pay to the post-1983 policies pursuant to its 1996 dividend scale, $114,925,864.00, and then calculated the guarantee at 85% of that amount, or $97,686,984.00. The final guaranteed amount was rounded down to $97.0 million. As with the 1995 MassMutual Dividend Guarantee, ConnMutual limited the 1995 ConnMutual Dividend Guarantee to only post-1983 policyholders to avoid adverse tax consequences. The 1995 ConnMutual Dividend Guarantee was set a level that ConnMutual believed was virtually certain to be paid.

The 1995 ConnMutual Dividend Guarantee was substantially similar to the 1995 MassMutual Dividend Guarantee, including, for example, the definitions of Annual Dividend Guarantee and Guaranteed Dividends; however, there were some differences between the two. The definition of Company was different for the 1995 ConnMutual Dividend Guarantee and 1995 MassMutual Dividend Guarantee, as was the title of the person charged with monitoring and certifying the payments of the dividends, with the 1995 ConnMutual Dividend Guarantee referring to the Company's Chief Financial Officer and 1995 MassMutual Dividend Guarantee referring to the Company's Executive Vice President - Corporate Financial Operations. The only substantive difference between the 1995 ConnMutual Dividend Guarantee and the 1995 MassMutual Dividend Guarantee, however, was Section 4.7. Section 4.7 of the 1995 MassMutual Dividend Guarantee stated: "The Company's Executive Vice President - Corporate Financial Operations shall certify that such payments or applications have been made or that the Annual Dividend Guarantee has been properly implemented." Section 4.7 of the 1995 ConnMutual Dividend Guarantee included the following additional sentence: "The Company's Chief Financial Officer shall certify that such payments or application described in Sections 4.4 and 4.5 have been made and the Annual Dividend Guarantee has been properly implemented. Failure to so certify shall not impair, defeat, or invalidate the action of the Board of Directors in establishing the Annual Guarantee."

In the letter to the Connecticut Insurance Department, ConnMutual indicated that it had included a footnote in its 1995 Annual Statement regarding the 1995 ConnMutual Dividend Guarantee. Footnote 22b in the ConnMutual Annual Statement stated: "The Board of Directors has further guaranteed that in 1996, a total of no less than $97.0 million will be paid or applied in the aggregate as annual dividends on certain life insurance and annuity contracts issued before January 1, 1996."

As of December 31, 1995, at least some of ConnMutual's post-1983 policies were paid through their anniversary dates the following year, including 22,595 post-1983 policies with anniversary dates of January, February, or March. After the merger,

MassMutual monitored the payment of ConnMutual's post-1983 policyholder dividends in 1996. Between January 1, 1996 and September 15, 1996, MassMutual paid a total of $77,425,125.00 in policyholder dividends to former ConnMutual post-1983 policyholders. On December 12, 1996, MassMutual determined that ConnMutual's $97.0 million dividend guarantee had been satisfied with post-1983 policyholder dividends paid through November 30, 1996. No second round of payments was required for the 1995 ConnMutual Dividend Guarantee.

**1996 Tax Year**

<u>1996 MassMutual Dividend Guarantee</u>

On October 14, 1996, the Board of Directors of MassMutual approved the 1997 dividend scale recommended by the Dividend Policy Committee. The 1997 dividend scale resulted in the apportionment of $873.3 million to all MassMutual's participating policies. On December 11, 1996, MassMutual's Board of Directors stated it was guaranteeing a minimum of $310.0 in policyholder dividend to be paid to post-1983 policyholders the following year. In order to determine the amount of dividends to be guaranteed, MassMutual calculated the dividends it expected to pay to the post-1983 policies pursuant to its 1997 dividend scale, $365.0 million and then set the guaranteed amount at 85% of that amount, or $310.3 million. The final guaranteed amount was rounded down to $310.0 million. The 1996 MassMutual Dividend Guarantee was set at a level MassMutual believed was virtually certain to be paid. At the December 11, 1996, MassMutual Board of Directors meeting, the Board of Directors voted:

> That the Company hereby and absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1997 and ending December 31, 1997, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 14, 1996, it will pay or cause to be applied during 1997, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount not less than $310 million; and that the Executive Vice President, Corporate Financial Operations be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1997 to assure that such guaranteed amount is so paid or applied.

The 1996 MassMutual Dividend Guarantee enacted by the MassMutual Board of Directors on December 11, 1996 was identical to the 1995 MassMutual Dividend Guarantee enacted the previous year.

On December 23, 1996, MassMutual sent a letter to the Massachusetts Division of Insurance indicating that MassMutual had:

> guaranteed absolutely and irrevocably that it would pay a specified amount of the total annual dividend apportionment determined as of

December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996. MassMutual continued this practice for 1996. MassMutual has guaranteed absolutely and irrevocably that it will pay a specified amount of the total annual dividend apportionment determined as of December 31, 1996, for the period beginning January 1, 1997 and ending December 31, 1997.

The December 23, 1996, letter noted that amount the MassMutual Board of Directors voted to guarantee was "not less than $310 million." The letter continued, "[t]he purpose of this letter is to inform you of the continuation of this guarantee so that you will be fully informed concerning MassMutual's dividend practices." The letter also noted that "[t]he difference between the 1995 MassMutual guarantee amount of $185 million and the 1996 guarantee amount is due primarily to the inclusion of a guarantee on policies issued by Connecticut Mutual, thereby also continuing Connecticut Mutual's practice of guaranteeing the payment of these dividends." Attached to the letter was a copy of the 1996 MassMutual Dividend Guarantee.

On December 26, 1996, Assistant Commissioner McAdoo of the Massachusetts Division on Insurance returned a copy of the MassMutual's December 23, 1996, letter which was stamped "approved." No state regulator, including any Massachusetts state regulator, in his or her official capacity, had objected to the legality of the 1996 MassMutual Dividend Guarantee.

As of December 31, 1996, at least some of the MassMutual's post-1983 policies were paid through their anniversary date in the following year, including 79,269 post-1983 policies with anniversary dates of January, February, or March. Between January 1, 1997 and September 15, 1997, MassMutual paid $136,930,036.00 in policyholder dividends to its post-1983 policyholders and $67,325,356.00 in policyholder dividends to former ConnMutual post-1983 policyholders. During 1997, MassMutual monitored the payment of post-1983 policyholder dividends, and on December 5, 1997, MassMutual determined that the $310.0 million guaranteed amount had been satisfied with post-1983 policyholder dividends paid through November 30, 1997. Under the 1997 dividend scale, MassMutual paid $354.7 million in dividends to post-1983 policyholders, which exceeded the 1996 MassMutual Dividend Guarantee by $44.7 million. No second round of payments was required for the 1996 MassMutual Dividend Guarantee.

**1997 Tax Year**

1997 MassMutual Dividend Guarantee

On October 13, 1997, the MassMutual Board of Directors approved the 1998 dividend scale recommended by the Dividend Policy Committee. The 1998 dividend scale resulted in the apportionment of $939.0 million to all MassMutual's participating policies. On December 10, 1997, MassMutual's Board of Directors stated it was guaranteeing a minimum of $360.0 million in policyholder dividend to be paid to post-1983 policyholders the following year. In order to determine the amount of dividends to

be guaranteed, MassMutual first calculated the dividends it expected to pay to the post-1983 policies pursuant to its 1998 dividend scale, $425.3 million and then set the guaranteed amount at 85% of that amount, or $361.5 million. The final guaranteed amount was rounded down to $360.0 million. As with the other Dividend Guarantees, the 1997 MassMutual Dividend Guarantee was set at a level MassMutual believed was virtually certain to be paid.

The MassMutual Board of Directors voted at the December 10, 1997, Board of Directors meeting:

> That the Company hereby and absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1998 and ending December 31, 1998, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 13, 1997, it will pay or cause to be applied during 1998, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $360 million; and that the Executive Vice President and Chief Financial Officer be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1998 to assure that such guaranteed amount is so paid or applied.

The 1997 Dividend Guarantee enacted by the MassMutual Board of Directors on December 10, 1997, was substantially similar to the MassMutual Dividend Guarantees had enacted in 1995 and 1996. The only difference between the 1997 MassMutual Dividend Guarantee from the 1995 and 1996 MassMutual Dividend Guarantees, was the title of the Executive Vice President charged with monitoring and certifying the payments of the dividends. In Sections 3.1 and 4.7 of the 1995 and 1996 MassMutual Dividend Guarantees list the title of the Vice President as Executive Vice President - Corporate Financial Operations, whereas in Sections 3.1 and 4.7 of the 1997 MassMutual Dividend Guarantee, the title is listed as the Executive Vice President and Chief Financial Officer.

On December 23, 1997, MassMutual sent a letter to the Massachusetts Division of Insurance indicating that MassMutual had again adopted a dividend guarantee which:

> guaranteed absolutely and irrevocably that it would pay a specified amount of the total annual dividend apportionment determined as of December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996. MassMutual continued this practice in 1996 and 1997. MassMutual has guaranteed absolutely and irrevocably that it will pay a specified amount of the total annual dividend apportionment determined as of December 31, 1997, for the period beginning January 1, 1998 and ending December 31, 1998.

The letter noted that amount the MassMutual Board of Directors voted to guarantee was "not less than $360 million." The letter continued, "[t]he purpose of this letter is to inform you of the continuation of this guarantee so that you will be fully informed concerning MassMutual's dividend practices." Attached to the letter was a copy of the 1997 MassMutual Dividend Guarantee. No state regulator, including any Massachusetts state regulator, in his or her official capacity, objected to the legality of the 1997 MassMutual Dividend Guarantee.

As of December 31, 1997, at least some of the MassMutual's post-1983 policies were paid through their anniversary date in the following year, including 79,628 post-1983 policies with anniversary dates of January, February, or March. Between January 1, 1998 and September 15, 1998, MassMutual paid $163,402,093.00 in policyholder dividends to its post-1983 policyholders and $75,226,505.00 in policyholder dividends to former ConnMutual post-1983 policyholders. During 1998, MassMutual monitored the payment of post-1983 policyholder dividends, and on December 5, 1997, MassMutual determined that the $360.0 million had been satisfied with post-1983 policyholder dividends paid through November 30, 1998. Under the 1998 dividend scale, MassMutual paid $415.1 million in dividends to post-1983 policyholders, which exceeded the 1997 MassMutual Dividend Guarantee by $55.1 million. No second round of payments was required for the 1997 MassMutual Dividend Guarantee.

Additionally, for the tax years at issue, none of the post-1983 policies had reached the cross-over point, at which point the aggregate dividends paid on a policy exceeded the aggregate premiums paid on the policy. Mr. Jermyn testified that a typical policy issued today "would have to wait at least 30 years before their cumulative dividends would start exceeding their cumulative premiums" or reached the cross-over point. Mr. Jermyn noted that because interest rates were higher and dividend scales were higher, the cross-over point would be shorter for policies purchased in the early 1980s, but he "would be very surprised if that period was shorter than say 20 years" and none of the post-1983 policies would have been 20 years or older in the years at issue. Mr. Jermyn also noted that the majority of policyholders use their policyholder dividends to purchase insurance as paid-up additions, considered additional premiums, which would extend the time before the cross-over point was reached. Paid-up additions refer to policyholder dividends applied to the following year's premium or used to purchase additional insurance instead of being received by the policyholder.

When asked if she and her fellow employees considered the dividend guarantee revocable, Ms. Sperry stated "we would not have thought that any action taken by the dividend policy committee and then recommend to and acted on by our full board of directors would be viewed as revocable…." Ms. Sperry stated that in addition, MassMutual "would not go to the Commissioner of our state of domicile with an action that we thought would not be a serious commitment, and that we intended it as such and viewed it as such."

Plaintiff's amended complaint alleged that for the taxable years 1995, 1996, and 1997, MassMutual was entitled to claim deductions as a result of the 1995, 1996, and

1997 MassMutual Dividend Guarantees. The parties stipulated that "[b]oth MassMutual and ConnMutual took the necessary administrative steps to elect the 'recurring item exception' within the meaning of Internal Revenue Code § 461(h)(3) with respect to policyholder dividends for the years at issue." The parties agree that the IRS denied MassMutual's claims to accrue its liability to pay the MassMutual Guarantee Dividends and deduct those changes for the tax years 1995, 1996, and 1997. The parties further agree that MassMutual timely filed claims for refund of federal income tax for the taxable years 1995, 1996 and 1997 and that the IRS had not taken any action on MassMutual's claims as of the date of the filing of the lawsuit in this court.

Plaintiff's amended complaint also alleged that for the 1995 tax year, ConnMutual was entitled to claim deductions as a result of the ConnMutual 1995 Dividend Guarantee. The parties agree that the IRS denied ConnMutual's claim to accrue its liability to pay the Guarantee Dividends and deduct that change in the accrual for 1995. The parties further agree that MassMutual, as successor to ConnMutual, filed a timely claim for refund of federal income tax for the 1995 tax year, and that the IRS partially disallowed the refund claim.

In its amended complaint plaintiff claims deductions for $77,425,125.00 in policyholder dividends attributable to ConnMutual's Dividend Guarantee for tax year 1995. Plaintiff also claims deductions for $118,975,383.00 in policyholder dividends attributable to the 1995 MassMutual Dividend Guarantee for tax year 1995, $7,854,784.00 in policyholder dividends attributable to the 1996 MassMutual Dividend Guarantee for tax year 1996, and $34,373,306.00 in policyholder dividends attributable to the 1997 MassMutual Dividend Guarantee for tax year 1997. This opinion addresses only liability regarding the dividend guarantee issue.

## DISCUSSION

The parties agree that the issue to be resolved during this phase of the litigation is:

For each of the three years before the Court, the ultimate issue is whether, for federal income tax purposes, Plaintiff is entitled to a deduction based on the declared guaranteed minimum amount in the year of declaration. The answer to this question requires a determination of the following sub-issues:

1. Whether, in the years they were adopted, the Resolutions fixed Plaintiff's liability to pay the declared guaranteed minimum amounts in the following year….

2. Whether Plaintiff's policyholder dividends are rebates, refunds, or similar payments under Treas. Reg. § 1.461-4(g)(3) that qualify for the recurring item exception under Treas. Reg. § 1.461-5(b)(5)(ii).

The plaintiff argued that its liability for the guaranteed amount of the policyholder dividends satisfies the requirements of the "all events test" and "[a]ccordingly, Plaintiff was entitled to deduct in tax years 1995, 1996 and 1997 a portion of the guaranteed minimum amount of policyholder dividends declared by Plaintiff's board of directors in 1995, 1996 and 1997." In contrast, the defendant argued that the guaranteed minimum amount of policyholder dividends could not be deducted "in the year in which the boards adopted the resolutions – because the dividend guarantees do not meet the all-events test for accrual under the Internal Revenue Code and the regulations." (citations omitted).

In a tax refund case, there is a presumption of the correctness of the findings of the Commissioner of Internal Revenue. See United States v. Fior D'Italia, Inc., 536 U.S. 238, 243 (2002) ("An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes. It is well established in the tax law that an assessment is entitled to a legal presumption of correctness – a presumption that can help the Government prove its case against a taxpayer in court."); Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir.) ("The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong." (quoting Transamerica Corp. v. United States, 902 F.2d 1540, 1543 (Fed. Cir. 1990)), reh'g denied (Fed. Cir. 2003); see also Stobie Creek Inv. LLC v. United States, 608 F.3d 1366, 1381 (Fed. Cir. 2010); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("In a tax refund case, the ruling of the Commissioner of Internal Revenue is presumed correct."), reh'g denied, en banc suggestion declined (Fed. Cir. 1999); Lima Surgical Assocs., Inc. v. United States, 944 F.2d 885, 888 (Fed. Cir. 1991) ("[D]eterminations of the Commissioner of Internal Revenue are presumptively correct.").

The taxpayer has the burden of rebutting the presumption of correctness, but also "the taxpayer has the burden of establishing entitlement to the specific refund amount claimed." Bubble Room, Inc. v. United States, 159 F.3d at 561; see also United States v. Gen. Dynamics Corp., 481 U.S. 239, 245 (1987) ("The taxpayer has the burden of proving its entitlement to a deduction." (citing Helvering v. Taylor, 293 U.S. 507, 514 (1932)). Similarly the Supreme Court has endorsed the "'familiar rule' that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer.'" Knight v. Comm'r, 552 U.S. 181, 192 (2008) (quoting INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992) (quoting Interstate Transit Lines v. Comm'r, 319 U.S. 590, 593 (1943))); see also United States v. Janis, 428 U.S. 433, 440-441 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover." (citing Lewis v. Reynolds, 284 U.S. 281, modified, 284 U.S. 599 (1932)); Helvering v. Taylor, 293 U.S. at 515 ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid."); Welch v. Helvering, 290 U.S. 111, 115 (1933) ("The Commissioner of Internal Revenue['s]...ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong." (citing Wickwire v. Reinecke, 275 U.S. 101 (1927)); Charron v. United States, 200 F.3d 785, 792 (Fed. Cir. 1999) ("Since the [plaintiffs] were seeking refunds of taxes they had

paid, they have the burden of proving they are entitled to the amount sought."); Danville Plywood Corp. v. United States, 899 F.2d 3, 7-8 (Fed. Cir. 1990); Barenholtz v. United States, 784 F.2d 375, 381 (Fed. Cir. 1986); Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 654-55, 410 F.2d 1233, 1244-45 (1969).

    To rebut the presumption of the Commissioner's correctness, "the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination." Bubble Room, Inc. v. United States, 159 F.3d at 561. Stated otherwise, to overcome the presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." KFOX, Inc. v. United States, 206 Ct. Cl. 143, 151-152, 510 F.2d 1365, 1369 (1975); Arrington v. United States, 34 Fed. Cl. 144, 147 (1995), aff'd, 108 F.3d 1393 (Fed. Cir. 1997) (table). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. Thus, a plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. See Transamerica Corp. v. United States, 902 F.2d at 1543; Danville Plywood Corp. v. United States, 899 F.2d at 7-8; Arrington v. United States, 34 Fed. Cl. at 147. Even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. See Transamerica Corp. v. United States, 902 F.2d at 1543; Danville Plywood Corp. v. United States, 899 F.2d at 8.

## The "All Events Test"

    The Tax Code at § 461(a) (2006) states: "The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." 26 U.S.C. § 461(a). The parties agree that MassMutual was an accrual basis taxpayer for tax years 1995, 1996, and 1997, and that ConnMutual was an accrual basis taxpayer for the 1995 tax year.[9] Pursuant to the accrual method of accounting, the Tax Code permits the deduction of an expense in the year in which it is "incurred," regardless of when the expense is actually paid. See 26 U.S.C. § 162(a) (2006) ("There shall be allowed as a

---

[9] The Tax Code and Treasury Regulations require life insurance companies to utilize the accrual method of accounting, or to the extent permitted in Treasury Regulation § 1.818-2(a)(2), a combination of the accrual method with any other method of accounting permitted by the Tax Code other than the cash receipts and disbursements method. See 26 U.S.C. § 811(a) (2006); see also Treas. Reg. § 1.818-2(a)(1) and § 1.818-2(a)(1) (2012); Nat'l Life Ins. Co v. Comm'r, 103 F.3d 5, 6 (2d Cir. 1996); Mass. Mut. Life Ins. Co. v. United States, 66 Fed. Cl. 217, 226 (2005); 2 Mertens, Law of Federal Income Taxation §12A:118, at 12A-189 (Supp. 2009). Treasury Regulation § 1.818-2(a)(1) states in part, "Section 818(a)(1) provides the general rule that all computations entering into the determination of taxes imposed by part I, subchapter L, chapter 1 of the Code, shall be made under an accrual method of accounting. Thus, the over-all method of accounting for life insurance companies shall be the accrual method." Treas. Reg. § 1.818-2(a)(1) (2012).

deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business…."); <u>see also</u> <u>Avon Prods., Inc. v. United States</u>, 97 F.3d 1435, 1438 (Fed. Cir. 1996).

Treasury Regulation § 1.461-1(a)(2)(i) (2012) states under the accrual method "a liability (as defined in [Treas. Reg.] § 1.446-1(c)(1)(ii)(B))[10] is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Treas. Reg. § 1.461-1(a)(2)(i).

In <u>United States v. General Dynamics Corp.</u>, the United States Supreme Court indicated, "[a]s we noted in <u>United States v. Hughes Properties, Inc.</u>, 476 U.S. 593, 600, 106 S. Ct. 2092, 2096, 90 L. Ed. 2d 569 (1986), whether a business expense has been 'incurred' so as to entitle an accrual-basis taxpayer to deduct it under § 162(a) of the Internal Revenue Code, 26 U.S.C. § 162(a), is governed by the 'all events' test that originated in <u>United States v. Anderson</u>, 269 U.S. 422, 441, 46 S. Ct. 131, 134, 70 L. Ed. 347 (1926)." <u>United States v. Gen. Dynamics Corp.</u>, 481 U.S. at 242; <u>see also</u> <u>United States v. Hughes Props., Inc.</u>, 476 U.S. 593, 600 (1986). In <u>Anderson</u>, the Supreme Court stated "a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it." <u>United States v. Anderson</u>, 269 U.S. 422, 441 (1926). Subsequently, the Supreme Court described the "all events test" as "a fundamental principle of tax accounting" and "the 'touchstone' for determining the year in which an item of deduction accrues…." <u>United States v. Consol. Edison Co.</u>, 366 U.S. 380, 385 (1961); <u>see also</u> <u>United States v. Hughes Props., Inc.</u>, 476 U.S. at 600. In <u>United States v. General Dynamics Corp.</u>, the Supreme Court noted in a footnote,

> The "all events" test has been incorporated into the Internal Revenue Code by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 598, 607, 26 U.S.C. § 461(h)(4) (1982 ed., Supp. III). Section 461(h) imposed limits on the application of the test, providing that 'in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.' § 461(h)(1). The pertinent portions of the 1984 amendments were retained in the Tax Reform Act of 1986.

<u>United States v. Gen. Dynamics Corp.</u>, 481 U.S. at 243 n.3; <u>see also</u> <u>Metro Leasing and Dev. Corp. v. Comm'r</u>, 376 F.3d 1015, 1023 (9th Cir. 2004) ("In 1984 this 'all events test' was engrafted into the Internal Revenue Code. In general, an accrual basis taxpayer may not deduct an expense until (1) all events have occurred that determine

---

[10] Treasury Regulation § 1.446-1(c)(1)(ii)(B) states in part, "[t]he term 'liability' includes any item allowable as a deduction, cost, or expense for Federal income tax purposes." Treas. Reg. § 1.446-1(c)(1)(ii)(B) (2012).

the fact of liability; (2) the amount of the liability can be determined with reasonable accuracy; and (3) economic performance or payment has occurred." (citing 26 U.S.C. § 461(h) and Treas. Reg. § 1.461-1(a)(2)).

Similarly, in <u>Coltec Industries, Inc. v. United States</u>, 454 F.3d 1340 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2006), <u>cert. denied</u>, 549 U.S. 1206 (2007), the United States Court of Appeals for the Federal Circuit indicated that a liability is incurred in the taxable year in which all events have occurred to establish the fact of the liability. <u>See id.</u> at 1347 (citing Treas. Reg. § 1.461-1(a)(2)(i)); <u>see also</u> <u>Interex, Inc. v. Comm'r</u>, 321 F.3d 55, 58 (1st Cir. 2003) ("Accrual method taxpayers may deduct expenses when they are incurred even if they have not yet been paid, as long as three factors are met: 1) all of the events that establish the fact of the liability must have occurred; 2) the amount must be able to be determined 'with reasonable accuracy;' and 3) economic performance must have occurred."); <u>Chernin v. United States</u>, 149 F.3d 805, 808-09 (8th Cir. 1998) (citing Treas. Reg. § 1.461-1(a)(2)) ("In general, an accrual basis taxpayer may not deduct an expense until (1) all events have occurred that determine the fact of liability; (2) the amount thereof can be determined with reasonable accuracy; and (3) economic performance has occurred with respect to the expense.").

The Tax Code at § 461(h)(4), defines the requirements of the "all events test" by stating, "[f]or purposes of this subsection, the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy." According to the United States Court of Appeals for the Federal Circuit, "[a]s that test [the "all events test"] would have it, a liability can only be included in basis 'for the taxable year in which all the events have occurred which determine the fact of liability and the amount thereof can be determined with reasonable accuracy.'" <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d 962, 974 (Fed. Cir. 2009) (quoting <u>La Rue v. Comm'r</u>, 90 T.C. 465, 478 (1988) (discussing the "all events test" in the context of a partnership and 26 U.S.C. § 752 (2006)). Likewise, the United States Court of Claims noted,

 [i]f all events which determine liability and fix the amount of the tax occur before the end of the prior year, a deduction is available to an accrual basis taxpayer…. The "all events" test has been applied frequently and regularly in this court and other jurisdictions to determine proper timing for tax expense deductions.

<u>Eastman Kodak Co. v. United States</u>, 209 Ct. Cl. 365, 371, 534 F.2d 252, 256 (1976).

Explaining the specific effect of the Deficit Reduction Act of 1984 on tax implications of policyholder dividends to insurance companies and its relation to the "all events test," the treatise Federal Taxation of Insurance Companies states:

[T]he 1984 Act [the Deficit Reduction Act of 1984] permitted the deduction for policyholder dividends to equal the policyholder dividends paid or accrued during the tax year. Thus, the concept of a reserve for

policyholder dividends contained in prior law has been eliminated and replaced by a more stringent accrual standard. The intent of the provision was likely to place the liability for dividends declared on a par with other liabilities subject to the "all events" tests.

Federal Taxation of Insurance Companies ¶ 7.03, at 708 (1999) (footnote omitted).

<u>The Fact of Liability</u>

The Tax Code states, with respect to the first element of the "all events test," "the all events test is met with respect to any item if all events have occurred which determine the fact of liability…." 26 U.S.C. § 461(h)(4); <u>see</u> <u>also</u> Treas. Reg. § 1.461-1(a)(2)(i). According to the United States Supreme Court, "[i]t is fundamental to the 'all events' test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established." <u>United States v. Gen. Dynamics Corp.</u>, 481 U.S. at 243. Similarly, the United States Court of Appeals for the Federal Circuit has indicated "[t]he all events test…states that '<u>an expense is deductible</u> for the taxable year in which all the events have occurred which determine <u>the fact of the liability</u>....'" <u>Iowa S. Utils. Co. v. United States</u>, 841 F.2d 1108, 1114 (Fed. Cir. 1988) (quoting Treas. Reg. § 1.461-1(a)(2)) (emphasis in original). The United States Supreme Court in <u>United States v. Hughes Properties, Inc.</u>, noted that "the Court's cases have emphasized that 'a liability does not accrue as long as it remains contingent.'" <u>United States v. Hughes Props., Inc.</u>, 476 U.S. at 600 (quoting <u>Brown v. Helvering</u>, 291 U.S. 193, 200 (1934)); <u>see</u> <u>also</u> <u>Dixie Pine Prods. Co. v. Comm'r</u>, 320 U.S. 516 (1944); <u>Lucas v. Am. Code Co.</u>, 280 U.S. 445, 452 (1930); <u>Union Pac. R.R. Co. v. United States</u>, 208 Ct. Cl. 1, 18, 524 F.2d 1343, 1350 (1975) ("So long as a liability remains contingent or if the liability has attached but the amount cannot be reasonably estimated, a business expense deduction is not allowed."), <u>cert.</u> <u>denied</u>, 429 U.S. 827 (1976).

The Supreme Court in <u>Hughes Properties</u> continued:

Thus, to satisfy the all-events test, a liability must be "final and definite in amount," <u>Security Flour Mills Co. v. Commissioner</u>, 321 U.S. 281, 287, 64 S. Ct. 596, 599, 88 L. Ed. 725 (1944), must be "fixed and absolute," <u>Brown v. Helvering</u>, 291 U.S. [193,] 201, 54 S. Ct. [356,] 360, [L. Ed. 725 (1934)], and must be "unconditional," <u>Lucas v. North Texas Lumber Co.</u>, 281 U.S. 11, 13, 50 S. Ct. 184, 185, 74 L. Ed. 668 (1930). And one may say that "the tax law requires that a deduction be deferred until 'all the events' have occurred that will make it fixed and certain." <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 543, 99 S. Ct. 773, 786, 58 L. Ed. 2d 785 (1979).

<u>United States v. Hughes Props., Inc.</u>, 476 U.S. at 600-01. The Supreme Court also has stated, "[n]or may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of

the taxable year." United States v. Gen. Dynamics Corp., 481 U.S. at 243-44; see also Hallmark Cards v. Comm'r, 90 T.C. 26, 34 (1988) ("The all events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability – or even absolute certainty – that such right or obligation will arise at some point in the future.").

Although a liability does not accrue as long as it remains contingent, uncertainties unrelated to the fixing of the amount of the liability do not prevent the taxpayers from meeting the "all events test." See Washington Post Co. v. United States, 186 Ct. Cl. 528, 535, 405 F.2d 1279, 1283-84 (1969) (describing a fact situation with "[n]o problem of estimating the amount of the expense is involved here, so this case certainly is not comparable to the cases involving accruals to 'contingency' accounts."). The Washington Post court further stated, "[w]e think the message is clear: the 'all-events' test that comes down to us from United States v. Anderson, [269 U.S. 422] is not inflexible; when the liability itself is clearly fixed, as in this case, other uncertainties do not necessarily destroy that initial certainty." Washington Post Co. v. United States, 186 Ct. Cl. at 536, 405 F.2d at 1284; see also Eastman Kodak Co. v. United States, 209 Ct. Cl. at 372, 534 F.2d at 257.

The Supreme Court in United States v. Hughes Properties, Inc., allowed a casino, using the accrual method, to deduct as a business expense guaranteed payouts on progressive slot machines, even though the jackpots had not yet been won. See United States v. Hughes Props., Inc., 476 U.S. at 606. The Supreme Court indicated "[t]he Government misstates the need for identification of the winning player. That is, or should be, a matter of no relevance for the casino operator. The obligation is there, and whether it turns out that the winner is one patron or another makes no conceivable difference as to basic liability." Id. at 602. In Washington Post Co. v. United States, 186 Ct. Cl. 528, 405 F.2d 1279, the United States Court of Claims noted that "indeterminacy at the time of accrual as to the ultimate recipient's exact share of accrued 'bonuses,' or indeterminacy as to the time of payout does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed." Washington Post Co. v. United States, 186 Ct. Cl. at 535, 405 F.2d at 1283. Therefore, the United States Court of Claims in Washington Post held that "when a 'group liability' is involved, it is the certainty of the liability which is of utmost importance in the 'all events' test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees." Washington Post Co. v. United States, 186 Ct. Cl. at 536, 405 F.2d at 1284; see also Willoughby Camera Stores v. Comm'r, 125 F.2d 607, 609 (2d Cir. 1942) ("The Board of Tax Appeals held that an employee of the taxpayer could not ascertain, within the taxable year, his proportionate share of the accrual. We do not regard that as relevant to the issue of deductibility."). In Kershaw Mfg. Co. v. Comm'r, 313 F.2d 942 (5th Cir. 1963), the United States Court of Appeals for the Fifth Circuit determined that bonus payments, which were not to be made until the following year could still be accrued, despite noting that, "it is plain that the amount of bonuses could not be finally ascertained until after the books were otherwise balanced and closed, and that this could not be done until after the end of the year." Id. at 944-945. Therefore, the court concluded that the minimum amount the taxpayer was

obligated to pay, was properly accrued, even though the final amount paid could be more.  See id. at 945.

Under the accrual system, the "all events test" allows for payment to occur in the future or even accounts for the possibility that payment may not occur at all as long as the liability is fixed.  The Supreme Court in United States v. Hughes Properties, Inc., stated the "potential nonpayment of an incurred liability exists for every business that uses an accrual method, and it does not prevent accrual…. 'The existence of an absolute liability is necessary; absolute certainty that it will be discharged by payment is not.'"  United States v. Hughes Props., Inc., 476 U.S. at 605-606 (citations omitted); see also Gold Coast Hotel & Casino v. United States, 158 F.3d 484, 489 (9th Cir. 1998) ("[F]or purposes of the 'all events' test, what is critical is the existence of an absolute liability, not an absolute certainty the liability will be discharged by payment.") (emphasis in original).  As previously noted by the Court of Claims, "[t]he 'all events' test thus allows deductions when the taxpayer has a special kind of knowledge which gives him enough facts to demonstrate the absolute necessity of paying an expense at some future date without regard to such matters as actual payment taking place, existence of legal liability, or accrual."  Eastman Kodak Co. v. United States, 209 Ct. Cl. at 373, 534 F.2d at 257.

Moreover, a liability need not be legally enforceable to be fixed under the "all events test."  See Eastman Kodak Co. v. United States, 209 Ct. Cl. at 373, 534 F.2d at 257 ("The 'all events' test on the other hand looks to a liability that is so fixed that the fact of liability is certain and the amount thereof reasonably ascertainable, although not necessarily legally enforceable."); see also Flamingo Resort, Inc. v. United States, 664 F.2d 1387, 1390 (9th Cir.) (indicating a casino's inability to legally enforce its debts was not a sufficient reason to preclude application of "all events test," and stating "[t]he debts which the 'markers' represent are, therefore, fixed; there is a reasonable expectancy of collection; and no contention has been made that the amounts cannot be determined with reasonable accuracy."), cert. denied sub nom. Hilton Hotels Corp. v. United States, 459 U.S. 1036 (1982); Burlington N. R.R. Co. v. Comm'r, 82 T.C. 143, 151 (1984) ("[T]he amount of the liability may be determined with reasonable accuracy and all events determining the fact of the liability occur prior to year-end.  Thus the purposes of the all events test are satisfied, and the taxpayer may properly accrue and deduct the expense even though legal liability may not exist until the subsequent year."); Champion Spark Plug Co. v. Comm'r, 30 T.C. 295, 298 (1958) ("[I]t may be true that here there was no underlying legal liability compelling the petitioner to make the fixed and definite obligation. But this lack of an underlying legal liability is not fatal to petitioner's argument."), aff'd, 266 F.2d 347 (6th Cir. 1959).

The cases cited regarding establishing the fact of the liability mostly precede the addition of the economic performance element of the "all events test" by the Deficit Reduction Act of 1984 and codification of the "all events test" at 26 U.S.C. § 461(h). Cases such as Gold Coast Hotel & Casino v. United States, 258 F.3d 484, decided after the codification of the "all events test" at 26 U.S.C. § 461(h), do not question the use of cases decided before the Deficit Reduction Act of 1984 and rely on them as precedent.

The parties have not been able to identify, nor has the court located a case or regulation which calls into question the precedential value of those cases which address the measure of determining the fact of the liability, which precede the addition of the economic performance element of the now applicable "all events test." The United States Supreme Court, in <u>United States v. General Dynamics Corp.</u>, when analyzing the "all events test," albeit for tax years prior to the codification of 26 U.S.C. § 461(h), noted the addition of the economic performance element in 26 U.S.C. § 461(h), without questioning the Court's prior analysis of the "all events test" or indicating how it might be applied in the future. <u>See</u> <u>United States v. General Dynamics Corp.</u>, 481 U.S. at 243 n.3. Similarly, in <u>Manus Energy Corporation v. United States</u>, 31 F.3d 1135 (Fed. Cir. 1994), the United States Court of Appeals for the Federal Circuit considered the plaintiff's deductions in tax years 1984 and 1985. Prior to considering the economic performance element of 26 U.S.C. § 461(h), the court noted "[u]nder the 'all events' test, the taxpayer cannot deduct an expense until all the events have occurred that fix the amount and fact of the underlying liability," and cited the earlier United States Supreme Court cases of <u>United States v. Consolidated Edison Company</u>, 366 U.S. 380, 385 (1961) and <u>United States v. Anderson</u>, 269 U.S. at 441, both decided prior to the codification of the "all events test" and the addition of the economic performance element. <u>See</u> <u>Manus Energy Corp. v. United States</u>, 31 F.3d at 1142.

Likewise, in 2006, the United States Court of Appeals for the Sixth Circuit examined whether the taxpayer had established liability with sufficient certainty to satisfy the first element of the "all events test," and considered the Supreme Court precedent of <u>United States v. Hughes Properties, Inc.</u> and <u>United States v. General Dynamics Corp.</u> without questioning the precedential value of either case, even though the economic performance was not yet a part of the "all events test." <u>See</u> <u>Chrysler Corp. v. United States</u>, 436 F.3d 644, 650-51 (6th Cir. 2006); <u>see also</u> <u>Gold Coast Hotel & Casino v. United States</u>, 158 F.3d at 488 (same); <u>Metro Leasing and Dev. Corp. v. Comm'r</u>, 376 F.3d at 1022-23 (citing <u>United States v. Hughes Properties, Inc.</u> and <u>United States v. Anderson</u>) (same); <u>Valero Energy Corp. v. Comm'r</u>, 78 F.3d 909, 915 (5th Cir. 1996) (same).

Finally, the legislative history to the Deficit Reduction Act of 1984 indicates that the addition of the economic performance to the "all events test" was to complement the existing two prongs of the "all events test," and did not call into question the precedential value of cases determining either the fact of liability or if liability could be determined with reasonable accuracy. <u>See</u> H.R. Rep. 98-432, pt. 2, at 1252-56 (1984); Staff of the Joint Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 258-62 (Comm. Print 1984). As the House Report No. 98-432(II) indicated, "[t]he Committee believes that the rules relating to the time for accrual of a deduction by a taxpayer using the accrual method of accounting should be changed to take into account the time value of money." H.R. Rep. 98-432, pt. 2, at 1254.

There are cases which have held that Board resolutions can fix liability for the purposes of the "all events test." <u>See</u> <u>Champion Spark Plug Co. v. Comm'r</u>, 30 T.C.

295; see also Willoughby Camera Stores, Inc. v. Comm'r, 125 F.2d 607; Produce Reporter Co. v. Comm'r, 18 T.C. 69 (1952), aff'd, 207 F.2d 586 (7th Cir. 1953).  In Champion Spark Plug, a company's Board resolutions were found to create a fixed and definite obligation and fixed the Champion's liability for the "all events test."  See Champion Spark Plug Co. v. Comm'r, 30 T.C. at 300.  A Board of Directors' resolution in Champion Spark Plug resolved to make sixty semi-monthly payments to a disabled employee.  Id. at 297. Although the payments would not begin until the year following the Board resolution, the payments would not be fully paid for a number of years, and the company was further under no underlying legal obligation to make the payments, the court determined the expenditure was a fixed and definite obligation that could be deducted as a liability in the year of the Board's resolution.  Id. at 298.  The court indicated "[i]t is sufficient here that the petitioner desired to obligate itself to make the payments that have a connection with its employer-employee relationship.  It translated its desire into an unconditional obligation to make the payments.  The expenditure, which we feel was ordinary and necessary in the conduct of its business, was properly accruable in the year 1953 when the obligation to pay was made fixed and definite by the resolution."  Id.

In Willoughby Camera Stores, Inc. v. Commissioner, the plaintiff, an accrual basis taxpayer, sought to deduct employee bonuses that had been declared in a Board of Directors' resolution and were to be paid the following year. See Willoughby Camera Stores, Inc. v. Comm'r, 125 F.2d at 608.  The United States Court of Appeals for the Second Circuit determined that the Board of Directors, in passing a Board resolution, "definitely fix[ed] a minimum for the amount to be paid" the following year to the employees and fixed the liability to comply with the "all events test."  See id. at 609. The court noted that the amount to be paid was known to the employees, and, therefore, the action on the part of the Board of Directors was viewed by the company and the employees as more than "a statement that so much would be paid if the company did not change its mind."  Id. (footnote omitted). The court also indicated that the promise to pay at least the amount set up in the reserve to the aggregate group could have been enforced by the employees as a class.  Id.  Therefore, the Second Circuit concluded: "all the events necessary to a determination of the amount to become due were present in the taxable years."  Id.  Notably, the Second Circuit stated "[t]he fact that before the amounts were paid in the succeeding years, new resolutions were passed by the board of directors is irrelevant; later resolutions were necessary to set the date of distribution, and those passed here, though somewhat repetitive, do not militate against the conclusion that the amounts set up by the earlier resolutions were regarded as final."  Id.

Similarly, in Produce Reporter Co. v. Commissioner, 18 T.C. 69, the Tax Court permitted amounts authorized as employee bonuses, pursuant to Board resolutions, to be deducted in the year of the resolution, although the payments were not made until the following year.  Id. at 76-77.  The Tax Court noted the company had a custom of announcing end of the year bonuses, authorized by the company's Board of Directors. The company would advise the employee of the exact amount the employee would receive the following year.  Id. at 77.  The company accrued the liability in the year the Board authorized the bonuses, and not the year the payments were made.  Id.  The Tax

Court stated, "[p]etitioner contends that a fixed, definite obligation to pay the bonuses was incurred in the respective years of accrual. We agree." Id.

The United States Court of Claims in Clevite Corp. v. United States, 181 Ct. Cl. 652, 386 F.2d 841 (1967), distinguished the case before it from Champion Spark Plug Co. v. Commissioner, 30 T.C. 295, and found that liability was not fixed for the "all events test" when a taxpayer deducted payment of vacation pay to its employees prior to when the vacation period begin. See Clevite Corp. v. United States, 181 Ct. Cl. at 657, 386 F.2d at 843. The Court of Claims indicated, "the Board of Directors passed no resolution, and the shareholders expressed no opinion on the subject, so that this case is demonstrably distinguishable from Champion Spark Plug Co." Clevite Corp. v. United States, 181 Ct. Cl. at 660, 386 F.2d at 844 (citation omitted). The United States Court of Appeals for the Federal Circuit in Avon Products, Inc. v. United States, 97 F.3d 1435 also distinguished a number of cases cited above which stated that taxpayers could "deduct in the year of accrual forms of employee compensation that were not paid until late in the following year." Id. at 1441. The Federal Circuit, however, was interpreting 26 U.S.C. § 404, which applies to "[d]eductions for contributions of an employer to an employees' trust or annuity plan and compensation under a deferred-payment plan." Regarding Willoughby Camera Stores, Inc. v. Commissioner, 125 F.2d 607, the Federal Circuit stated that the Willoughby case "predate[d] section 404 and its predecessor." Regarding Produce Reporter Co. v. Commissioner, 18 T.C. 69, the Federal Circuit indicated, "the question of the timing of the payments does not appear to have been raised as an issue." Avon Prods., Inc. v. United States, 97 F.3d at 1441. Notably, the Avon Products court did not question if Board resolutions could fix an accrual basis taxpayer's liability because the accrual of the company's employee profit-sharing payments were not based on the company's Board resolutions fixing the company's liability, but instead involved a foreign tax credit issue for a foreign subsidiary which was "required by Mexican law to pay its employees a percentage of its profits each year within five months of the close of its taxable year." See id. at 1437.

For the accrual method of accounting, and pursuant to Treasury Regulation § 1.446-1, "[t]he term 'liability' includes any item allowable as a deduction, cost, or expense for Federal income tax purposes," Treas. Reg. § 1.446-1(c)(ii)(B), and under the Tax Code, policyholder dividends are liabilities which are properly deductible by life insurance companies. See 26 U.S.C. § 805(a)(3); UNUM Corp. v. United States, 130 F.3d 501, 509 (1st Cir. 1997) ("There is no dispute that § 805(a)(3) allows life insurance companies to deduct 'policyholder dividends' from income."), cert. denied, 525 U.S. 810 (1998); see also 26 U.S.C. § 808(c) ("The deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year."); CUNA Mut. Life Ins. Co. v. United States, 39 Fed. Cl. 660, 661 (1997), aff'd, 169 F.3d 737 (Fed. Cir. 1999).

The plaintiff argued that when the Board passed its Dividend Guarantee Resolutions, it fixed plaintiff's liability for the purposes of the "all events test," in that year "to pay the guaranteed minimum amounts of policyholder dividends in each of the years

at issue,"[11] even though plaintiff's custom was to pay out policyholder dividends to its policyholders the following year.   Plaintiff also argued that the Dividend Guarantee Resolutions identified a "defined a group of policyholders that, in the aggregate, were entitled to receive the specified minimum in the following year regardless of which individuals composed the group," and that "[s]uch an identifiable group existed at the end of each of the tax years at issue, as more than 100,000 policyholders had already paid their premiums through their next anniversary date in the following year."

By contrast, the defendant argued "[i]n they [sic] year they were adopted, the dividend-guarantee resolutions did not fix ConnMutual's and MassMutual's liability to pay the declared guaranteed minimum amounts in the following year."   Defendant argued that plaintiff cannot demonstrate that at the end of each tax year, plaintiff was obligated to pay the entire guaranteed amount "under the facts as they stood at the end of that year."   According to defendant, despite plaintiff's assumption that it was already obligated to pay the guaranteed amount of dividends, conditions existed which demonstrate that "the companies [MassMutual and ConnMutual] had no liability to pay the entire guaranteed amount until a later event occurred – and that event was not simply the passage of time and the preservation of the status quo at year-end." Therefore, defendant argued, there was not an identifiable group of policyholders eligible to receive the Dividend Guarantee in the year the Dividend Guarantee Resolutions were adopted.

Although Board resolutions can establish the fact of liability, the court must determine if the Dividend Guarantee Resolutions, established the fact of liability.   As discussed above, "'a liability does not accrue as long as it remains contingent.'"   United States v. Hughes Props., Inc., 476 U.S. at 600 (quoting Brown v. Helvering, 291 U.S. at 200).   The plaintiff's Dividend Guarantees[12] stated in relevant part:

---

[11] MassMutual also was liable to pay settlement dividends to certain policyholders with policies 15 years or older and whose policies had lapsed or otherwise terminated prior to the policy's anniversary date.   For the years at issue, MassMutual deducted, in the year prior to the dividend payment, the lesser of the settlement dividend or the regular dividend due under the dividend scale adopt by MassMutual.   The IRS permitted the deductions of the settlement dividends. For the years at issue, MassMutual also paid policyholder dividends in December for policies with January anniversary dates of the following year, and deducted the policyholder dividends in the year they were paid.   The IRS permitted the deductions of the January anniversary date dividends in the year the dividends were paid.

[12] As noted above, although the Dividend Guarantees were not identical, the operative language was the same, including the definitions of Annual Dividend Guarantee and Guaranteed Dividends, and none of the differences are material to determining if the Dividend Guarantees fixed the fact of liability.   Non-material differences between the Dividend Guarantees included: different definitions of Company between the 1995 ConnMutual Dividend Guarantee and the MassMutual Dividend Guarantees, as well as the title of the person charged with monitoring and certifying the payments of the dividends, with the 1995 ConnMutual Dividend Guarantee indicating the individual as

4.1.    During each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall pay or apply annual policyholder dividends to its policyholders in accordance with its usual practices and procedures. The Company's adoption of an Annual Dividend Guarantee for any year shall not affect any individual policyholder's right to receive, or the Company's obligation to pay or apply, the annual policyholder dividend otherwise due to that individual policyholder on the applicable anniversary date.

4.2.    Prior to December 31st of each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall determine whether it actually has paid or applied annual policyholder dividends with respect to post-1983 policies in an amount at least equal to the specified amount of Guaranteed Dividends.

4.3.    If the Company determines that it actually has paid or applied annual policyholder dividends with respect to post-1983 policies in an amount at least equal to the amount of Guaranteed Dividends specified, then the Company's Executive Vice President – Corporate Financial Operations shall certify that the Company has satisfied its obligations imposed under the Annual Dividend Guarantee.

---

the Company's Chief Financial Officer," the 1995 and 1996 MassMutual Dividend Guarantees indicating the individual as the Company's Executive Vice President – Corporate Financial Operations, and the 1997 MassMutual Dividend Guarantee referring to the individual as the "Executive Vice President and Chief Financial Officer. Additionally, Section 4.7 of the 1995 ConnMutual Dividend Guarantee included a sentence not included in Section 4.7 of the MassMutual Dividends Guarantees, which stated: "The Company's Chief Financial Officer shall certify that such payments or application described in Sections 4.4 and 4.5 have been made and that the Annual Dividend Guarantee has been properly implemented.  Failure to so certify shall not impair, defeat, or invalidate the action of the Board of Directors in establishing the Annual Guarantee." There is no indication from the record before the court that ConnMutual's Chief Financial Officer failed to certify the payments, at the certification of the payments is not an issue before this court.

Moreover, the defendant, after describing 1995 MassMutual Dividend Guarantee, noted, "[a]lso in 1995, after consulting with MassMutual, ConnMutual adopted a nearly identical guarantee…. After the merger, MassMutual adopted similar dividend-guarantee resolutions in 1996 and 1997." Additionally, defendant quoted Section 4 "from the dividend guarantee that ConnMutual adopted in 1995 to govern payment of the guaranteed amount of dividends during the year 1996, but every dividend guarantee before the Court contains identical provisions." For purposes of discussion, the court uses the language of the 1995 MassMutual Dividend Guarantee quoted earlier.

4.4.   If the amount of Guaranteed Dividends specified exceeds the amount of annual policyholder dividends that the Company actually has paid or applied during the year (plus the amount that the Company determines will be paid or applied through December 31st of the year) with respect to post-1983 policies, then the Company shall be obligated to pay or apply an additional amount of policyholder dividends, equal to such excess, with respect to post-1983 policies.

4.5.   Such excess shall be apportioned among the post-1983 policies still in force in proportion to the annual policyholder dividends otherwise paid or applied with respect to such policies during the year.

4.6.   Such excess shall be paid or applied with respect to post-1983 policies during the year in accordance with the apportionment made pursuant to the preceding paragraph.

4.7.   The Company's Executive Vice President – Corporate Financial Operations shall certify that such payments or applications have been made and that the Annual Dividend Guarantee has been properly implemented.

The terms Annual Dividend Guarantee and Guaranteed Dividends were defined in the Dividend Guarantees.  The definition of the Annual Dividend Guarantee was, "the Company's irrevocable guarantee that it will pay or apply an amount not less than a specified amount of annual policyholder dividends with respect to post-1983 policies in the following year."  The definition of Guaranteed Dividends was, "annual policyholder dividends with respect to post-1983 policies in an amount that, pursuant to its Annual Dividend Guarantee, the Company has irrevocably committed itself to pay or apply in the following year."   The Dividend Guarantees guaranteed a minimum amount of policyholder dividends to be paid the following year to post-1983 policyholders whose policies were still in effect after the annual policyholder dividends were paid, if the annual policyholder dividend was not equal or greater to the guaranteed minimum amount.

Although the Dividend Guarantees did not identify the amount each individual policyholder would receive under the Dividend Guarantees, or even which specific policyholders would receive the minimum amount of guaranteed dividends, neither is fatal to the fixing of liability.  See Washington Post Co. v. United States, 186 Ct. Cl. at 536, 405 F.2d at 1284 ("[W]hen a 'group liability' is involved, it is the certainty of the liability which is of utmost importance in the 'all events' test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees."); see also Willoughby Camera Stores v. Comm'r, 125 F.2d at 609.

The parties disagree about two aspects of the plaintiff's Dividend Guarantee Resolutions regarding determining if liability was fixed: (1) whether the Dividend Guarantee Resolutions created a condition precedent, and (2) whether the Dividend

Guarantee Resolutions were revocable or likely to be enforced by plaintiff's regulators.[13] First addressing whether the Dividend Guarantee Resolutions created a condition precedent, which would prevent plaintiff's liability from accruing, Black's Law Dictionary defines a condition precedent as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises. If the condition does not occur and is not excused, the promised performance need not be rendered," and defines a condition subsequent as "[a] condition that, if it occurs, will bring something else to an end; an event the existence of which, by agreement of the parties, discharges a duty of performance that has arisen." Black's Law Dictionary 334 (9th ed. 2009). In the context of a copyright infringement suit, the United States Supreme Court, quoting an earlier version of Black's Law Dictionary stated, "'[a] condition precedent is one which must happen or be performed before the estate to which it is annexed can vest' or which must be performed 'before some right dependent thereon accrues.' A 'condition subsequent is one annexed to an estate already vested,…and by the failure or non-performance of which it is defeated.'" Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 47 (quoting Black's Law Dictionary (3d ed. 1933)), reh'g denied (1939) (omissions in original, footnotes omitted).

The court in Burnham Corp. v. Commissioner, 90 T.C. 953 (1988), aff'd, 878 F.2d 86 (2d Cir. 1989), explained the relationship of a condition precedent and a condition subsequent for the accrual of a liability for the "all events test:"

> If existence of a liability depends on satisfaction of a condition precedent, the liability is not unconditionally fixed as required by the first requirement of the all events test. Liability does not in fact arise until the condition is satisfied. A taxpayer is, therefore, prevented from obtaining the benefit of a deduction for an expense that he has NO liability to pay until some event, other than the passage of time, occurs. A liability subject to a condition subsequent, however, is definitely fixed, subject only to a condition which may cut off liability in the future. An accrual basis taxpayer having such a liability may deduct an expense for which it is presently liable.

Id. at 956 (emphasis in original); see also Charles Schwab Corp. v. Comm'r, 107 T.C. 282, 293 (1996), aff'd, 161 F.3d 1231 (9th Cir. 1998), cert. denied, 528 U.S. 822 (1999)

---

[13] The defendant also suggested that plaintiff is trying to use the Dividend Guarantees to return to the reserve method of accounting by arguing, "MassMutual is trying, in effect, to change its accounting method for policyholder dividends from the accrual method back to the reserve method by deducting policyholder dividends in the year in which its board declared them." Plaintiff responded that neither its intent, nor the result of the Dividend Guarantees, was to return to the reserve method of accounting. According to plaintiff, it "applied the accrual rules to its specific set of facts in each of the tax years at issue." The issue, before the court, however, is whether, using the accrual method of accounting which plaintiff was required to use, did the Dividend Guarantees meet the criteria of the "all events test," and the court finds no evidence in the record before the court that the reserve method was used by plaintiff.

(distinguishing between conditions precedent and conditions subsequent for the "all events test" in the context of income).

As it applies to plaintiff's case, if the Dividend Guarantees imposed a condition precedent on the payment of the guaranteed amount of minimum dividends, then the plaintiff's liability cannot be considered fixed and the requirements of the "all events test" are not met. Noting that the plaintiff's Dividend Guarantee Resolutions stated that the policyholders were not eligible to receive the minimum amount of guaranteed dividends until after the annual policyholder were paid, the defendant argued that the Dividend Guarantee Resolutions "demonstrate the that companies [MassMutual and ConnMutual] may not accrue a liability to pay the guaranteed amounts in the years they adopted the dividend guarantees because the liability was contingent on an event that could not happen until the next year." The defendant asserted that the payment of the annual policyholder dividends was the contingent event which prevents the liability from being fixed in the year the Dividend Guarantee Resolutions were adopted. The defendant further argued that "the present case is not one in which identifiable persons had fulfilled a 'condition precedent' during the first year and were already eligible by the end of that year to receive a distribution during the next year." The defendant also maintained that the post-1983 policyholders were eligible only for the guaranteed amount after they received their regular dividend, which they could only receive the following year, and because the policyholders could have lost their eligibility if their policies were still not in force, a condition precedent persisted.

By contrast, plaintiff argued that a defined group of post-1983 policyholders existed who had already paid their policies through their next anniversary and were already entitled to receive the annual dividend. The plaintiff contended there were no conditions precedent to these policyholders receiving their annual dividend, only the passage of time and the status quo. Therefore, the plaintiff argued, the fact of liability can be established for the Dividend Guarantees for all the tax years at issue. Plaintiff further argued that "[p]laintiff's liability to pay the guaranteed minimum amount of policyholder dividends became fixed and, therefore, accruable in the year the Dividend Guarantee Resolutions were adopted…. Plaintiff had at year end a single dividend liability with a guaranteed minimum and a reasonably estimated maximum." Moreover, plaintiff stated it "purposely chose to set the dividend guarantees at a level that was virtually certain to be paid in the ordinary course under Plaintiff's dividend scale."

At trial, Susan Marchacos, the "reporting and strategy manager" for MassMutual's United States Insurance Group, presented evidence of MassMutual's and ConnMutual's post-1983 policies as paid through their following anniversary, with anniversary dates of January, February and March for each of the tax years at issue. For example, as of December 31, 1995, there were 78,569 post-1983 MassMutual policies with anniversary dates of January, February, or March, with the premiums paid through the next anniversary and 22,595 similar post-1983 ConnMutual policies as of December 31, 1995.[14] This testimony, seemingly, refutes the defendant's argument

---

[14] The information presented by Ms. Marchacos at trial and included in Joint Exhibits was in the form of summaries. At trial, Ms. Marchacos testified that the summaries

that there were not a group of identifiable policyholders already eligible for the guarantee minimum amount of dividends in the year the Dividend Guarantee Resolutions were adopted.

The defendant, however, argued that the typical MassMutual policy was entitled to a dividend only if the policyholders had paid premiums for the two previous policy years, and asserted that the summaries of the policies identified by Ms. Marchacos only showed premiums paid for one year. In response the plaintiff argued that defendant's argument is inconsistent with the defendant's own statement in its post-trial brief that the plaintiff's lapse rate is typically between five and six percent. For all the policies identified by Ms. Marchacos, and included in the Joint Exhibits, as policies for which only one year of premiums had been paid, the plaintiff stated that "every single post-1983 policyholder with policies commencing during the first quarter of each year from 1984 to 1993 would have had to lapse or die prior to December 31, 1995. Such an assumption is completely unrealistic and unwarranted given the facts on the record." Indeed, as Mr. Jermyn testified, MassMutual's lapse rate was in the 5 to 6 percent range during the mid to late 1990s and the lapse rate was relatively stable. It would be highly unusually for the lapse rate to increase to one hundred percent for the post-1983 policies with January, February, or March anniversary dates. This is further supported by the number of MassMutual and ConnMutual post-1983 policies paid through their following anniversary, with anniversary dates of January, February and March as of December 31, 1996 and 1997. As of December 31, 1996, there were 79,269 MassMutual post-1983 policies paid through their following anniversary, with anniversary dates of January, February and March, an increase from the 78,569 such policies as of December 31, 1995. Similarly, as of December 31, 1997, there were 79,628 MassMutual post-1983 policies paid through their following anniversary. Likewise, for ConnMutual, as of December 31, 1996, there were 22,758 MassMutual post-1983 policies paid through their following anniversary, with anniversary dates of January, February and March and 23,111 similar policies as of December 31, 1997 – for both companies an increase from the 22,595 policies as of December 31, 1995. Defendant's position regarding the MassMutual and ConnMutual post-1983 policies paid through their following anniversary appears to be unfounded in the record.

There also is a distinct group of MassMutual and ConnMutual post-1983 policies which were no longer required to pay any further premiums on their policies. Ms. Marchacos presented evidence at trial of MassMutual and ConnMutual post-1983 policies which were paid-up policies for each of the tax years at issue. Ms. Marchacos explained that paid-up policies were "policies where premiums were no longer due" and policies which have paid all the premiums they were ever going to have to pay. Although a smaller group of policies, the plaintiff demonstrated there was an identifiable group of policyholders with paid-up policies. For example, as of December 31, 1995, there were 1,848 post-1983 MassMutual policies with anniversary dates of January, February or March, which were paid-up policies, and 287 similar post-1983 ConnMutual

---

were reliable summaries of the data that underlined them. Defendant did not object to the Joint Exhibits providing the numbers of policies paid through the following anniversary date or paid-up policies.

paid-up policies as of December 31, 1995. For the group of policyholders with paid-up policies, no event but the passage of time would occur before those policyholders would receive their annual dividend and, thus, be eligible for the minimum guaranteed dividends. Indeed, if any event prevented the paid-up policyholders from receiving their policyholder dividends or rendered the paid-up policyholders ineligible for receiving the minimum guaranteed dividends, it would not be a condition precedent, rather a condition subsequent, which would not prevent liability for being fixed. See Burnham Corp. v. Comm'r, 90 T.C. at 956. Notably, in all of the years at issue plaintiff's payment of annual policyholder dividends exceeded the guaranteed minimum of dividends and an additional round of payments to the post-1983 policyholders with policies still in force was not required.

In addition to arguing that there was not an identifiable group of policyholders eligible to receive the Dividend Guarantee in the year the Dividend Guarantee Resolutions were adopted, the defendant devoted substantial effort to the words of the Dividend Guarantee. The defendant emphasized that "[n]o policyholder is entitled to share in the entire guaranteed amount before receiving the regular annual policyholder dividend 'during the year,' and the dividend guarantees and enacting resolutions, read as a whole, demonstrate that the phrase 'during the year' can refer only to the year after the year in which the guarantees were adopted." The defendant argued that "[i]n each of the years before the Court, the Board instructed the company to assure that the guaranteed amount was properly paid or applied by monitoring payment of the annual dividends during the following year. Thus, according to the defendant, the documents themselves demonstrate that the guaranteed amounts can comprise only dividends paid in the year after the guarantees were adopted." (internal citations omitted; emphasis in original).

As discussed above, however, simply because the plaintiff will not pay out the liability until the following year does not prevent the liability from accruing under the "all events test." See United States v. Hughes Props., Inc., 476 U.S. at 605-606; see also Eastman Kodak Co. v. United States, 209 Ct. Cl. at 373, 534 F.2d at 257 ("The 'all events' test thus allows deductions when the taxpayer has a special kind of knowledge which gives him enough facts to demonstrate the absolute necessity of paying an expense at some future date without regard to such matters as actual payment taking place, existence of legal liability, or accrual."). Although a condition precedent can prevent a liability from being fixed, if the only event(s) still to occur are the passage of time and/or the payment, the liability is considered fixed. See generally Burnham Corp. v. Comm'r, 90 T.C. 953. For the identifiable group of post-1983 policyholders with paid-up policies, no events other than the passage of time and payment of the policyholder dividend were required.

The defendant also argued that simply because the plaintiff was certain to be obligated to pay the guaranteed amount the following year, does not mean the liability was fixed in the year before the Dividend Guarantee Resolutions were passed, citing to Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26. In Hallmark Cards, the taxpayer did not accrue income in one year for merchandise because title and risk of loss did not

pass to the purchaser until the following year, even though the merchandise had shipped in the first year. See id. at 30. It was the taxpayer's practice to ship Valentine's Day merchandise the year before Valentine's Day, but not to pass the risk of loss and title to the purchaser until the following year. See id. at 29. The taxpayer had this arrangement for Valentine's Day merchandise to address customer concerns about receiving Valentine's Day merchandise while they still had Christmas merchandise and the financial impact of inclusion of the Valentine's Day merchandise in their year-end inventories. See id. at 28. Although title was certain to pass to the purchaser the following year, the Tax Court concluded that the income could be not be accrued in the first year by the taxpayer, because the fact of liability under the "all events test" was not met. Id. at 32. The Tax Court determined "petitioner does not possess any fixed and definite rights to payment at year end. The fact that at the stroke of midnight petitioner knows with absolute certainty that in the next instant these rights will arise cannot compensate for the fact that as of the close of the old year they do not exist. The all events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability - or even absolute certainty - that such right or obligation will arise at some point in the future." Id. at 34.

The defendant tried to analogize the Hallmark Cards case as applicable to the plaintiff's Dividend Guarantees. The Hallmark Cards case, however, is factually distinct, as the Hallmark Cards case addressed the accrual of income to the taxpayer, whereas the instant case relates to the accrual of a liability to the plaintiff. Although the analysis is similar for fixing liability under the "all events test," see Rev. Rul. 98-39, 1998-2 C.B. 198, the accrual of income is distinct from the accrual of a liability.[15]

Unlike the plaintiff, the taxpayer in Hallmark Cards adopted the practice of shipping the merchandise without passing the risk of loss and title in response to concerns from its purchasers so that Hallmark did "not possess any fixed and definite rights to payment at year end," Hallmark Cards, Inc. v. Comm'r, 90 T.C. at 34. MassMutual adopted the Dividend Guarantees, not due to policyholder concerns about guaranteeing payment of dividends, but to align their tax accounting with their financial reporting for the post-1983 policies. Moreover, MassMutual established a binding commitment before years end to pay out a guaranteed minimum of dividends to policyholders, albeit with payment to occur in the following year. Moreover, in the case of Hallmark Cards, it was the IRS which was trying to demonstrate that the "all events test" was met, and the taxpayer was resisting the application of the test, the inverse of the positions of the parties in this case. The Hallmark Cards case also is not binding precedent on this court. See Amergen Energy Co., LLC ex rel. Exelon Generation Co., LLC v. United States, 94 Fed. Cl. 413, 422 (2010); see also Alpha I, L.P. v. United States, 93 Fed. Cl. 280, 309 n.15 (2010) ("Although decisions of the Tax Court are not

---

[15] The Revenue Ruling indicates that "[g]enerally, in a transaction where one taxpayer is accruing a liability to pay another taxpayer, the last event necessary to establish the fact of liability under the all events test of § 1.461-1(a)(2)(i) is the same event that fixes the right to receive income under the all events test of § 1.451-1(a)." Rev. Rul. 98-39, 1998-2 C.B. 198.

precedential for and are not binding upon the Court of Federal Claims, decisions of the Tax Court are substantial authority under Treasury Regulation § 1.6662–4(d)(3)(iii).").[16]

An identified group of plaintiff's policyholders were certain to receive the regular dividend and, therefore, qualify for the guaranteed dividend, subject only to the passage of time even though plaintiff might not be liable to a segment of post-1983 policyholders since some post-1983 policyholders might not receive the regular dividends if their policies lapsed. Furthermore, the group of policyholders with paid-up policies were not at risk for their policies lapsing as they never had to pay another premium on their policies. Therefore, unlike the taxpayer in Hallmark Cards, plaintiff's Dividend Guarantees did not impose conditions precedent on the payment of the guaranteed amount of policyholder dividends. Plaintiff had an unconditional obligation to post-1983 policyholders with paid-up policies to pay the guaranteed amounts of policyholder dividends in the year the Dividend Guarantee Resolutions were adopted.

In addition to arguing that the Dividend Guarantee Resolutions created a condition precedent, the defendant also argued that the resolutions did not impose any obligation on the plaintiff because the Dividend Guarantee Resolutions were both revocable and unlikely to be enforced by a regulator. Counsel for the defendant framed

---

[16] Defendant also relied on a case decided by a Judge of the United States District Court for the Southern District of New York, New York Life Insurance Co. v. United States, 780 F. Supp. 2d 324 (S.D.N.Y. 2011), in which the Judge dismissed the case on a motion for failure to state a claim, see Fed. R. Civ. P. 12(b)(6) (2011), following review of the plaintiff's complaint. At issue in New York Life Insurance was, were all the elements of the "all events test" met, such that plaintiff could deduct policyholder dividends. New York Life Ins. Co. v. United States, 780 F. Supp. 2d at 326. The District Court found in the case before it," the liability was contingent upon the continuation of an internal recordkeeping practice that was not required by law, id. at 328, which was insufficient to establish "a plausible inference that [plaintiff] was required to do so," under the "all events test." Id. (emphasis in original). In the case before this court, the facts have been more fully developed after trial, and in the court's view, results in a different result. Moreover, without much discussion, the New York court references its reliance on the Supreme Court decision in United States v. General Dynamics Corp., 481 U.S. 239, determining "[t]his Court finds the case at hand to be more akin to [United States v.] General Dynamics [Corp., 476 U.S. 239] than to [United States v.] Hughes Properties [Inc., 476 U.S. 593]." New York Life Ins. Co. v. United States, 780 F. Supp. 2d at 328. This court does not find United States v. General Dynamics Corp. to be particularly helpful in applying the "all events test" to the facts of the case before the court. In General Dynamics, the accrual basis taxpayer sought to deduct an estimate of its obligation to pay for employee medical care in the taxable year when all of the claims had not been submitted or processed. See United States v. Gen. Dynamics Corp., 481 U.S. at 241-42. The facts in General Dynamics do not appear to be similar to the plaintiff's passage of Board Resolutions to enact Dividend Guarantees which fixed liability in the taxable year the resolutions were enacted, and would not have provided sufficient guidance for this court to have dismissed plaintiff's claim for failure to state a claim.

the argument as "[t]his issue comes down to the question of this: Would anyone or anything have forbidden MassMutual to withdraw the dividend resolution if it wanted to?" The defendant contends "a board of directors can always rescind or ignore its own resolutions; and a board with the power to add the word 'irrevocable' to a resolution also has the power to remove or ignore the word 'irrevocable.'" Defendant's counsel quoted from an unpublished opinion from the Court of Chancery of Delaware for the proposition "'[i]f the board has the power to adopt resolutions (or policies), then the power to rescind resolutions (policies) must reside with the board as well.'" Unisuper, Ltd. v. News Corp., No. 1699-N, 2005 WL 3529317, *5 (Del. Ch. Dec. 20, 2005).

Defendant argued that had the beneficiaries been aware of the resolutions, the resolutions might not have been revocable, because the beneficiaries could have relied upon the resolutions and kept their policies in force because of the guaranteed dividend. Defendant also intimated that cases which permitted accrual of expenses by Board resolution uniformly informed the beneficiaries. In the case of Willoughby Camera Stores, Inc. v. Commissioner, discussed above, however, in which accrual was permitted, it is not apparent that the beneficiary was aware of the Board resolution or that such knowledge was required for the liability to be fixed. See Willoughby Camera Stores, Inc. v. Comm'r, 125 F.2d 607. Similarly, in Champion Spark Plug Co. v. Commissioner, 30 T.C. 295, the Tax Court did not mention if the disabled employee or his widow were provided notice of the Board's resolution prior to payment of the benefits.

Even if notice of a Board's resolutions might be an important element for consideration, which does not appear so from the case law, defendant acknowledged that ConnMutual included a footnote disclosing the dividend guarantee of payment of policyholder dividends in its 1995 Annual Statement. Defendant argued, however, that ConnMutual did not disclose the terms or that the guarantee applied only to post-1983 policyholders. Defendant stated "[e]xcept for this meager information in a footnote of a financial statement, ConnMutual did not disclose the dividend guarantee to its policyholders or its field force; and according to a former Connecticut insurance commissioner, even a trained insurance investigator could easily overlook footnotes in a financial statement," and MassMutual did not make any such disclosure.

Moreover, in response to the defendant's argument that the Board Resolutions could be revoked, the plaintiff argued that "the government does not (and cannot) point to a single tax accounting case, statute or regulation requiring 'irrevocability' as an element necessary to accrue a liability. No such requirement exists under the federal tax law." Counsel for the defendant admitted at closing argument "that of all my arguments this is the weakest. The impression I'm left with, perhaps no good, is that a revocable board resolution that is respected is respected voluntarily pretty much because they're voluntarily not revoking it. That may be a weak argument." The court agrees.

In addition, the defendant also argued that the plaintiff's regulators never approved the Dividend Guarantees and would not have monitored MassMutual's

compliance with them. Defendant conceded, however, that Mr. McAdoo, Assistant Commissioner of the Massachusetts Division of Insurance, stamped "approved" on the letter sent to him by MassMutual regarding the Dividend Guarantee in 1996 and returned the stamped letter to MassMutual. The defendant argued this was an error because the Massachusetts Division of Insurance did not have the authority to approve policies such as the Dividend Guarantees. Noting, given that the Dividend Guarantees were set in an amount virtually certain to be paid, plaintiff argued that it is not surprising the Massachusetts Division of Insurance "did not devote regulatory resources to something that was virtually self-enforcing." Moreover, as stipulated by the parties, no state insurance regulator objected to the legality of the guarantees. In fact, both ConnMutual and MassMutual corresponded with their respective regulators for each year the companies adopted a Dividend Guarantee, to inform the regulators in advance of the Dividend Guarantee and none of the regulators questioned their ability to monitor the Dividend Guarantees and payment of the policyholder dividends. Notably, Massachusetts Division of Insurance Assistant Commissioner McAdoo, in response to MassMutual's letter informing the Division of Insurance of its intention to adopt a Dividend Guarantee, stated "[w]e intend to instruct the examiners who perform MassMutual's Examination to verify that the guaranteed aggregate amount is paid in accordance with the 'Terms of the Annual Dividend Guarantee.'"

Furthermore, the defendant alleged that an "insurance commissioner would have been unlikely to enforce the dividend guarantees," however, defendant's sole witness for this assertion was Robert Wilcox, a former Utah insurance commissioner, who was qualified as an expert generally on insurance regulation and insurance industry practice, with no particular Massachusetts or Connecticut expertise. By contrast, one of plaintiff's expert witness was a former Connecticut Insurance Commissioner, Robert Googins. Mr. Wilcox himself noted that Mr. Googins was more knowledgeable than he was about Connecticut insurance regulation,[17] and acknowledged that Mr. Googins was "right that the Connecticut commissioner has ample authority over dividends." Moreover, as plaintiff noted, "not a single deponent testified that the DOI [Massachusetts Division of Insurance] or [Connecticut] Insurance Department lacked the authority to enforce the dividend guarantees in the unlikely event enforcement should ever become necessary," nor was other evidence to that effect introduced into the record.

Defendant also raised the possibility that if a second round of payments was required under the Dividend Guarantees, then post-1983 policyholders would receive an extra amount of dividends, greater than received by the pre-1984 policyholders in the same dividend class. This, defendant argued, would result in the post-1983 policyholders receiving a disproportionate share of the divisible surplus in relation to their contributions and would violate the contribution principle, which "addresses the fair equitable…payment of dividends to policyholders." Defendant also cited to Massachusetts and Connecticut statutes, Mass. Ann. Laws. ch. 175 § 120 (1995) and Conn. Gen. Stat. § 38a-446 (1994), prohibiting discrimination in the amount of dividends paid to insurants in the same class, i.e., a violating the contribution principle.

---

[17] Mr. Wilcox, however, also asserted that he and Mr. Googins "we're on equal footing" regarding knowledge of Massachusetts insurance regulation.

Addressing this concern, Mr. Jermyn testified that as MassMutual's Senior Vice President and Chief Actuary, he "would have expected that we most certainly would have made any second round of payments had they been necessary," explaining that "every decision that has ever been made relative to the payment of dividends of MassMutual have [sic] been to ensure that we're fair and consistent with our policyholders to ensure that we're consistent with our practices, so it would be inconceivable to me that if the payments that have been made to our policyholders were less than the guarantee such that there was a difference that had to be made up, that we would not have made that difference up." Similarly, Ms. Sperry stated that "MassMutual stands by its commitments, and if it made a guarantee, if its board took an action, they would take actions that they view as serious and binding, and if they made that commitment…I feel that they would have made whole on that guarantee." In response, defendant argued that even if the insurance commissioners had known about the potential for violations of the contribution principle by the terms of the Dividend Guarantees, the commissioners could not have known about "MassMutual's non-existent plans to remedy potential violations."

Although the defendant raised the possibility that plaintiff's regulators might have been unlikely to enforce the dividend guarantees and that a second round of payments might have violated the contribution principle, or even state law, the defendant does not demonstrate how this would prevent plaintiff from establishing the fact of liability. As plaintiff pointed out, and defendant acknowledged, a liability need not be legally enforceable to be fixed under the "all events test." See Eastman Kodak Co. v. United States, 209 Ct. Cl. at 373, 534 F.2d at 257; see also Burlington N. R.R. Co. v. Comm'r, 82 T.C. at 151; Champion Spark Plug Co. v. Comm'r, 30 T.C. at 298. Even if the parade of horribles that defendant envisions were to have come true, a second round of payments, which defendant itself noted would not be triggered absent some unforeseeable cataclysmic event, such as a total breakdown of the financial system or a nuclear war, and plaintiff failed to make a similar payment to similarly situation pre-1984 policyholders in violation of the contribution principle and state law, none of the above demonstrates that the Dividend Guarantees did not fix the fact of liability.

Plaintiff's Dividend Guarantees created an unconditional obligation to pay an aggregate group of policyholders the following year. The Dividend Guarantees were not subject to a condition precedent and neither defendant's concerns regarding enforceability or revocability of the Dividend Guarantee Resolutions prevents plaintiff's liability from being fixed in the year in which plaintiff enacted the Dividend Guarantees. Plaintiff has demonstrated that the Dividend Guarantees establish the fact of liability, meeting the first requirement of the "all events test."

After the close of testimony in the above captioned case, on November 9, 2011, the IRS released Revenue Ruling 2011-29, which held that: "An employer can establish the 'fact of the liability' under § 461 for bonuses payable to a group of employees even though the employer does not know the identity of any particular bonus recipient and the amount payable to that recipient until after the end of the taxable year." Rev. Ruling 2011-29, 2011 WL 5379455 (Nov. 9, 2011). The example used in the Revenue Ruling

was an employer who used an accrual method of accounting and paid bonuses to group of employees after the end of a tax year pursuant to a defied bonus program, previously described to the employees, for performance during the tax year. See id. Although the employer would not know the identity of any particular bonus recipient and the amount payable to that recipient until after the end of the taxable year, the aggregate minimum of bonuses to be paid was fixed, as the employer would reallocate the bonuses to other employees if an employee was no longer employed on the date the bonuses were paid, and, therefore, was not qualified to receive a bonus. See id.

As noted by a Judge on the United States Court of Federal Claims, "Revenue rulings typically contain the Service's interpretation of how the law applies to a commonly encountered set of hypothetical facts. Although not as broad in application as regulations, revenue rulings are considered authoritative." Reliant Energy Inc. v. United States, 45 Fed. Cl. 302, 306 n.6 (1999).[18] Because Revenue Ruling 2011-29 was enacted on November 9, 2011, years after the first tax year at issue in this case, there is some debate if the ruling would be retroactively effective. As discussed at length in a footnote in Principle Life Insurance Co. v. United States, the court stated that:

> Odd as it might seem, some courts have held that, under section 7805 of the Code, revenue procedures relate back to the effective date of the statute they implement, unless they prescribe otherwise. See Cohen v. Comm'r of Internal Revenue, 910 F.2d 422, 427 (7th Cir. 1990); Shore v. Comm'r of Internal Revenue, 631 F.2d 624, 628 n. 8 (9th Cir. 1980) ("Revenue Rulings and Procedures are normally given retroactive application."); United States v. Lavi, 2006 WL 1305288, at *3 (E.D.N.Y. March 30, 2006), aff'd, 168 F. App'x 454 (2d Cir. 2006) ("Section 7805 of Title 26 of the United States Code applies to both Revenue Rulings and Revenue Procedures and requires both to be applied retroactively unless the Treasury Secretary states otherwise."); cf. Matson Navigation Co. v. Comm'r of Internal Revenue, 68 T.C. 847, 852–55 (1977) (rejecting this view).

Principle Life Ins. Co. v. United States, 95 Fed. Cl. 786, 799 n.30 (2010). The court continued, noting that:

> That said, there are several reasons to question whether the IRS, without any prior warning, may establish procedures that apply retroactively. First,

---

[18] The Federal Circuit has indicated that it has not determined if Revenue Rulings are binding on the court of appeals and this court. See Am. Mut. Life Ins. Co. v. United States, 267 F.3d 1344, 1352 n.3 (Fed. Cir. 2001) ("We leave for another day the issue of whether IRS revenue rulings are binding on this court…."); but see B.F. Goodrich Co. v. United States, 94 F.3d 1545, 1550 n.5 (Fed. Cir. 1996) ("We recognize, however, that IRS Revenue Rulings have no binding effect on this court."); 26 U.S.C. § 6110(k)(3) (2006) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent.").

it is well-established that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988); <u>see</u> <u>also</u> <u>Durr v. Nicholson</u>, 400 F.3d 1375, 1380 (Fed. Cir. 2005). Nothing in section 6603 provides such an "express" power. And it is debatable whether section 7805 of the Code does so, as the Secretary's authority thereunder to issue retroactive regulations deals primarily, if not exclusively, with interpretative rules. Legislative regulations, by comparison, are generally viewed as springing from the specific enactment language and not from the general authorization for the Secretary to "prescribe all needful rules and regulations" found in section 7805(a). <u>See</u> <u>E.I. du Pont de Nemours & Co. v. Comm'r of Internal Revenue</u>, 41 F.3d 130, 135 n.20 (3d Cir. 1994). Second, it is unclear whether the Secretary may use a revenue procedure to effectuate a grant of legislative rulemaking authority, even a grant that, unlike some, does not explicitly require the issuance of "regulations." <u>Cf.</u> 26 U.S.C. § 2663 ("The Secretary shall prescribe such regulations..."). Affording such a revenue procedure the weight of a legislative regulation seems particularly problematic if, as happened here, the IRS issues the procedures without complying with the notice-and-comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b)—the ones that normally apply to legislative rules. <u>See</u> <u>Schwalbach v. Comm'r of Internal Revenue</u>, 111 T.C. 215, 220 (1998) (Secretary must comply with APA, 5 U.S.C. § 553(b) when he prescribes legislative regulations); <u>see</u> <u>also</u> <u>Fransen v. United States</u>, 191 F.3d 599, 600 (5th Cir. 1999).

<u>Principle Life Ins. Co. v. United States</u>, 95 Fed. Cl. at 799 n.30.  Regardless of whether the Revenue Ruling can be applied retroactively to the facts of this case, the holding of Revenue Ruling 2011-29, that the fact of liability can be established even though an employer making bonus payments does not know the identity of any particular recipient and bonus is not paid until the following year, is consistent with the court's conclusion that plaintiff's Dividend Guarantees established the fact of liability even though the Dividend Guarantees did not identify which policyholders would receive the minimum amount of guaranteed dividends or what amount each individual policyholder would receive under the Dividend Guarantees. Similar to the example cited in the Revenue Ruling, in which the fact of liability was established, plaintiff in the above captioned case established a guaranteed minimum amount of dividends to pay policyholders, which was sufficient to establish the fact of liability.

<u>Liability Determined with Reasonable Accuracy</u>

The second element of the "all events test" is that "the amount of such liability can be determined with reasonable accuracy."  26 U.S.C. § 461(h)(4); Treas. Reg. § 1.461-1(a)(2)(i) <u>see</u> <u>also</u> <u>United States v. Gen. Dynamics Corp.</u>, 481 U.S. at 242 (quoting Treas. Reg. § 1.461-1(a)(2) (1986) ("The test is now embodied in Treas. Reg. §

1.461-1(a)(2), 26 C.F.R. § 1.461-1(a)(2) (1986), which provides that '[u]nder an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy.'"); Hughes Props., Inc. v. United States, 760 F.2d 1292, 1293 (Fed. Cir. 1985) (citing Treas. Reg. § 1.446-1(c)(1)(ii) (1984) ("Under the accrual method of accounting, an expense is deductible for a tax year in which all of the events have occurred that determine the fact of liability and the amount thereof can be determined with reasonable accuracy."), aff'd, 476 U.S. 593 (1986). Notably, "the all events test does not require that the amount of liability be known with certainty. The second prong of the test makes clear that the amount only need be known with reasonable accuracy." Burnham Corp. v. Comm'r, 878 F.2d at 88.

The defendant did not allege at trial, or argue in filings submitted to the court, that the Dividend Guarantees did not satisfy the second element of the "all events test." Defendant also conceded that "[e]ach of the dividend guarantee resolutions did establish a minimum amount of policyholder dividends to be paid to post-1983 policyholders in the following year." In Burnham Corp. v. Commissioner, the court concluded that the "[b]y failing to argue that the test's second prong had not been satisfied, the [defendant] has in effect conceded that the amount of liability could be determined with reasonable accuracy." Id. Like the United States in the cause currently before the court, in United States v. General Dynamics Corp., 481 U.S. 239, in determining whether all the events necessary to fix liability had occurred, the Supreme Court noted in a footnote, that the "United States did not seek review of whether the amount of liability in this case could be determined with reasonable accuracy." Id. at 242 n.2.

Each of the Dividend Guarantees at issue had an identical definition for the Annual Dividend Guarantee: "the Company's irrevocable guarantee that it will pay or apply an amount not less than a specified amount of annual policyholder dividends with respect to post-1983 policies in the following year." As a specific example, at the December 13, 1995, MassMutual Board of Directors meeting, the Board of Directors stated it was guaranteeing a minimum amount of $185.0 million in policyholder dividends to be paid to post-1983 policyholders in the following year. The MassMutual Board of Directors voted:

> That the Company hereby absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1996 and ending December 31, 1996, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 9, 1995, it will pay or cause to be applied during 1996, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $185 million; and that the Executive Vice President, Corporate Financial Operations be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1996 to assure that such guaranteed amount is so paid or applied.

Therefore, in 1995, the minimum amount of policyholder dividends guaranteed by the 1995 MassMutual Dividend Guarantee was $185.0 million and the minimum amount of policyholder dividends guaranteed by the 1995 ConnMutual Dividend Guarantee was $97.0 million.  In 1996, the minimum amount of policyholder dividends guaranteed by the 1996 MassMutual Dividend Guarantee was $310.0 million and in 1997, the minimum amount of policyholder dividends guaranteed by the 1997 MassMutual Dividend Guarantee was $360.0 million. Each of the Dividend Guarantees identified a specific minimum amount of guaranteed policyholder dividends for which MassMutual and ConnMutual were liable and, although not stated in dollar amounts in the Board Resolutions, the amount of plaintiff's liability for the Dividend Guarantees was determinable with "reasonable accuracy" for each tax year at issue.  Plaintiff has established, and defendant has not effectively contested, that for the second element of the "all events test," the amount of liability was determined with reasonable accuracy.

    Economic Performance

    The Federal Circuit has indicated that "I.R.C. § 461(h) embodies an 'economic performance' test, according to which an accrual method taxpayer may not deduct an expense prior to the time when 'economic performance' occurs in relation to the expense." Maxus Energy Corp. v. United States, 31 F.3d 1135, 1142 (Fed. Cir. 1994); see also United States v. Gen. Dynamics Corp., 481 U.S. at 243 n.3.  The Tax Code at 26 U.S.C. § 461(h)(1) states, "[i]n determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." 26 U.S.C. § 461(h)(1); see also Metro Leasing and Develop. Corp. v. Comm'r, 376 F.3d at 1023; Gold Coast Hotel & Casino v. United States, 158 F.3d at 487 n.5 ("Section 461(h)(1) further provides that the 'all events' test is not satisfied any earlier than when 'economic performance' has occurred.").  Therefore, although the fact of liability may be established and the amount of the liability can be established with reasonable accuracy, unless economic performance has occurred, the "all events test" has not been met. See 2 Mertens Law of Federal Income Taxation, § 12A:119, at 12A-191 ("For accrued expenses, the all-events test is modified by the rule of Section 461(h), that the all-events test is not deemed to have been met any earlier than the occurrence of the economic performance of the item or obligation underlying the taxpayer's liability.") (footnote omitted).[19]  However, 26 U.S.C. § 461(h)(3) provides an exception for certain recurring items.  Section 461(h)(3) states:

---

[19]  As the United States Claims Court stated, "[t]he addition of I.R.C. § 461(h)(1), section 91(a) of the TEFRA, [Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 411 (1982)] precludes an accrual basis taxpayer from meeting the 'all events' test prior to the completion of economic performance." Long v. United States, 10 Cl. Ct. 46, 57 n.6 (1986), aff'd, 824 F.2d 976 (Fed. Cir. 1987) (table).  Although the court in Long v. United States referenced the Tax Equity and Fiscal Responsibility Act, the Claims Court was more likely referring to the Deficit Reduction Act of 1984, which amended 26 U.S.C. § 461 to include subsection h, entitled, "Certain Liabilities Not

(A) In general.--Notwithstanding paragraph (1) an item shall be treated as incurred during any taxable year if--

(i) the all events test with respect to such item is met during such taxable year (determined without regard to paragraph (1)),

(ii) economic performance with respect to such item occurs within the shorter of--

(I) a reasonable period after the close of such taxable year, or

(II) 8 1/2 months after the close of such taxable year,

(iii) such item is recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which the requirements of clause (i) are met, and

(iv) either--

(I) such item is not a material item, or

(II) the accrual of such item in the taxable year in which the requirements of clause (i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs.

26 U.S.C. § 461(h)(3); see also 2 Mertens Law of Federal Income Taxation, § 12A:123, at 12A-201. Treasury Regulation § 1.461-5(a), promulgated pursuant to 26 U.S.C. § 461(h), see Treas. Dec. 8408, 57 Fed. Reg. 12411 (Apr. 10, 1992), states, in part, that "[e]xcept as otherwise provided in paragraph (c) of this section, a taxpayer using an accrual method of accounting may adopt the recurring item exception described in paragraph (b) of this section as method of accounting for one or more types of recurring items incurred by the taxpayer." Treasury Regulation § 1.461-5(b) states,

Under the recurring item exception, a liability is treated as incurred for a taxable year if--

Incurred Before Economic Performance." See Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 91, 98 Stat. 494.

(i) As of the end of that taxable year, all events have occurred that establish the fact of the liability and the amount of the liability can be determined with reasonable accuracy;

(ii) Economic performance with respect to the liability occurs on or before the earlier of--

> (A) The date the taxpayer files a timely (including extensions) return for that taxable year; or

> (B) The 15th day of the 9th calendar month after the close of that taxable year;

(iii) The liability is recurring in nature; and

(iv) Either--

> (A) The amount of the liability is not material; or

> (B) The accrual of the liability for that taxable year results in a better matching of the liability with the income to which it relates than would result from accruing the liability for that taxable year in which economic performance occurs.

Treas. Reg. § 1.461-5(b) (2012); see also Rev. Rul. 2007-3, 2007-1 C.B. 350 (Jan. 22, 2007); Stephen F. Gertzman, Federal Tax Accounting ¶ 4.04[3][f] (2010). Although the Tax Code and the Treasury Regulations permit the recurring item exception to economic performance to be met if the amount of the liability is not material, 26 U.S.C. § 461(h)(3)(iv)(I); Treas. Reg. § 1.461-5(b)(iv)(A), neither party has argued that the amount of liability is not material for any of the tax years at issue.

The parties have stipulated that "[b]oth MassMutual and ConnMutual took the necessary administrative steps to elect the 'recurring item exception' within the meaning of Internal Revenue Code § 461(h)(3) with respect to policyholder dividends for the years at issue." As noted above, plaintiff's policyholder dividends are liabilities because pursuant to Treasury Regulation § 1.446-1, "[t]he term liability includes any item allowable as a deduction, cost or expense for Federal income tax purposes," Treas. Reg. § 1.446-1(c)(ii)(B), and policyholder dividends are properly deducible by life insurance companies under the Tax Code. See 26 U.S.C. § 805(a)(3); see also 26 U.S.C. § 808(c); UNUM Corp. v. United States, 130 F.3d at 509. The policyholder dividends were payment liabilities for the purposes of economic performance, because the payment of the liability is the economic performance. See Gold Coast Hotel & Casino v. United States, 158 F.3d at 487 n.5 (citing Treas. Reg. § 1.461-4(k)(3) ("[F]or payment liabilities for which payment is economic performance, the requirement applies to liabilities that would otherwise be deductible or incurred for taxable years beginning

after December 31, 1991."). Moreover, the parties have jointly stipulated that the plaintiff's "liability to pay policyholder dividends is a payment liability within the meaning of Treas. Reg. § 1.461-4." In 1995, ConnMutual set aside as a liability on its 1995 Annual Statement, an estimate of the total amount of dividends payable for the following year and in the years 1995-1997, MassMutual set aside as a liability on its Annual Statement for an estimate of the total amount of dividends payable for the following year. As determined above, the liability for each year was fixed and determined. The liabilities were recurring in nature, as the plaintiff not only paid policyholder dividends in each of the tax years at issue, but paid policyholder dividends on an annual basis.

The parties also have stipulated that ConnMutual timely filed its federal income tax return in 1995 and MassMutual timely filed its federal income tax return for 1995, 1996, and 1997. The parties also have stipulated the amount of policyholder dividends the plaintiff paid to former ConnMutual policyholders between January 1, 1996 and September 15, 1996 and the amount of policyholder dividends that MassMutual paid in policyholders dividends between January 1, 1996 and September 15, 1996, January 1, 1997 and September 15, 1997 and January 1, 1998 and September 15, 1998, in each instance, on "the 15th day of the 9th calendar month after the close of that taxable year." Treas. Reg. § 1.461-5(b)(ii)(B).

The only remaining criteria for the plaintiff to satisfy the recurring item exception for economic performance is the matching requirement. <u>See</u> 26 U.S.C. § 461(h)(3)(iv)(II); Treas. Reg. § 1.461-5(b)(iv)(B). "The exception to the economic performance test under Section 461(h) requires that the accrual of an item in a particular taxable year results in better matching of the deduction with the income to which the item relates. To determine whether a better matching results generally accepted accounting principles are an important factor." 2 Mertens Law of Federal Income Taxation, § 12A:123, at 12A-203. Indeed, as Treasury Regulation § 1.461-5(b)(5)(i) states, "[i]n determining whether the matching requirement of paragraph (b)(1)(iv)(B) of this section is satisfied, generally accepted accounting principles are an important factor, but are not dispositive." Treas. Reg. § 1.461-5(b)(5)(i).

Pursuant to Treasury Regulation § 1.461-5(b)(5)(ii), the matching requirement of Treasury Regulation § 1.461-5(b)(1)(iv)(B) may be deemed satisfied in the case of certain liabilities. <u>See</u> Treas. Reg. § 1.461-5(b)(5)(ii). Treasury Regulation § 1.461-5(b)(5)(ii) states:

> In the case of a liability described in paragraph (g)(3) (rebates and refunds), paragraph (g)(4) (awards, prizes, and jackpots), paragraph (g)(5) (insurance, warranty, and service contracts), paragraph (g)(6) (taxes), or paragraph (h) (continuing fees under the Nuclear Waste Policy Act of 1982) of § 1.461-4, the matching requirement of paragraph (b)(1)(iv)(B) of this section shall be deemed satisfied.

Treas. Reg. § 1.461-5(b)(5)(ii). The matching requirement of Treasury Regulation § 1.461-5(b)(5)(ii) refers to "rebates and refunds" in Treasury Regulation § 1.461-4(g)(3), which provides, in part: "If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the

price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed." Treas. Reg. § 1.461-4(g)(3) (2012).[20]

The parties sole source of disagreement regarding the economic performance element of the "all events test" is whether policyholder dividends constitute rebates, refunds, or similar payments, such that plaintiff can satisfy the matching requirement of the recurring item exception to economic performance. The plaintiff argued that "[t]he question of whether Plaintiff's policyholder dividends are 'in the nature of' rebates or refunds is the issue disputed between the parties and presented to the Court." In its pre-trial memorandum, the defendant stated that even if the court determined the fact of liability was fixed, the court must also determine whether "a mutual life insurer's policyholder dividends constitute rebates, refunds, or similar payments under Treas. Reg. § 1.461-4(g)(3)." In its post-trial brief, the defendant argued that the policyholders dividends are not rebates, refunds or similar payments, but rather "they are 'other liabilities' described in [Treasury Regulation] § 1.461-4(g)(7), for which 'economic performance occurs as the taxpayer makes payments in satisfaction of the liability to the person to which the liability is owed.'" (quoting Treas. Reg. § 1.461.4(g)(7)).

Treasury Regulation § 1.461.4(g)(7) is a catch-all provision for economic performance of a liability. Treasury Regulation § 1.461.4(g)(7) states:

In the case of a taxpayer's liability for which economic performance rules are not provided elsewhere in this section or in any other Internal Revenue regulation, revenue ruling or revenue procedure, economic performance occurs as the taxpayer makes payments in satisfaction of the liability to

---

[20] Treasury Regulation § 1.461-4(g)(3) states:

Rebates and refunds. If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed. This paragraph (g)(3) applies to all rebates, refunds, and payments or transfers in the nature of a rebate or refund regardless of whether they are characterized as a deduction from gross income, an adjustment to gross receipts or total sales, or an adjustment or addition to cost of goods sold. In the case of a rebate or refund made as a reduction in the price of goods or services to be provided in the future by the taxpayer, "payment" is deemed to occur as the taxpayer would otherwise be required to recognize income resulting from a disposition at an unreduced price. See Example 2 of paragraph (g)(8) of this section. For purposes of determining whether the recurring item exception of § 1.461-5 applies, a liability that arises out of a tort, breach of contract, or violation of law is not considered a rebate or refund.

Treas. Reg. § 1.461-4(g)(3).

the person to which the liability is owed. This paragraph (g)(7) applies only if the liability cannot properly be characterized as a liability covered by rules provided elsewhere in this section. If a liability may properly be characterized as, for example, a liability arising from the provision of services or property to, or by, a taxpayer, the determination as to when economic performance occurs with respect to that liability is made under paragraph (d) of this section and not under this paragraph (g)(7).

Treas. Reg. § 1.461.4(g)(7). The plaintiff does not allege that the liability for policyholder dividends would be characterized as a liability for any other section of Treasury Regulation § 1.461.4 if the court were to find policyholder dividends were not in the nature of a rebate or a refund. If the policyholder dividends are "a rebate, refund, or similar payment" pursuant to Treasury Regulation § 1.461.4(g)(3) and fulfill the matching requirement of 26 U.S.C. § 461(h), thereby qualifying for the recurring item exception to economic performance, and the Dividend Guarantees meets each of the elements of the "all events test."

Section 461 of the Tax Code does not indicate if rebates or refunds satisfy the matching requirement. Therefore, the court must look to the rules of statutory construction. The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)); see also Jimenez v. Quaterman, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 608 F.3d 1317, 1323 (Fed. Cir.) ("When interpreting any statute, we look first to the statutory language."), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 1513 (2011). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992) and McCarthy v. Bronson, 500 U.S. 136, 139 (1991)). "'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.'" Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d 1357, 1361 (Fed. Cir.) (quoting Bull v. United States, 479 F.3d 1365, 1376 (2007)), reh'g en banc denied (Fed. Cir. 2010).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Barnhart v. Sigmon Coal Co., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 489 n.13 (2004) ("It is, moreover, '"a cardinal principle of statutory construction"' that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant."'" (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)

(quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001))); <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. See <u>Duncan v. Walker</u>, 533 U.S. at 174 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts...to regard each as effective." <u>Radzanower v. Touche Ross & Co.</u>, 426 U.S. 148, 155 (1976); <u>see also</u> <u>Hanlin v. United States</u>, 214 F.3d 1319, 1321 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000).

When the statute provides a clear answer, the court's analysis is at an end. <u>See Barnhart v. Sigmon Coal Co.</u>, 534 U.S. at 450; <u>see also</u> <u>Arko Foods Int'l, Inc. v. United States</u>, 654 F.3d 1361, 1364 (Fed. Cir. 2011) ("'[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.'" (quoting <u>Millenium Lumber Distrib., Ltd. v. United States</u>, 558 F.3d 1326, 1328 (Fed. Cir. 2009), <u>reh'g denied</u>, 558 F.3d 1326 (2009)); <u>Am. Airlines, Inc. v. United States</u>, 551 F.3d 1294, 1300 (Fed. Cir. 2008), <u>reh'g granted</u>, 319 F. App'x 914 (Fed. Cir. 2009). Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" <u>Johnson v. United States</u>, 529 U.S. 694, 723 (2000) (quoting <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989) (quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917))); <u>see also</u> <u>Bartels Trust for the Benefit of Cornell Univ. ex. rel. Bartels v. United States</u>, 617 F.3d at 1361 (citing <u>Sharp v. United States</u>, 580 F.3d 1234, 1237 (Fed. Cir. 2009), <u>Jimenez v. Quarterman</u>, 555 U.S. at 118, and <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 6 (2000)). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." <u>Weddel v. Sec'y of Dep't of Health and Human Servs.</u>, 23 F.3d 388, 391 (Fed. Cir.) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) (citing <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469, 476, <u>cert. denied</u>, 505 U.S. 1218 (1992) and <u>Darby v. Cisneros</u>, 509 U.S. 137, 147 (1993))), <u>reh'g denied</u> <u>and</u> <u>en banc suggestion declined</u> (Fed. Cir. 1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." <u>Weddel v. Sec'y of Dep't of Health and Human Servs.</u>, 23 F.3d at 391 (citing <u>INS v. Chadha</u>, 462 U.S. 919 (1983)). "'[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" <u>Shannon v. United States</u>, 512 U.S. 573, 583-84 (1994) (quoting <u>Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB</u>, 814 F.2d 697, 712 (D.C. Cir. 1987)). <u>AFL-CIO v. NLRB</u>, 814 F.3d 697, 712 (D.C. Cir. 1987). Indeed, in construing a statute courts "'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" <u>Schindler Elevator Corp. v. United States</u>, 131 S. Ct. 1885, 1891 (2011) (quoting <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 129 S. Ct. 2343, 2350 (2009)) (internal quotation marks omitted). Even "'[w]hen terms used in a statute are undefined, we give them their ordinary meaning.'" <u>Schindler Elevator Corp. v. United States</u>, 131 S. Ct. at 1891 (quoting <u>Asgrow Seed Co. v. Winterboer</u>, 513 U.S. 179, 187 (1995)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. See <u>Whitfield v.</u>

United States, 543 U.S. 209 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history...."), reh'g denied sub nom. Hall v. United States, 544 U.S. 913 (2005); but see Chamberlain Grp., Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1196 (Fed. Cir. 2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting Tidewater Oil Co. v. United States, 409 U.S. 151, 157 (1972))), cert. denied, 544 U.S. 923 (2005).

Legislative history may be helpful in certain instances "to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1081-82 (2011) (citing Exxon Mobile Corp. v. Allapatah Servs., Inc., 545 U.S. 546, 568 (2005); see also Xianli Zhang v. United States, 640 F.3d 1358, 1373 (Fed. Cir. 2011), petition for cert. filed (U.S. Jan. 9, 2012). However, legislative history does not "trump[] clear text." Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d at 1361 (citing Sharp v. United States, 580 F.3d at 1238, Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 396 (Fed. Cir. 1990), and Coltec Indus., Inc. v. United States, 454 F.3d 1340).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that would otherwise control. See Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228-29 (1957). ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 (1932)); see also Bulova Watch Co. v. United States, 365 U.S. 753, 761 (1961). A more specific statute will not be superseded by a more recent, general statute unless there is a clear indication of the intent to do so. Morton v. Mancari, 417 U.S. 535, 550-551 (1974) (holding specific controlling over general, irrespective of priority of enactment). Therefore, for a subsequently enacted statute to be held controlling, the circumstances must explicitly indicate the congressional intent to do so. United States v. United Cont'l Tuna, 425 U.S. 164, 168 (1976) (holding that "...repeals by implication are not favored.") The principle is particularly applicable in situations in which a party seeks to have a specific statute superseded by a more general one. Southwest Marine of San Francisco, Inc. v. United States, 896 F.2d 532, 533 (Fed. Cir. 1990). The view of a later Congress on a statute, however, does not control how to interpret an earlier enacted statute, O'Gilvie v. United States, 519 U.S. 79, 90 (1996), although subsequent legislation "does have persuasive value," Bell v. New Jersey, 461 U.S. 773, 784 (1983), and "is entitled to great weight in statutory construction," Red Lion Broad. Co. v. FCC, 395 U.S. 367, 380-81 (1969).

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984) (footnote omitted); see

also Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 239 (2004).  The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  United States v. Mead Corp., 533 U.S. at 226-27; see also Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 129 S. Ct. 2710, 2715 (2009) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837) ("Under the familiar Chevron framework, we defer to an agency's reasonable interpretation of a statute it is charged with administering."); Yanco v. United States, 258 F.3d at 1362.

Elaborating on the Chevron doctrine, the United States Supreme Court in Mead stated:

> When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," Chevron, 467 U.S., at 843-844, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.  See id., at 844; United States v. Morton, 467 U.S. 822, 834 (1984); APA, 5 U.S.C. §§ 706(2)(A), (D).  But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered.  "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" Bragdon v. Abbott, 524 U.S. 624, 642 (1998) (quoting Skidmore, 323 U.S., at 139-140), and "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." Chevron, supra, at 844 (footnote omitted); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980); Zenith Radio Corp. v. United States, 437 U.S. 443, 450 (1978).  The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position, see Skidmore, supra, at 139-140.

United States v. Mead Corp., 533 U.S. at 227-28 (omissions in original and footnotes omitted); see also Household Credit Servs., Inc. v. Pfennig, 541 U.S. at 239, 242; Lacavera v. Dudas, 441 F.3d 1380, 1383 (Fed. Cir. 2006), cert. denied, 549 U.S. 1205 (2007); California Indus. Prods, Inc. v. United States, 436 F.3d 1341, 1352-57 (Fed. Cir. 2006); Rotech Healthcare Inc. v. United States, 71 Fed. Cl. 393, 421, appeal dismissed,

214 F. App'x 973 (Fed. Cir. 2006). Moreover, explaining the relevance and purpose of Chevron deference, the Supreme Court has noted:

> In Chevron, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (internal citations omitted).

Chevron deference requires that a court ask the following questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43. If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." Id. at 843 (footnotes omitted). see also Judulang v. Holder, 132 S. Ct. 476, 484 n.7 (2011) ("[U]nder Chevron step two, we ask whether an agency interpretation is "'arbitrary or capricious in substance."'" (quoting Mayo Found. for Medical Ed. and Research v. United States, 131 S. Ct. 704, 711 (2011) (quoting Household Credit Servs., Inc. v. Pfennig, 541 U.S. at 242)). "[I]f Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 866) (other citations omitted).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.11 (citations omitted). However, "[d]eference does not mean acquiescence." Presley v. Etowah County Comm'n, 502 U.S. 491, 508 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court,

employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." Rust v. Sullivan, 500 U.S. 173, 184 (1991) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

The United States Supreme Court has stated for "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570 (1995) (quoting Dep't of Revenue of Oregon v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)). The Supreme Court has applied this normal rule of statutory construction to the Internal Revenue Code. See Sorenson v. Treasury, 475 U.S. 851, 860 (1986).

The United States Supreme Court also has indicated that regulations issued by the IRS are accorded Chevron deference if consistent with the relevant statute. "Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" Comm'r v. Portland Cement Co., 450 U.S. 156, 169 (quoting Comm'r v. South Texas Lumber Co., 333 U.S. 496, 501 (1948)). The Supreme Court elaborated that courts "must defer to Treasury Regulations that 'implement the congressional mandate in some reasonable manner.'" Comm'r v. Portland Cement Co., 450 U.S. at 169 (quoting United States v. Correll, 389 U.S. 299, 307 (1967)). The Supreme Court noted that "[w]e do this because Congress has delegated to the [Commissioner], not to the courts, the task of prescribing all needful rules and regulations for the enforcement of the Internal Revenue Code," United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 219 (2001) (quoting Nat'l Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472, 477 (1979)) and because the Supreme Court does not "'sit as a committee of revision to perfect the administration of the tax laws.'" United States v. Cleveland Indians Baseball Co., 532 U.S. at 218 (quoting United States v. Correll, 389 U.S. at 306-307); see also Keener v. United States, 551 F.3d 1358, 1363 (Fed. Cir.) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843) ("Since the statute is ambiguous with respect to this issue, we give deference to the agency's interpretation of the statute."), reh'g en banc denied (Fed. Cir.), cert. denied, 130 S. Ct. 153 (2009); Khan v. United States, 548 F.3d 549, 554 (7th Cir. 2008) ("We review general authority tax regulations under the criteria articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).").

The Federal Circuit likewise has indicated that: "'Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" CUNA Mut. Life Ins. Co. v. United States, 169 F.3d 737, 742 (Fed. Cir. 1999) (quoting Am. Mut. Life Ins. Co. v. United States, 43 F.3d 1172, 1176 (8th Cir. 1994)); see also Dow Corning Corp. v. United States, 984 F.2d 416, 419 (Fed.

Cir. 1993); Dillon, Read & Co., Inc. v. United States, 875 F.2d 293, 299 (Fed. Cir. 1989) (citing United States v. Vogel Fertilizer Co., 455 U.S. 16, 26 (1982)) (Treasury Regulations "are to be sustained unless disharmonious with the controlling statute…."). "'Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a).'" Colt Indus., Inc. v. United States, 880 F.2d 1311, 1314 (Fed. Cir. 1989) (quoting United States v. Correll, 389 U.S. at 307 (quoting 26 U.S.C. § 7805(a))); see also Murfam Farms, LLC v. United States, 88 Fed. Cl. 516, 522 (2009) ("Section 7805(a) of the Code authorizes the Secretary of the Treasury to promulgate rules and regulations in connection with the enforcement of the Code.") (internal citation omitted), motion to vacate denied (2010).

Section 461(h)(3) of the Tax Code does not contain a general definition for rebate or refund. Nor is there a general definition of rebate or refund for the Tax Code generally or in Treasury Regulations § 1.461-5 or § 1.461-4. The economic performance element of the "all events test," Section 461(h)(3) of the Tax Code, identifies the recurring item exception to that test and the requirements necessary to meet the exception. One of the requirements is that the accrual of such item occur in the taxable year in which the requirements of clause "(i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs." 26 U.S.C. § 461(h)(3)(A)(iv)(II). However, 26 U.S.C. § 461(h)(3) does not identify how a more proper match is achieved pursuant to the "all events test." The Treasury Regulations attempt to address how an accrual taxpayer can achieve a "more proper match." See Treasury Regulations §§ 1.461-4(g)(3), 1.461-5(b)(5)(ii). The Tax Code language at Section 461(h)(3) is broad and ambiguous, and the court is left to determine if the Treasury Regulation is a reasonable and consistent interpretation of the statute. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 and Comm'r v. Portland Cement Co., 450 U.S. at 169. The Tax Code provides, at 26 U.S.C. § 7805(a) (2006), that: "Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." Moreover, 26 U.S.C. § 461(h), which governs economic performance, states "[i]n the case of any other liability [not enumerated in 26 U.S.C. § 461(h)(2)] of the taxpayer, economic performance occurs at the time determined under regulations prescribed by the Secretary [of the Treasury]." 26 U.S.C. § 461(h)(2)(D).[21]

Treasury Regulation § 1.461-5, titled, "Recurring item exception," addresses the matching requirement of 26 U.S.C. § 461(h)(3), and restates the matching requirement

---

[21] The liabilities specifically identified in 26 U.S.C. § 461(h)(2) include: "Services and property provided to the taxpayer," 26 U.S.C. § 461(h)(2)(A), "[s]ervices and property provided to the taxpayer," 26 U.S.C. § 461(h)(2)(B), and "[w]orkers compensation and tort liabilities of the taxpayer," 26 U.S.C. § 461(h)(2)(C), none of which are at issue in this case.

from the statute and states: "The accrual of the liability for that taxable year results in a better matching of the liability with the income to which it relates than would result from accruing the liability for the taxable year in which economic performance occurs." Treas. Reg. § 1.461-5(b)(1)(iv)(B).  Treasury Regulation § 1.461-5 provides some clarification of the matching requirement at § 1.461-5(b)(5), "Matching requirement," noting "[i]n determining whether the matching requirement of paragraph (b)(1)(iv)(B) of this section is satisfied, generally accepted accounting principles are an important factor, but are not dispositive."  Treas. Reg. § 1.461-5(b)(5)(i).  The Treasury Regulation continues, "[i]n the case of a liability described in paragraph (g)(3) (rebates and refunds), paragraph (g)(4) (awards, prizes, and jackpots), paragraph (g)(5) (insurance, warranty, and service contracts), paragraph (g)(6) (taxes), or paragraph (h) (continuing fees under the Nuclear Waste Policy Act of 1982) of § 1.461-4, the matching requirement of paragraph (b)(1)(iv)(B) of this section shall be deemed satisfied."  Treas. Reg. § 1.461-5(b)(5)(ii).  Because the standard identified in the statute is that the recurring item exception is applicable when a more proper match can be met, and the application in the Treasury Regulation lists specific liabilities that may be conclusively considered to be a better match for accrual in the taxable year than the taxable year economic performance occurred, the Treasury Regulation was consistent in the aim of the statute and was, therefore, not "'unreasonable and plainly inconsistent with the revenue statutes.'" Comm'r v. Portland Cement Co., 450 U.S. 156, 169 (1981) (quoting Comm'r v. South Texas Lumber Co., 333 U.S. 496, 501 (1948)).

The words rebate and refund, however, do not appear in the statute, 26 U.S.C. § 461(h), and neither word is defined in Treasury Regulations § 1.461-5 or § 1.461-4 nor in the Tax Code or the Treasury Regulations more generally.[22]  For example, the Tax Code at  26 U.S.C. § 808, which relates to policyholder dividends, defines an "experience-rated refund," which are not before the court, the definition merely states, "[t]he term 'experience-rated refund' means any refund or credit based on the experience of the contract or group involved," and does not define a "refund."   26 U.S.C. § 808(d)(3).

Two other sections of the Tax Code provides a definition of the term rebate, but within the context of a deficiency or underpayment of taxes.  First, 26 U.S.C. § 6664 (2006), relating to accuracy-related and fraud penalties, states:

> For purposes of this part, the term "underpayment" means the amount by which any tax imposed by this title exceeds the excess of--
>
> > (1) the sum of--
> >
> > > (A) the amount shown as the tax by the taxpayer on his return, plus

---

[22]  The term rebate appears in 22 provisions of the Tax Code, either current or subsequently amended, and the term "refund" appears in over 275 provisions of the Tax Code, either current or subsequently amended.  See 26 U.S.C. §1 et seq.  The majority of the provisions of the Tax Code with the term refund relate to claims for a tax refund.

(B) amounts not so shown previously assessed (or collected without assessment), over

(2) the amount of rebates made.

For the purposes of paragraph (2) the term "rebate" means so much of an abatement, credit, refund or other repayment, as was made on the ground that the tax imposed was less the excess of the amount specified in paragraph (1) over the rebates previously made.

26 U.S.C. § 6664. Similarly, in the subchapter of the Tax Code relating to "Deficiency Procedures in the Case of Income, Estate, Gift, and Certain Excise Taxes," 26 U.S.C. § 6211, definition of a deficiency, states:

(a) In general.--For purposes of this title in the case of income, estate, and gift taxes imposed by subtitles A and B and excise taxes imposed by chapters 41, 42, 43, and 44 the term "deficiency" means the amount by which the tax imposed by subtitle A or B, or chapter 41, 42, 43, or 44 exceeds the excess of--

(1) the sum of

(A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

(B) the amounts previously assessed (or collected without assessment) as a deficiency, over--

(2) the amount of rebates, as defined in subsection (b)(2), made.

(b) Rules for application of subsection (a).--For purposes of this section--

(1) The tax imposed by subtitle A and the tax shown on the return shall both be determined without regard to payments on account of estimated tax, without regard to the credit under section 31, without regard to the credit under section 33, and without regard to any credits resulting from the collection of amounts assessed under section 6851 or 6852 (relating to termination assessments).

(2) The term "rebate" means so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by subtitle A or B or chapter 41, 42, 43, or 44 was less than the

excess of the amount specified in subsection (a)(1) over the rebates previously made.

26 U.S.C. § 6211 (2006). Neither use of the term rebate provides a general definition of the term rebate, nor does either definition further an understanding of the term rebate as used in Treasury Regulation § 1.461-4(g)(3), or as the term applies to the facts of the current case.

There also is no general definition for the terms rebate or a refund in the Treasury Regulations.[23] The Treasury Regulations do have a definition for a rebate, but it is found in the specific context of an arbitrage rebate. See Treas. Reg. § 1.148-3(b) (2012). Treasury Regulation § 1.148-3(b) states: "Definition of rebate amount. As of any date, the rebate amount for an issue is the excess of the future value, as of that date, of all receipts on nonpurpose investments over the future value, as of that date, of all payments on nonpurpose investments." Treas. Reg. § 1.148-3(b). As noted by the United States Court of Appeals for the Federal Circuit, "[a]rbitrage is the practice of 'simultaneous[ly] buying and selling...identical securities in different markets, with the hope of profiting from the price difference in those markets.'" Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 608 F.3d at 1319 (quoting Black's Law Dictionary 112 (8th ed. 2004)) (omission in original). Arbitrage is not at issue in this case, and a definition of a rebate amount in the context of arbitrage is not helpful as a general definition of a rebate in the Treasury Regulations or to further the understanding of the use of the term rebate under Treasury Regulation § 1.461-4(g)(3), or as applied to the facts of this case.

The Treasury Regulations also provide another definition of a rebate, albeit in the context of an underpayment for the purposes of an accuracy-related penalty or a fraud. Treasury Regulation § 1.6664-2(e) states:

Rebates. The term "rebate" means so much of an abatement credit, refund or other repayment, as was made on the ground that the tax imposed was less than the excess of--

(1) The sum of--

(i) The amount shown as the tax by the taxpayer on his return, plus

(ii) Amounts not so shown previously assessed (or collected without assessment), over

(2) Rebates previously made.

---

[23] The term rebate appears in 65 Treasury Regulations, and the term refund appears in over 800 Treasury Regulations. As with the Tax Code, the vast majority of the Treasury Regulations using the term refund relate to claims for a tax refund.

Treas. Reg. § 1.6664-2(e) (2012). Similarly, Treasury Regulation § 301.6653-1, "Failure to pay tax," referencing 26 U.S.C. § 6211, discussed above, in subsection c, "Definition of underpayment" states that "[f]or purposes of this subparagraph, the term 'rebates' means so much of an abatement, credit, refund, or other repayment as was made on the ground that the tax imposed was less than the excess of the amount specified in subdivision (i) or (ii) of this subparagraph, whichever is applicable, over any rebates previously made." Treas. Reg. § 301.6653-1(c) (2012). The definition of a rebate in the context of fraud or an "accuracy-related penalty" is not useful in understanding the definition of rebate under the Treasury Regulation § 1.461-4(g)(3) or as applied to the facts of the case before the court.

Additionally, although a definition is not provided, Treasury Regulation § 1.419A(f)(6)-1, "Exception for 10 or more employer plan," in the context of an example mentions if an employer "uses the amount contributed by each employer to purchase one-year term insurance coverage on the lives of the covered employees with a face amount equal to the death benefit provided by the plan. No employer is entitled to any rebates or refunds provided under the insurance contract." Treas. Reg. § 1.419A(f)(6)-1 (2012). Although Treasury Regulation § 1.419A(f)(6)-1 uses the very phrase at issue in the present case, "rebates or refunds" and applies in the context of an insurance contract, the Treasury Regulation fails to provide a definition for either term. Nor does reviewing the terms in the context of Treasury Regulation § 1.419A(f)(6)-1 provide any guidance for the instant case.

The Treasury Regulations also offer specific definitions for the term refund, but do not offer a general definition or one that is applicable to this case. For example, Treasury Regulation § 1.148-4, "Yield on an issue of bonds," subsection (f)(7) states "Refund or reduction of guarantee payments. If as a result of an investment of proceeds of a refunding issue in a refunding escrow, there will be a reduction in, or refund of, payments for a guarantee (savings), the savings must be treated as a reduction in the payments on the refunding issue." Treasury Regulation § 1.148-4(f)(7) (2012). An additional definition, which does not provide much illumination regarding rebates or refunds, is Treasury Regulation § 1.522-1, "Tax treatment of farmers' cooperative marketing and purchasing associations exempt under section 521." Treasury Regulation § 1.522-1(b)(4) states: "Patronage dividends, rebates, and refunds. The term patronage dividend, rebate, or refund includes any amount allocated by a cooperative association, to the account of a patron on the basis of the business done with or for such patron." Treas. Reg. § 1.522-1(b)(4) (2012).

The definition of the term refund that would appear to be the most helpful to understanding the definition of a rebate or a refund in the context of the policyholder dividends at issue in this case is in Treasury Regulation § 1.404(a)-8 (2012). Subsection (a)(3) of Treasury Regulation § 1.404(a)-8, "Contributions of an employer under an employees' annuity plan which meets the requirements of section 401(a)" states that: "There must be a definite written arrangement between the employer and the insurer that refunds of premiums, if any, shall be applied within the taxable year of the employer in which received or within the next succeeding taxable year toward the purchase of retirement annuities…. For the purpose of this condition, 'refunds of

premiums' means payments by the insurer on account of credits such as dividends, experience rating credits, or surrender or cancellation credits." Treas. Reg. 1.404(a)-8(a)(3). Although the Treasury Regulation offers a definition of a refunds of premium, which includes dividends, it is in the context of account of credits and also includes other types of credits not applicable to this case, such as experience rating credits, surrender credits and cancellation credits. Moreover, the definition is specific to employer contributions to an employees' annuity plan, which is not at issue in the present case.

In sum, neither the Tax Code nor the Treasury Regulations provide a specific definition for rebate or refund applicable to this case. As recently stated by the Federal Circuit:

> When terms are not defined, it is a basic principle of statutory interpretation that they are deemed to have their ordinary meaning. Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S. Ct. 1534, 71 L. Ed. 2d 748 (1982); Perrin v. United States, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979). For that meaning, it is appropriate to consult dictionaries. See BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91-92, 127 S. Ct. 638, 166 L. Ed. 2d 494 (2006); Lamar v. United States, 241 U.S. 103, 113, 36 S. Ct. 535, 60 L. Ed. 912 (1916).

Neilson v. Shinseki, 607 F.3d 802, 805-806 (Fed. Cir. 2010); see also Salman Ranch Ltd v. United States, 573 F.3d 1362, 1374 (Fed. Cir. 2009) (citing Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 476 (1994) for the proposition "that, in the absence of a statutory definition, statutory terms are construed in accordance with their ordinary or natural meaning."). The Federal Circuit also has indicated, "[i]n construing statutory language, we look to dictionary definitions published at the time that the statute was enacted." Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010) (footnote omitted).

Treasury Regulation § 1.461-4 was published in the Federal Registry on April 10, 1992. See T.D. 8408; 57 Fed. Reg. 12411-02 (Apr. 10, 1992), corrected by 69 Fed. Reg. 44596-01 (Jul. 27, 2004).[24] Likewise, Treasury Regulation § 1.461-5 was published in the Federal Registry on April 10, 1992. See T.D. 8408; 57 Fed. Reg. 12411-02. The then-current Black's Law Dictionary defines a rebate as a "[d]iscount; deduction or refund of money in consideration of prompt payment. A deduction from a stipulated premium on a policy of insurance, in pursuance of an antecedent contract. A deduction or drawback from a stipulated payment, charge or rate (as, a rate for the transportation of freight by a railroad), not taken out in advance of payment, but handed back to the payer after he has paid the full stipulated sum. Refund of purchase price made by manufacturer to consumer to induce purchase of product." Black's Law

---

[24] The correction to Treasury Regulation § 1.461-4 related to Treasury Regulation § 1.461-4(d)(4), which is not at issue in this case, does not change the court's analysis of Treasury Regulation § 1.461-4. See 69 Fed. Reg. 44596-01.

Dictionary 1266 (6th ed. 1990).[25]  Black's Law Dictionary defines a refund as, "[t]o repay or restore; to return money in restitution or repayment; e.g. to refund overpaid taxes; to refund purchase price of returned goods.  See also Rebate; Refund claim; Refunds."  Id. at 1281.[26]

The 1993 Random House Unabridged Dictionary defines a rebate as: "1. a return of part of the original payment for some service or merchandise; partial refund.  2. to allow as a discount. 3. to deduct (a certain amount), as from a total.  4. to return (part of an original payment).… 5. to provide a rebate for (merchandise) after purchase.  6. to blunt (an edged or pointed weapon). 7. to cover the edge or point of (an edged weapon) in order to make it incapable of cutting or piercing.  8. to allow rebates, esp. as the policy or practice of a company, store, etc."  Random House Unabridged Dictionary 1608 (2d ed. 1993).  The Random House Unabridged Dictionary defines a refund as: "1. to give back or restore (esp. money); repay.  2. To make repayment to; reimburse. 3. To make repayment. 4. An act or instance of refunding.  5. An amount refunded."  Id. at 1622. (parts of speech omitted).

The plaintiff argued that the policyholder dividends are in the nature of rebates, refunds, or similar payments because the policyholder dividends are a return of premium.  The above dictionary definitions of rebate and refund support plaintiff's view that a return of premium would be considered a rebate or return.  For instance, Black's Law Dictionary defines a rebate in part as rebate as a "[d]iscount; deduction or refund of money in consideration of prompt payment.  A deduction from a stipulated premium on a policy of insurance, in pursuance of an antecedent contract," Black's Law Dictionary 1266 and a refund as "[t]o repay or restore; to return money in restitution or repayment." Id. at 1281.  Similarly, the first definition for rebate in the Random House Unabridged Dictionary is "a return of part of the original payment for some service or merchandise; partial refund," Random House Unabridged Dictionary 1608, and the first definition of refund as, "to give back or restore (esp. money); repay." Id. at 1622.

The court also may look to industry terminology to assist in interpreting the definition of a word.  See Star-Glo Assocs., LP v. United States, 414 F.3d 1349, 1356 (Fed. Cir.) ("This is quite plainly an instance where the statutory term is a term of art that is defined most appropriately by the preexisting industry usage. See, e.g., La. Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 372, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986)

---

[25]  Black's Law Dictionary also states that a rebate is "[p]ortion of a transportation charge refunded to a shipper.  Rebates are forbidden by the Interstate Commerce Act.  Tax rebate is an amount returned (i.e. refunded) to the taxpayer after he has made full payment of the tax."  Black's Law Dictionary 1266.

[26]  Black's Law Dictionary also states that a refund is "[t]o fund again or anew; specifically, finance, to borrow, usually by the sale of bonds, in order to pay off an existing loan with the proceeds." Black's Law Dictionary 1281.  Black's Law Dictionary provides a further definition of the term refund: "As generally referred to in connection with income taxes, is the amount a taxpayer or reporting entity would receive from the government due to an overpayment of taxes." Id.

(defining a statutory term 'in accordance with the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply.').")), reh'g and reh'g en banc denied (Fed. Cir. 2005), cert. denied, 547 U.S. 1147 (2006); see also Corning Glass Works v. Brennan, 417 U.S. 188, 201-02 (1971). The industry view supports the plaintiff's position that policyholder dividends are a return of premium. For example, the American Council of Life Insurers defines a policy dividend as: "A refund of part of the premium on a participating life insurance policy, reflecting the difference between the premium charged and actual experience." Similarly, the Connecticut Department of Insurance, the regulators for ConnMutual, in its glossary, defines a policy dividend as: "A refund of part of the premium on a Participating Life Insurance policy reflecting the difference between the premium charged and actual experience." Notably, the glossary for the Connecticut Department of Insurance included a statement, which stated in part, "[t]his page is a glossary of insurance terms and definitions that are commonly used in the insurance business." Id.

Additionally, MassMutual's correspondence for the tax years at issue demonstrates MassMutual considered policyholder dividends to be a return of premium. In both the July 1, 1996 issue and the September 22, 1997 issue of The Word, which Mr. Jermyn described as "a printed communication that the company prepares and distributed to its career agents and general agents and to some home office employees," MassMutual noted "[i]n a sense, dividends are the return of a portion of premium resulting from experience that is more favorable than was assumed in setting the premium."

Testimony at trial also supports the plaintiff's position that the participating policyholder dividends constitute a return of premium. Plaintiff's expert, Mr. Lombardi, examined the policyholder dividends for the tax years at issue on the post-1983 policies and testified he "view[ed] them as a return of premium." Mr. Lombardi explained that regarding participating policies, "I view that higher premium is being returned as the company reviews the experience and becomes comfortable that it can pay it back to the policyholder." Mr. Lombardi further testified that this view was shared by the National Association of Insurance Commissioners. Isadore Jermyn, the Senior Vice President and Chief Actuary of MassMutual, stated that, "[t]he payment of those [participating policyholder] dividends in my view can then be viewed as a return of the premium that has been paid in order to enjoy the potential benefit of getting dividends."

During opening arguments, counsel for the defendant remarked, "the dividend you can say at least from a tax purpose is a return of premium…."[27] In his expert report, defense expert, Robert Wilcox, referring to plaintiff's expert, stated: "Mr. Lombardi also concludes, at least in part correctly, that the dividends paid in 1995, 1996, and 1997 were a return of premiums paid in prior periods." Mr. Wilcox concluded in his expert report, however, that "[i]n my opinion, the conclusion that policy dividends are simply a return of premiums paid in prior periods is an oversimplification of material facts relating to the determination of dividends," and testified to the same at trial. In this case,

---

[27] Counsel for the defendant continued, however, "[a] return of premium is not a refund of premium…."

however, as both Mr. Jermyn and plaintiff's expert Mr. Lombardi testified, none of the post-1983 policies had reached the cross-over point for the years at issue, and, therefore, the aggregate dividends paid to any of post-1983 policyholders had not exceeded the aggregate premiums paid by the policyholder.

In addition to industry definitions and expert testimony at trial, treatises on both federal income taxation and insurance regard policyholder dividends as a return of premium. For example, the glossary of the Federal Taxation of Insurance Companies offers a general definition of dividends which supports the view that dividends are a return of premium, stating that dividends are "[t]hat part of unabsorbed premium or operating profits of an insurance company returned to policyholders as provided in the bylaws and as authorized by the board of directors." Federal Taxation of Insurance Companies ¶ 40.01, at 4017. The glossary of the Federal Taxation of Insurance Companies noted that "[t]his glossary defines and explains words and phrases, that through usage, have acquired a special meaning in the field of insurance company taxation." Id. at 4001. Mertens Law of Federal Income Taxation states "dividends paid by a mutual company on a life insurance policy, whether paid in cash or used to reduce premiums, are treated as a return of premiums that is not subject to tax until the amounts received exceed the aggregate premiums or other consideration paid for the policy." 1 Mertens Law of Fed. Income Tax'n § 7:69, at 7-187-88. Similarly, Couch on Insurance states: "[a] dividend represents a share of the surplus earnings apportioned by the insurance carrier's directors for distribution to its policyholders. A dividend is commonly considered a reduction of premium. In mutual insurance companies, the dividend is a return of the policyholder's actual unearned, or unused portion of the premium previously paid." Steven Plitt, Daniel Maldonado and Joshua D. Rogers, Couch on Insurance §80:50 (3d ed. 2010). Another insurance treatise, Appleman on Insurance 2d, indicates that: "[d]ividends on insurance policies are, in reality, adjustments of the premium paid…." 28 Eric Mills Holmes, Appleman on Insurance 2d § 173.05, at 15 (2006). Regarding participating policies, Appleman on Insurance specifically states, "[m]utual insurance companies issue participating policies on which they pay 'dividends' to their policyholders, returning or crediting a portion of the premium to the policyholders. These dividends are not distributions of corporate earnings, but in reality are premium adjustments." Id. § 179.05, at 288.

Furthermore, other reference materials relied upon by plaintiff's expert Lombardi, demonstrate that policyholder dividends are considered a return of premium. For example, Life Insurance, by Dan M. McGill states that "[t]he refund to mutual policyholders is called a 'dividend.' This an unfortunate term, since only with respect to the excess of actual over assumed investment earnings can such a refund be regarded as a return on invested capital – the usual connotation of the word. It is nothing more than a refund of a deliberate overcharge and should not be confused with ordinary dividends payable to corporate stockholders." Dan M. McGill, Life Insurance 331 (rev. ed. 1967) Additionally, in Life & Health Insurance Law, Muriel L. Crawford states:

> Participating policies are issued at a premium high enough to cover all
> likely future experience. The insurer expects to be able to operate on a

smaller premium. The difference is a margin of safety. The insurer refunds any excess premium if the experience of that class warrants such a refund. This refund is the dividend. The dividend is a premium abatement. The policyowner does not pay income tax on this dividend because it is not income. The policyowner is simply receiving back part of the premium he paid.

Muriel L. Crawford, Life and Health Insurance Law 255 (8th ed. 1998) (footnote omitted). In the glossary of the Life and Health Insurance Law, a policyowners' dividend is defined as "[t]he refund of excess premium to the owner of a participating policy; a premium abatement." Id. at 503.

The same view also is evident in the legislative history to the Life Insurance Company Income Tax Act of 1959, Pub. L. No. 86-169, 73 Stat. 112 (codified as amended at 26 U.S.C. § 801-20), in which Senate Report number 291 noted: "Policyholder dividends in part reflect the fact that mutual insurance is usually written on a higher initial premium basis than nonparticipating insurance, and thus the premiums returned as policyholder dividends, in part, can be viewed as a return of redundant premium charges." S. Rep. No. 86-291, at 22 (1959). Although the Life Insurance Company Income Tax Act of 1959 predates the Deficit Reduction Act of 1984 and 26 U.S.C. § 808, the view expressed in the Senate Report is not contradicted by the Deficit Reduction Act of 1984 or its legislative history.

Although the issue of whether mutual life insurer's policyholder dividends constitute rebates, refunds, or similar payments under Treasury Regulation § 1.461.4(g)(3) is one of "first impression," according to the defendant, and, according to the plaintiff, has "never been interpreted by any court,"[28] the United States Court of Appeals

---

[28] The court agrees with the parties that the issue of whether policyholder dividends constitute rebates, refunds, or similar payments under Treasury Regulation § 1.461.4(g)(3) is one of first impression. Although the plaintiff states that "the language of Treas. Reg. § 1.461.4(g)(3) has never been interpreted by any court," the court notes that the United States Tax Court in MidAmerican Energy Co. v. Commissioner, 114 T.C. 570 (2000), considered petitioner's argument that Treasury Regulation § 1.461.4(g)(3) allowed for a refund by means of a setoff qualify as a deductible expense. The court concluded, however, "[t]his regulation does not assist petitioner, because there is no liability of petitioner to repay its customers…. In addition, section 1.461-4(g)(3), Income Tax Regs., was not in effect for the years in issue. It is effective only for years after December 31, 1991." MidAmerican Energy Co. v. Comm'r, 114 T.C. at 587; see also Roanoke Gas Co. v. United States, 1991 WL 214295, *3 (W.D. Va. Aug. 16, 1991). Additionally, a 2009 Internal Revenue Service Technical Advice Memorandum considered if policyholder dividends could be considered rebates or refunds under section 1.461-4(g)(3)." See Technical Advice Memorandum 200948042 (Nov. 27, 2009). Although concluding they could not be, the Technical Advice Memorandum offered little analysis and noted that pursuant to 26 U.S.C. § 6110(k)(3), the Technical Advice Memorandum could not be used or cited as precedent. See 26 U.S.C. §

for the Federal Circuit has addressed policyholder dividends in other contexts and used the term rebates. <u>See</u> <u>John Hancock Fin. Servs., Inc. v. United States</u>, 378 F.3d 1302 (Fed. Cir. 2004); <u>Principal Mut. Life Ins. Co. v. United States</u>, 295 F.3d 1241 (Fed. Cir.), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2002); <u>CUNA Mut. Life Ins. Co. v. United States</u>, 169 F.3d 737; <u>Gulf Life Ins. Co. v. United States</u>, 118 F.3d 1563 (Fed Cir. 1997).

In <u>Gulf Life Insurance Co.  v. United States</u>, the taxpayer sought a refund for policyholder dividends for which the insurer had obtained indemnity reinsurance of the dividends.  The Federal Circuit framed the issue as "the placement of tax liability in connection with 'participating' life insurance policies upon which indemnity reinsurance has been obtained" and noted that "[t]he policyholder receives premium rebates, called dividends…." <u>Gulf Life Ins. Co. v. United States</u>, 118 F.3d at 1564.  Although the issue in <u>Gulf Life</u> was whether the reimbursement by reinsurance "imparts tax liability to the insurer, or is correctly treated for tax purposes as flowing directly from the reinsurer to the policyholder," <u>id.</u>, it is notable that the Federal Circuit did not specifically limit the reference of dividends as rebates only to reinsurance.

In <u>CUNA Mutual Life Insurance Co. v. United States</u>, the Federal Circuit considered whether a mutual life insurance company was entitled to a tax refund for policyholder dividends when an adjustment rate to reduce policyholder dividends of a mutual life insurance company was a negative amount.  <u>See</u> <u>CUNA Mutual Life Ins. Co. v. United States</u>, 169 F.3d at 742.   When considering the issue, the Federal Circuit drew a distinction between mutual life insurance companies and stock life insurance companies in interpreting the statute which created the adjustment for policyholder dividends of mutual life insurance companies, 26 U.S.C. § 809 (2000), <u>repealed by</u> the Pension Funding Equity Act of 2004, Pub. L. 108-218, Title II, § 205(a), 118 Stat. 610 (2004),[29] and stated:

> Life insurance companies traditionally rebate to their policy holders, as excessive charges, part of the premiums paid and deduct these payments from their income.  In addition to these so-called policyholder dividends, stock life insurance companies also pay dividends out of earnings to their shareholders, which the company cannot deduct.  Mutual companies, however, have no stockholders; the policyholders in effect own the company.

<u>CUNA Mut. Life Ins. Co. v. United States</u>, 169 F.3d at 738.

---

6110(k)(3); <u>Strategic Hous. Fin. Corp. of Travis Cnty. v. United States</u>, 86 Fed. Cl. 518, 541 n.43 (2009), <u>aff'd in part</u>, <u>vacated in part</u>, 608 F.3d 1317 (Fed. Cir. 2010).

[29]  The Pension Funding Equity Act of 2004, Pub. L. 108-218, Title II, § 205(c), 118 Stat. 610 (2004) stated: "The amendments made by this section shall apply to taxable years beginning after December 31, 2004."  The tax years at issue in this case are, therefore, unaffected by the repeal of 26 U.S.C. § 809, as the statute was in effect for 1995, 1996, and 1997.

In Principal Mutual Life Insurance Co. v. United States, 295 F.3d 1241, the Federal Circuit interpreted 26 U.S.C. § 809, in the context of the IRS's calculation of a mutual life insurance company's equity basis, and again highlighted the distinction between stock life insurance companies and mutual life insurance companies. Id. at 1242. The Federal Circuit indicated:

> Stock life insurance companies frequently rebate to their policyholders part of the premiums paid. Those premium rebates are tax deductible by the company. Stock life insurance companies also pay their shareholders a portion of their profits as dividends. Those dividend payments, however, are not tax deductible. Mutual life insurance companies give premium rebates to their policyholders, but because the policyholders are also the company's owners, payments to policyholders are in part price rebates, in part policyholder benefits, and in part returns on equity.

Id.

Most recently in John Hancock Financial Services, Inc. v. United States, 378 F.3d 1302, the Federal Circuit considered a tax refund suit and the "tax benefit rule"[30] for a mutual life insurance company's policyholder dividends in the context of 26 U.S.C. § 809. See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303; see also 26 U.S.C. § 809 (2000), repealed by Pension Funding Equity Act of 2004, Pub. L. 108-218, Title II, § 205(a), Apr. 10, 2004, 118 Stat. 610. As in CUNA Mutual Life Insurance Co. and Principal Mutual Life Insurance Co. the Federal Circuit drew a distinction between mutual life insurance companies and stock life insurance companies, noting:

> Stock life insurance companies are owned by shareholders, who receive shareholder dividends based on company earnings. Stock companies also make payments known as policyholder dividends to their policyholders. Policyholder dividends are price rebates that the company can deduct from its taxable earnings. Shareholder dividends, on the other hand, constitute a disbursement of the company's earnings and may not be deducted.

> Unlike stock companies, mutual life insurance companies are owned by their policyholders. They pay "policyholder dividends" to their policyholders, but because mutual companies have no separate group of shareholders, the policyholder dividends do not distinguish between price rebates and distributions of earnings. If mutual companies were allowed to deduct the entire amount of their policyholder dividends, they would have a potential tax advantage over stock companies because they would be allowed to deduct the component of their policyholder dividends constituting distributions of earnings, which for stock companies would be non-deductible.

---

[30] As noted by the Federal Circuit, the tax benefit rule relates to a tax benefits a taxpayer was unable to use in earlier years. See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303.

John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303.  All three Federal Circuit decisions, John Hancock Financial Services, Inc. v. United States, Principal Mutual Life Insurance Co. v. United States, and CUNA Mutual Life Insurance Co. v. United States, focused primarily on policyholder dividends as rebates in the context of 26 U.S.C. § 809, and draw distinctions between the rebates which are properly deductable by mutual life insurance companies and return of equity, which are not deductible by mutual life insurance companies.  See, e.g., John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303.

Section 809 of the Tax Code, since repealed by the Pension Funding Equity Act of 2004, was the result of Congress attempting to "solve the problem of the differing tax treatment of stock and mutual companies by enacting legislation that permitted mutual companies to deduct only a portion of their policyholder dividends."  John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303 (citing Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, 733).  Section 809 determined the amount of policyholder dividends that could be deducted.  See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303; see also Principal Mutual Life Ins. Co. v. United States, 295 F.3d at 1243 ("Under the 1984 Act [Deficit Reduction Act of 1984], stock companies and mutual companies were both permitted to deduct payments to policyholders, but the amount of the deduction for mutual companies was reduced to prohibit mutual companies from deducting the portion of the payments that the statute treated as a return on equity to owners rather than a price rebate to customers.").  As the legislative history to the Deficit Reduction Act of 1984 noted, 26 U.S.C. § 809 was a reflection of "Congress' recognition that, to some extent, policyholder dividends paid by mutual companies are distributions of the companies' earnings to the policyholders as owners."  Staff of the Joint Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 612 (Comm. Print 1984).

Section 809(a)(1) stated that: "In the case of any mutual life insurance company, the amount of the deduction allowed under section 808 shall be reduced (but not below zero) by the differential earnings amount." 26 U.S.C. § 809(a)(1).  As noted by the Federal Circuit, 26 U.S.C. § 809 "created a complex formula for calculating the portion of the policyholder dividends that a mutual company could deduct."  John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303.  The Federal Circuit summarized the formula as follows:

> The statutory scheme for calculating the deduction for mutual companies in the affected years works as follows: First, the "current stock earnings rate" is calculated. The current stock earnings rate is derived by averaging the earnings rates of 50 major domestic stock life insurance companies for the previous three years. The current stock earnings rate is calculated after payment of the policyholder dividends but before payment of the shareholder dividends. Next, the "average mutual earnings rate" is calculated. The average mutual earnings rate is based on the aggregate gain or loss from operations for all domestic mutual life insurance companies divided by their aggregate equity bases for a particular year. That rate is determined after the payment of policyholder dividends.

The statute next provides for the calculation of an "imputed earnings rate." That rate is set by statute at 16.5 percent in the case of taxable years beginning in 1984….

The next step is to determine an initial "differential earnings rate," or DER, which is the excess of the imputed earnings rate for the taxable year over the average mutual earnings rate for the second calendar year preceding the calendar year in which the taxable year begins. In the event that the average mutual earnings rate exceeds the imputed earnings rate, the DER is treated as zero. See CUNA Mut. Life Ins. Co. v. United States, 169 F.3d 737, 742 (Fed. Cir. 1999).

The initial DER is then multiplied by the equity of the particular mutual company taxpayer. The resulting amount is subtracted from the deduction the mutual company is allowed to take based on its policyholder dividends.

Once the actual earnings rate of the mutual companies is known, which usually happens in the following year, a recomputed DER is calculated. This recomputed DER is then compared to the initial DER and the mutual companies are required to adjust their earnings for the subsequent year based on the relationship between the two amounts. If the recomputed DER is greater than the initial DER, the mutual companies are required to make an upward adjustment in their income for the subsequent year. If the recomputed DER is less than the initial DER, the mutual companies are permitted to reduce their income for the subsequent year by a corresponding amount. Thus, the recomputed DER ultimately determines the amount by which the policyholder deduction is reduced for a given year.

John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303-4.

For each year, the Department of Treasury computed the Differential Earnings Rate and a Recomputed Differential Earnings Rate, each of which were published in Revenue Rulings. The reason for both the Differential Earnings Rate and the Recomputed Differential Earnings Rate was "Congress recognized that the use of the older average mutual earnings rate would lead to inaccuracy. Because it could not directly correct the problem it required mutual insurance companies to base their tax calculations upon the older rate and then, in the next year, after the average mutual rate for the previous year is published, determine a recomputed differential earnings amount by making the same calculations but using the updated average mutual industry rate." CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 739. For the tax years at issue in this case the Differential Earnings Rate was 0% in 1995 and 1997. See Rev. Rul. 96-42, 1996-2 C.B. 45; Rev. Rul. 98-38, 1998-2 C.B. 132. In 1996, the Differential Earnings Rate was 6.447%. See Rev. Rul. 97-35, 1997-2 C.B. 71. For each of the tax years at issue, however, the Recomputed Differential Earnings Rate was 0%. See Rev.

Rul. 97-35, 1997-2 C.B. 71; Rev. Rul. 98-38, 1998-2 C.B. 132; Rev. Rul. 99-35, 1999-2 C.B. 278.    In 1995 and 1997, because the Differential Earnings Rate was 0%, the plaintiff was permitted to deducted all of its policyholder dividends pursuant to 26 U.S.C. § 808.  For 1996, the plaintiff stated "[o]n its 1996 tax return, Plaintiff applied the 6.447% DER [Differential Earnings Rate] to calculate its section 809 reduction, resulting in a reduced policyholder dividends deduction," but noted that the 1996 Recomputed Differential Earnings Rate was zero, and the plaintiff made an adjustment on its 1997 tax return to reverse the Section 809 reduction for the 1996 tax year.

The plaintiff argued that application of section 809 supports plaintiff's view that the policyholder dividends at issue are in the nature of rebates or refunds.  The plaintiff asserted that for 1995 and 1997, "the Code treated 100% of Plaintiff's policyholder dividends in that year as representing rebates or refunds of premium," and for all tax years at issue, 26 U.S.C. § 809 did not reduce plaintiff's policyholder dividend deduction.  According to plaintiff, this demonstrated that the plaintiff's policyholder dividends for the tax years at issue did not include any of the distributions of earnings or shareholder-like dividends, identified by the Federal Circuit in John Hancock Financial Services, Inc. v. United States, 378 F.3d at 1303, and the "most reasonable inference is that, for federal income tax purposes, Plaintiff's policyholder dividends deducted in tax years 1995, 1996 and 1997 consisted solely of premium rebates or refunds."

The defendant did not challenge the plaintiff's calculations or conclusions that none of plaintiff's policyholder dividends were reduced by application of 26 U.S.C. § 809.  Instead, defendant argued that "[u]nlike MassMutual, Congress never believed that a mutual company's policyholder dividends comprise only deductible 'rebates' and nondeductible returns on equity…." (footnote omitted).  Moreover, defendant, in an attempt to minimize the value of consideration of 26 U.S.C. § 809, claimed that because Congress choose "an arbitrary percentage" for the imputed earnings rate, instead of the actual rate of return, Congress never intended "to reduce the mutual companies' policyholder-dividend deductions by the real economic equivalent of the dividends actually paid to shareholders of stock companies," and that 26 U.S.C. § 809 "was the result of a political compromise." (footnotes omitted).  Citing to the Department of the Treasury, Final Report to The Congress on Life Insurance Company Taxation, 1989, defendant noted that Treasury Department identified conceptual problems with Section 809, including that Section 809 linked the taxes owed by mutual life insurance companies to the performance of stock life insurance companies, such that if stock life insurance companies became more profitable, mutual life insurance companies could owe more taxes, even if they lost money.  The defendant also observed one of the Treasury Department's suggestion was a repeal of Section 809 (citing Department of the Treasury, Final Report to The Congress on Life Insurance Company Taxation, 1989 33, 39), which defendant noted Congress eventually did enact.

Although defendant cited extensively to non-binding legislative history and the Treasury Final Report for support, the Federal Circuit precedent, which is binding on this court, has repeatedly spoken to 26 U.S.C § 809 and policyholder dividends without identifying the limitations that the defendant articulates.  See generally John Hancock Fin. Servs., Inc. v. United States, 378 F.3d 1302; Principal Mut. Life Ins. Co. v. United

States, 295 F.3d 1241; CUNA Mut. Life Ins. Co. v. United States, 169 F.3d 737. In fact, the Federal Circuit specifically addressed the legislative history of 26 U.S.C § 809 in CUNA Mutual Life Insurance Co. Quoting from the House Report, the Federal Circuit noted how Congress, in part, created the framework for 26 U.S.C § 809:

> "Because mutual companies' policyholders are also the owners of the enterprise, policyholder dividends paid to them are distributions from the company that are a combination of price rebates, policyholder benefits and returns of company profits. Although there is no precise way to segregate a policyholder dividend or other payment into these various components, the committee believes that it is valid to conclude that profit oriented enterprises tend to distribute earnings to their owners in amounts that are proportional to the owners' equity in the business. Thus, the committee believes that the portion of a policyholder dividend that is a distribution of earnings can be measured as a percentage of the mutual company's equity…."

CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 738 (quoting H.R .Rep. No. 98-432, pt. 2, at 1422 (1984), reprinted in 1984 U.S.C.C.A.N. 697, 1067).

Defendant also questioned the value of relying on John Hancock Financial Services, Inc. v. United States, stating that, the Federal Circuit's statement that, "[p]olicyholder dividends are price rebates that the company can deduct from its taxable earnings," John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303, is dicta because it does not address applying 26 U.S.C. § 809, and is factually incorrect, because, when the cross-over point is reached, the dividend is more than a rebate. As testified to at trial, for the policyholder dividends at issue in this case, none of the policies reached the cross-over point, so all the dividends can be properly characterized at rebates. Moreover, the Federal Circuit, in John Hancock Financial Services, Inc. v. United States, was attempting to address the difference between the stock life insurance companies and mutual life insurance companies, precisely at issue when interpreting 26 U.S.C. § 809. The defendant did not address the other Federal Circuit statements regarding policyholder dividends as rebates in the context of 26 U.S.C. § 809, notably that "[m]utual life insurance companies give premium rebates to their policyholders," Principal Mut. Life Ins. Co. v. United States, 295 F.3d at 1242, or "[l]ife insurance companies traditionally rebate to their policy holders, as excessive charges, part of the premiums paid and deduct these payments from their income." CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 738. Instead, defendant argued that these Federal Circuit cases examining policyholder dividends were not construing Treasury Regulation § 1.461-4(g)(3), and the plaintiff did not cite a case in which a federal court has recognized policyholder dividends are in the nature of rebates or refunds.

As noted above, both parties acknowledge the issue of whether policyholder dividends constitute rebates, refunds, or similar payments under Treasury Regulation § 1.461.4(g)(3) is one of first impression. Only two cases briefly discussed Treasury Regulation § 1.461.4(g)(3), and did not mention policyholder dividends. See MidAmerican Energy Co. v. Comm'r, 114 T.C. at 587; see also Roanoke Gas Co. v. United States, 1991 WL 214295, *3, an unreported United States Western District of

Virginia case which also briefly mentioned Treasury Regulation § 1.461.4(g)(3), but also not in the context of policyholder dividends. The use of the term rebate by the Federal Circuit regarding policyholder dividends supports plaintiff's argument that policyholder dividends are in the nature of a rebate or a refund to the extent they are returns of premium and not shareholder's earnings. See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303; Principal Mut. Life Ins. Co. v. United States, 295 F.3d at 1242; CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 738. As none of plaintiff's policyholder dividends deductions were ultimately reduced for the tax years at issue under 26 U.S.C. § 809, plaintiff's policyholder dividends are in the nature of the price rebates identified by the Federal Circuit. See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303. Defendant's arguments regarding 26 U.S.C. § 809 are not persuasive.

Defendant further argued that "[w]hatever the nature of policyholder dividends may be, the dividend guarantees do not promise to pay anything that has the nature of a refund or rebate." As 26 U.S.C. § 461(h)(1) states, however, "in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." 26 U.S.C. § 461(h)(1). The liability the court looks to in determining whether an amount has been incurred is plaintiff's liability to pay policyholder dividends. Therefore, for the economic performance element of the "all events test," the court considers whether policyholder dividends, not merely the guaranteed portion of the plaintiff's policyholder dividends constitute rebates, refunds, or similar payments.

The plaintiff argued that 26 U.S.C. § 72(e) (2006) supports its position that the policyholder dividends are returns of premium, arguing that the Tax Code does not treat policyholder dividends as taxable income to individual policyholders until the policy reaches the cross-over point. Focusing on the individual policyholder, and not on the mutual life insurance company, the plaintiff stated that "policyholder dividends are generally not treated as income to policyholders, until and unless the policy reaches the point where aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder…."[31] By contrast, the defendant argued that "[p]olicyholder dividends are not 'rebates or refunds' because the Internal Revenue Code treats them (for a time) as a return of the policyholder's basis in the insurance contract."

_____

[31] The defendant seemingly accepts plaintiff's argument regarding the tax treatment of policyholder dividends to the taxpayer. As the defendant stated, "MassMutual notes that the Internal Revenue Code treats policyholder dividends as a non-taxable return of premium until the aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder," and further acknowledged, "[b]ecause policyholder dividends are variable and non-guaranteed, they are 'amounts not received as an annuity' and are generally taxable only after the total dividends received exceed total premiums paid, as MassMutual has stated."

Section 72 of the Tax Code addresses annuities and certain proceeds of endowment and life insurance contracts, and provides that "[e]xcept as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract." 26 U.S.C. § 72(a). Treasury Regulation § 1.72-1a (2012) states, "[i]n general, these rules provide that amounts subject to the provisions of section 72 are includible in the gross income of the recipient except to the extent that they are considered to represent a reduction or return of premiums or other consideration paid." Treas. Reg. § 1.72-1(a); see also Shimota v. United States, 21 Cl. Ct. 510, 514 (1990).

A dividend is one of the specifically identified exceptions in 26 U.S.C. § 72(e)(1)(B), and would, therefore, "represent a reduction or return of premiums." Section 72(e)(1)(B) states, "[f]or purposes of this section, any amount received which is in the nature of a dividend or similar distribution shall be treated as an amount not received as an annuity." 26 U.S.C. § 72(e)(1)(B); see also Fisher v. United States, 82 Fed. Cl. 780, 783 n.5 (2008) (quoting 26 U.S.C. § 72(e)(1)(B)) ("Section 72 of the Code provides rules governing the reporting of income corresponding to annuities received under annuity, endowment or life insurance contracts. Section 72(e)(2) excludes from gross income certain amounts not received as annuities, among them 'any amount received which is in the nature of a dividend or similar distribution,' as defined in section 72(e)(1)(B)."), aff'd, 333 F. App'x 572 (Fed. Cir. 2009); Grow v. Comm'r, No. 20185-94, T.C. Memo. 1995-594, 1995 WL 738592, at *1 (T.C. Dec. 14, 1995) ("Section 72(e) provides that an amount not received as an annuity is includable in gross income, except to the extent attributable to an individual's investment in the contract.").

As noted by the plaintiff, the policyholder dividends are treated as income only if the aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder. Section 72(e)(5) of the Tax Code limits the amount of income to the taxpayer to the amount exceeding the investment in the contract or policy. See 26 U.S.C. § 72(e)(5); see also McGowen v. Comm'r, No. 14116-07, T.C. Memo. 2009-285, 2009 WL 4797538, *4 (T.C. Dec. 14, 2009). Section 72(e)(6) of the Tax Code further defines the investment of the contract and provides the investment in the contract as of any date is "(A) the aggregate amount of premiums or other consideration paid for the contract before such date, minus (B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income under this subtitle or prior income tax laws." 26 U.S.C. § 72(e)(6)(A-B). "Section 72(e)(1)(B) [referring to what is now U.S.C. § 72(e)(6)][32] provides that if any amount is received under a life insurance contract and if that amount is not received as an annuity, the amount is included in gross income 'only to the extent that it…exceeds the aggregate premiums or other consideration paid.'" Moseley v. Comm'r, 72 T.C. 183, 186 (1979) (omission in original; footnote omitted).

---

[32] The Tax Reform Act of 1986, Pub. L. 99-514, § 1852(c)(4)(B), 100 Stat. 2867 (1986) amended 26 U.S.C. § 72 "by striking out 'subsection (e)(1)(B)' in subparagraph (C) and inserting in lieu thereof 'subsection (e)(6).'"

Treasury Regulation § 1.72-1(d) also describes how amounts which are not received as an annuity, such as policyholder dividends, are not treated as income until reaching the cross-over point. Treasury Regulation § 1.72-1(d) states "[a]mounts not received as an annuity which are received at any other time are generally includible in the gross income of the recipient only to the extent that such amounts, when added to all amounts previously received under the contract which were excludable from the gross income of the recipient under the income tax law applicable at the time of receipt, exceed the premiums or other consideration paid." Treas. Reg. § 1.72-1(d). In explaining the rationale behind the treatment of policyholder dividends not as taxable income, the treatise Appleman on Insurance states, "[d]ividends on insurance policies, are in reality, adjustments of the premium paid and are therefore not treated as taxable income unless the aggregate dividends received exceed the aggregate premiums paid." 28 E. Holmes, Appleman on Insurance 2d § 173.05, at 15. Similarly, at trial, in response to cross-examination regarding the cross-over point, defendant's expert, Mr. Wilcox, stated "for tax purposes only," a portion of policyholder dividends would be a return of premium to the policyholder.

Defendant argued that when participating policies reach the cross-over point, "nothing of substance changes the nature of the policyholder dividends," and "[i]n economic reality dividends have the same nature before and after the cut-off point: they remain what they were – the policyholder's share of the insurer's profits, not refunds of the premiums." In fact, the policyholder dividends are different after the cross-over point, the policyholder dividends are no longer only the return of the premium, but also a portion of the insurer's profits. Section 72 of the Tax Code accurately captures the difference; the tax treatment of the policyholder dividend changes and the policyholder dividends are treated as income to the policyholder when the aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder. Although policyholder dividends might not properly be considered solely rebates or refunds if the participating policies have reached the cross-over point, that issue is not before the court, as none of the post-1983 policies for the tax years at issue in this case reached the cross-over point. Any dividend payments made for the years at issue would have been treated as a return of premium and not taxable income.

The defendant further asserted that if "MassMutual correctly argues that policyholder dividends constitute refunds or rebates because the Internal Revenue Code treats them as a return of premium until the cross-over point, then it must follow that a portion of amounts received as annuity payments constitutes a refund or a rebate because the Code also treats that portion as a return for the consideration paid for the annuity contract. But it is obviously not correct to say that the purchaser of an annuity receives regular 'refunds' or 'rebates' over the life of the annuity in any recognizable sense of the words." The plaintiff, argued, "[t]hat Congress afforded similar tax treatment to annuity payments is both irrelevant and legally inaccurate," noting that the Tax Code pursuant to Section 72(e)(2) treats annuity payments differently than policyholder dividends under Section 72(e)(5). The statute at 26 U.S.C. § 72(e)(5), limits the amount of income to the taxpayer to the amount exceeding the investment in the contract or policy, or when the cross-over point is reached. By contrast, 26 U.S.C.

§72(e)(2), specifically provides for any amount "received on or after the annuity starting date, shall be included in gross income."  The comparison to a policyholder dividend, received after the beginning of an insurance contract and an amount received pursuant to an annuity is, therefore, not applicable.  Moreover, an annuity is factually distinct from a policyholder dividend.  As noted by the plaintiff, "[t]he evidence also demonstrates that, factually, policyholder dividends are in the nature of rebates, refunds or similar payments." Unlike policyholder dividends, which may or may be not distributed to participating policyholders from year to year, and which are unlikely to be the same amount from year to year, an annuity "may be defined broadly, as the right to a series of fixed payments independent of market forces." Cook v. Comm'r, 349 F.3d 850, 855 (5th Cir. 2003).  Additionally, the United States Court of Appeals for the Ninth Circuit has drawn a distinction between annuities and life insurance policies, noting, "[a] single-premium annuity that provides a guaranteed stream of income and has no contingencies that can divest the debtor or his beneficiaries of their right to payment is an investment, not a life insurance policy."  In re Simpson, 557 F.3d 1010, 1015 (9th Cir. 2009).

Defendant additionally argued that "people buy participating policies in part because they hope to receive or benefit from a stream of income; the income (i.e., the dividend) is part of what the policyholder buys – not a refund of the money used to buy it."  Despite the defendant's assertion, the policyholder is not purchasing a stream of income or even an investment.  Plaintiff's expert, Mr. Lombardi, testified that "[t]here is a fundamental difference between a life insurance policy and a bank account or what I would generalize and say an investment.  A bank account or a mutual fund for that matter are investments.  A life insurance policy is not an investment.  It's a life insurance policy." Additionally, a stream of income is not a certainty with a life insurance policy, because dividends are not guaranteed in a typical life insurance policy.  As stated in the exemplary MassMutual participating policy included as a Joint Exhibit, the word participating "means this policy may share in any dividends we pay," and continued, "[e]ach year we determine how much money can be paid as dividends.  This is called divisible surplus."  (emphasis added). Mr. Jermyn testified that "[d]ividends are not guaranteed…and depending upon the company's experience, they may or may not be paid."  This view is echoed in insurance treatises.  As Couch on Insurance notes "[a] policyholder of a mutual life insurance company is only entitled to dividends after a divisible surplus has been ascertained or apportioned." S. Plitt, D. Maldonado and J. Rogers, Couch on Insurance § 80:51.  Likewise, Life & Health Insurance Law indicates that "[t]he insurer does not have to pay a dividend unless it has sufficient earned surplus.  Moreover, the insurer has a right to keep surplus for contingencies, as it deems necessary, as long as it acts in good faith."  M. Crawford, Life & Health Insurance Law 255 (footnote omitted).   Moreover, defendant offers no evidence that policyholders buy participating policies to receive or benefit from a stream of income, only stating that policyholders are the owners of mutual life insurance companies, like shareholders are owners of a stock company.

The defendant also suggested that shareholders expect a return on their investment in the form of dividends, and likewise, participating policyholders expect a

share of the mutual life insurance company's profits in the form of policyholder dividends.  As plaintiff noted, however, stockholders are distinct from policyholders, as "an interest in a mutual life insurance company can only be acquired by purchase of a participating insurance policy," and unlike a stock exchange, no market exists to buy or sell an interest in a mutual life insurance company.  Plaintiff stated, "[a]ccordingly, policyholders purchase life insurance policies primarily for the death benefit protection rather than equity participation."  Without more, the court cannot conclude policyholder dividends are not in the nature of a rebate or a refund based on the defendant's conclusory statements.

After consideration of the arguments presented, the policyholder dividends constitute rebates, refunds, or similar payments, and, therefore, the matching requirement of 26 U.S.C. § 461(h)(3) is satisfied, and the requirements of economic performance have been fulfilled.  The plaintiff has demonstrated that all events have occurred which determine the fact of liability, that the liability can be determined with reasonable accuracy and that economic performance has occurred.

**Economic Substance**

In addition to defendant's arguments regarding the "all events test," discussed above, the defendant also asserted before this court that the Dividend Guarantees did not possess economic substance, because the "dividend-guarantee resolutions had no economic effect" and "MassMutual's dividend-guarantee resolutions had no non-tax business purpose." Therefore, according to the defendant, the "tax law cannot recognize the existence of the guarantees."  Quoting the United States Court of Appeals for the Federal Circuit's decision in <u>Coltec Industries, Inc. v. United States,</u> 454 F.3d at 1355, the defendant argued that the economic substance doctrine "prevents taxpayers 'from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit,'" <u>id.</u> at 1353-54 and that "for over seventy years 'has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality.'" <u>Id.</u> at 1352.[33]

---

[33]  Defendant's also cited to the addition of a subsection to the Tax Code, 26 U.S.C.A. § 7701(o) (2010) in the Healthcare and Education Reconciliation Act of 2010, which states:

> (o) Clarification of economic substance doctrine.--
>
>> (1) Application of doctrine.-- In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if--
>>
>>> (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and

The United States Court of Appeals for the Federal Circuit in <u>Coltec Industries, Inc. v. United States,</u> 454 F.3d 1340, stated that "the economic substance doctrine is merely a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance." <u>Id.</u> at 1354. The issue of economic substance has been addressed repeatedly over the years. In <u>Frank Lyon Co. v. United States</u>, the United States Supreme Court held that a transaction will be respected "where…there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 583-84 (1978). The United States Court of Appeals for the Federal Circuit followed this guidance in <u>Coltec Industries, Inc. v. United States</u>, 454 F.3d at 1355, when it articulated the general principles of the economic substance doctrine as the relevant test to be used in this Circuit. The economic substance doctrine permits transactions to take advantage of tax benefits so long as those transactions also have a non-tax business purpose. As further indicated by the Federal Circuit, "[t]he doctrine disregards for tax purposes transactions that comply with the literal terms of the tax code but lack economic reality in order to prevent taxpayers from subverting the legislative purpose of the Code." <u>Bartels Trust for Benefit of Cornell University ex rel. Bartels v. United States</u>, 617 F.3d at 1362-63 (citing <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d at 1352 and <u>Tank Truck Rentals v. Comm'r</u>, 356 U.S. 30, 35 (1958)); <u>see also</u> <u>Wells Fargo & Co. v. United States</u>, 641 F.3d at 1325 <u>Stobie Creek Invs. LLC v. United States</u>, 608 F.3d at 1375 (emphasis in original) ("The economic substance doctrine seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is

---

(B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

26 U.S.C.A. § 7701(o); <u>see</u> <u>also</u> Healthcare and Education Reconciliation Act of 2010, § 1409(a), Pub. L. 111-152, 124 Stat. 1029 (2010). The defendant noted that "[o]n March 30, 2010, the President signed the Healthcare and [sic] Reconciliation Act of 2010, H.R. 4872, which codifies the economic substance doctrine." It is unclear the purpose of the defendant's citation to the Healthcare and Education Reconciliation Act of 2010, because as defendant notes, "[t]he new provision is effective for transactions occurring after the date of enactment[,]" <u>see</u> <u>also</u> Staff of the Joint Comm. on Taxation, 111th Cong., Technical Explanation of the Revenue Provisions of the Reconciliation Act of 2010, as amended in combination with the Patient Protection and Affordable Care Act 157 (2010 WL 1047322) and, therefore, is not applicable to the tax years at issue in this case. Subsequent to the enactment of the Healthcare and Education Reconciliation Act of 2010, the United States Court of Appeals for the Federal Circuit addressed economic substance, but did not reference the Healthcare and Education Reconciliation Act of 2010. <u>See</u> <u>generally</u> <u>Wells Fargo & Co. v. United States</u>, 641 F.3d 1319 (Fed. Cir. 2011); <u>Stobie Creek Invs. LLC v. United States</u>, 608 F.3d 1366.

legitimate, and <u>creating</u> a transaction to generate a tax benefit, which is illegitimate."); <u>Jade Trading, LLC ex rel. Ervin v. United States</u>, 598 F.3d 1372, 1376 (Fed. Cir. 2010) (quoting <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d at 1352) ("The economic substance doctrine 'require[s] disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality.'"); <u>ACM P'ship v. Comm'r</u>, 157 F.3d 231, 248 n.31 (3d Cir. 1998) ("[W]e do not intend to suggest that a transaction which has actual, objective effects on a taxpayer's non-tax affairs must be disregarded merely because it was motivated by tax considerations."), <u>cert. denied</u>, 526 U.S. 1017 (1999); <u>Gilman v. Comm'r</u>, 933 F.2d 143, 147-48 (2d Cir. 1991) (Utilizing the business purpose/economic effect analysis based on objective standards, and stating that "'[a] transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions.'" (quoting <u>Jacobson v. Comm'r</u>, 915 F.2d 832, 837 (2d Cir. 1990) (quoting <u>DeMartino v. Comm'r</u>, 862 F.2d 400, 406 (2d Cir. 1988))), <u>cert. denied</u>, 502 U.S. 1031 (1992).

In <u>Coltec</u>, the Federal Circuit wrote:

First, although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, <u>Gregory [v. Helvering]</u>, 293 U.S. at 469…the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality…. The Supreme Court later explained that "[if]…the <u>Gregory</u> case is viewed as a precedent for the disregard of a transfer of assets without a business purpose…it gives support to a natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." <u>Higgins v. Smith</u>, 308 U.S. 473, 476…(1940).

…

While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.

Second, when the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance.

…

Third, the economic substance of a transaction must be viewed objectively rather than subjectively.

…

Fourth, the transaction to be analyzed is the one that gave rise to the alleged tax benefit…. [T]here is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate).

Coltec Indus., Inc. v. United States, 454 F.3d at 1355-57 (footnotes omitted).[34]

The plaintiff responded to defendant's assertion that the economic substance doctrine does not bar its claim by pointing out that "the United States does not contest Plaintiff's entitlement to deduct the policyholder dividends at issue." Plaintiff correctly stated that, as argued before this court, "the parties' sole dispute is *when* Plaintiff's legitimate deductions should be taken under the accrual method of tax accounting." (emphasis in original).

Plaintiff asserted that the economic substance doctrine "does not apply in tax accounting cases such as this one where the legitimacy of the underlining transaction, is not challenged by the government." Plaintiff cited to Dana Corp. v. United States, 174 F.3d 1344, 1346 (Fed. Cir. 1999), for the proposition that taxpayers are not required to prove an independent business purpose to "satisfy the tax accounting rules laid down by Congress." Plaintiff asserted that the United States Court of Appeals for the Federal Circuit in Dana Corp. v. United States "accepted that the taxpayer's 'tax motive [wa]s not controlling,' and that the strict rules for tax accounting applied even though the taxpayer's prepayment of interest was made 'for tax advantages.'" (quoting Dana Corp. v. United States, 174 F.3d 1346, 1348) (brackets in original). In Dana Corp., plaintiff's subsidiary was a party to a number of leases for which it entitled to accrued rents and was also obligated to pay interest on loans related to the properties it received accrued rents. Id. at 1346. In 1984 and 1985, the subsidiary paid interest that had accrued, but was not due until the following year, and "[u]nder the cash method of accounting, receipts are recognized in the year in which received and expenses in the year in which paid." Id. (footnote omitted). In Dana Corp., as a result of making the interest payments, which were ordinary and necessary business expenses, the subsidiary's expenses exceeded its gross income resulting in no tax liability. The IRS determined that the cash method of accounting used by the subsidiary did not clearly reflect the subsidiary's income, stating that the cash method caused excess interest deductions and pursuant to 26 U.S.C. § 446(b), required the subsidiary's federal income tax liability to be recalculated, using the accrual method of accounting. See Dana Corp. v. United States, 174 F.3d at 1346. This requirement effectively eliminated the deductions for the advance payments. Id. The Federal Circuit held that "the Code allows a taxpayer, such as [the subsidiary], to pay in advance its interest obligations which have already accrued in the way done here for tax advantages. Such advance payments of interest by cash method taxpayers are lawful so long as the interest has accrued, or is otherwise allocable to the tax year for which the interest deduction was taken." Id. at 1348 (footnote omitted).

---

[34] The Federal Circuit noted one additional element of an economic substance analysis, "arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." Coltec Indus., Inc. v. United States, 454 F.3d at 1357. No subsidiary of either MassMutual or ConnMutual is implicated in the plaintiff's case.

Respecting <u>Dana Corp. v. United States</u>, defendant responded that the issue was not whether the transactions should be respected for tax purposes, but whether the IRS erred in requiring the subsidiary to delay a deduction until the year the liability accrued.  Defendant also argued that the Federal Circuit's statement in <u>Dana</u>, that a tax motive is not controlling in determining if a refund is proper, was not the holding of the case.  While <u>Dana Corp. v. United States</u> is not directly on-point, given that the subsidiary used the cash method accounting, and an interest deduction was at issue, the case is still informative as to the Federal Circuit's view regarding plaintiff's use of the Dividend Guarantees.  Like the subsidiary in <u>Dana Corp. v. United States</u>, the plaintiff used the Tax Code to its advantage in order to take a deduction.  The plaintiff deducted a liability that had accrued, but had not yet been paid.  The Supreme Court in <u>Gregory v. Helvering</u>, 293 U.S. 465, 469 (1935) stated that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  <u>Id.</u>  The Federal Circuit, likewise, has indicated that "[t]ax planning is not a disapproved activity." <u>Gulf Life Ins. Co, v. United States</u>, 118 F.3d at 1566.  In <u>Gulf Life Insurance Co. v. United States</u>, the Federal Circuit, after noting the government had stipulated that the taxpayer's reinsurance agreement was entered into for valid business purposes and had economic substance and that the taxpayer had stipulated that tax planning was a principal business purpose, indicated that "[a] 'major motive' to reduce taxes is not grounds of illegality." <u>Gulf Life Ins. Co., v. United States</u>, 118 F.3d at 1566 (citing <u>United States v. Cumberland Pub. Serv. Co.</u>, 338 U.S. 451, 455 (1950)).

The plaintiff further argued that the "determinations as to timing are governed by the detailed rules for tax accounting (because the underlying transaction has all the economic substance it needs).  The United States' preoccupation with cases on economic substance should not blur the clarity of that distinction."  It appears that the defendant sought to characterize the economic substance inquiry in this case as a typical one, arguing that "[m]any courts, including the Court of Appeals for the Federal Circuit, 'have identified a number of different factors pertinent to the determination of whether a transaction lacks economic substance and thus should be disregarded for tax purposes.'" (quoting <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d at 1355).  The examination of Dividend Guarantees under an economic substance analysis, however, differs from the typical transaction previously reviewed in the courts.   In its analysis of the economic substance doctrine, the United States Court of Appeals for the Federal Circuit in <u>Coltec Industries, Inc. v. United States</u> repeatedly refers to the determination of whether the "<u>transaction</u>" has economic substance.  <u>See</u> <u>generally</u> <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d 1340.  For example, at the beginning of its analysis, the Federal Circuit states "[t]he Supreme Court, various courts of appeals, and our predecessor court, have identified a number of different factors pertinent to the determination of whether a transaction lacks economic substance and thus should be disregarded for tax purposes." <u>Id.</u> at 1355.  The United States Supreme Court in <u>Frank Lyon v. United States</u>, likewise, uses the term "transaction" to discuss economic substance.  <u>See</u> <u>generally</u> <u>Frank Lyon v. United States</u>, 435 U.S. 561.  The Supreme Court in <u>Frank Lyon v. United States</u> also held that when "there is a genuine multiple-party transaction with economic substance…the Government should honor the

allocation of rights and duties effectuated by the parties." <u>Frank Lyon v. United States</u>, 435 U.S. at 583-84. In the case before this court, there was not a multiple-party transaction, nor was there "rights and duties effectuated by the parties." In fact, there was no independent transaction at all. Instead, there was MassMutual's and ConnMutual's unilateral, "irrevocable guarantee that it will pay or apply an amount not less than a specified amount of annual policyholder dividends with respect to post-1983 policies in the following year," followed by the payment of the policyholder dividends as part of its underlying insurance business with its original business partners, their policyholders. There were no agreements or multiple parties structuring a transaction, rather what occurred was a unilateral decision by plaintiff in the regular course of its primary insurance business. The payment of policyholder dividends was an inherent part of the structure of MassMutual's and ConnMutual's core business model. This is not a case in which tax deductions were generated unrelated to plaintiff's business. The dispute is not really about entitlement to, or the allowability of the business deductions. Defendant has conceded plaintiff is entitled to take these deductions at some point. Unlike the issue in the typical economic substance case, the dispute between the parties is solely about in which year those deductions should be taken.

Because the issue in plaintiff's case is the timing of when to take the deductions, the case is unique from transactions that typically raise economic substance concerns, or regarding alleged sham transactions. Plaintiff's case was not a lease-in, lease-out transaction, as "[i]n a typical LILO [lease-in, lease-out], a U.S. taxpayer leases property from a tax-exempt entity and simultaneously leases that property back to the owner. The tax-exempt owner's sublease has a shorter term than the taxpayer's lease. Upon expiration of the shorter sublease, the owner may exercise an option to buy back the remainder of the taxpayer's lease. Thus, in practical terms, the tax-exempt property owner continues to use the property during the sublease term just as it did before the transaction and bears no risk of losing control of its asset(s)." <u>BB&T Corp. v. United States</u>, 523 F.3d 461, 464 (4th Cir. 2008). Likewise, plaintiff's actions were not in the nature of a sale-in, lease out structure [SILO], in which "a United States taxpayer…enters into various agreements with an entity that is not subject to federal income tax, and with financing institutions. The agreements are described as 'leases,' 'subleases,' and 'loans,' among others, but they are all part of a single, integrated 'sale in, lease out' transaction." <u>Wells Fargo & Co. v. United States</u>, 91 Fed. Cl. 35, 39 (2010), <u>aff'd</u>, 641 F.3d 1319 (Fed. Cir. 2011). Moreover, no BOSS or Son of BOSS transaction occurred, "where 'BOSS' stands for 'Bond and Option Sales Strategy,' in which transactions in securities are employed to create an artificially high basis in unrelated property." <u>Salman Ranch Ltd v United States</u>, 573 F.3d 1362, 1379 (Fed. Cir.) (citing IRS Notice 2000-44, 2000-2 C.B. 255 (Aug. 13, 2000)), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2009); <u>see</u> <u>also</u> <u>Stobie Creek Inves. LLC v. United States</u>, 608 F.3d at 1368 n.1 ("'BOSS' is an acronym for 'Bond and Option Sales Strategy.' Son of BOSS is a variation on the BOSS tax shelter."). Nor was it any other type of tax shelter devise, for example a "tax shelter product known as 'Currency Options Bring Reward Alternatives' ('COBRA')," <u>Murfam Farms, LLC v. United States</u>, 88 Fed. Cl. 516, 519 (2009), <u>motion to vacate denied</u> (2010), or "a tax shelter known as Bond Linked Issue Premium Structure ('BLIPS')," <u>Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United</u>

States, 568 F.3d 537, 540 (5th Cir. 2009), of which "'[t]he principal purpose of an entity, plan or arrangement is to avoid or evade Federal income tax if that purpose exceeds any other purpose.'" Alpha I, L.P. v. United States, 93 Fed. Cl. at 304 (quoting Treas. Reg. § 1.6662-4(g)(2)(i)).  Finally, MassMutual and ConnMutual did not engage in a typical transaction with an investment followed by a deduction.  Instead, as plaintiff notes, plaintiff's payment of policyholder dividends was not designed to generate a tax benefit, rather "the payment of policyholder dividends is central to Plaintiff's business and that of the mutual life insurance industry as a whole," and to the benefit of the policyholder.

As the plaintiff noted, "Coltec [Industries, Inc. v. United States] and other cases cited by the United States focus on whether transactions, i.e., events that give rise to deductions for federal income tax purposes, should be respected, and not on when legitimate deductions, e.g., Plaintiff's liability for its policyholder dividends, should be accounted for." (emphasis in original).  The Board Resolutions enacting the Dividend Guarantees are not transactions as typically understood by the Supreme Court or the Federal Circuit and do not implicate the same fears of a sham transaction that a typical multi-party transaction designed to only achieve tax benefits might engender.  The originally "judicially created economic substance doctrine," ACM P'ship v. Comm'r, 157 F.3d at 259, does not fit the Dividend Guarantees enacted by plaintiff, which already has met the "all events test."  See Bartels Trust for benefit of Cornell University ex rel. Bartels v. United States, 617 F.3d at 1363 ("The [economic substance] doctrine is a judicial tool for enforcing the Code…..").

The atypical nature of this case and the difficulty of trying to pigeonhole plaintiff's case into the model of the standard economic substance analysis is reinforced by the absence of case law applying the economic substance doctrine to policyholder dividends.  The only case from the United States Court of Appeals for the Federal Circuit which has addressed economic substance and policyholder dividends, was Gulf Life Insurance Co. v. United States, 118 F.3d 1563, discussed above, in which the court addressed indemnity reinsurance of policyholder dividends and mentioned economic substance only to note that "the government stipulated Taxpayer's reinsurance agreement was entered into for valid business purposes and had economic substance." Gulf Life Ins. Co. v. United States, 118 F.3d at 1566.  There are also two district court cases which mention policyholder dividends in the context of an economic substance analysis.   The first case, decision in the United States District Court for the Southern District of Ohio, American Electric Power, Inc. v. United States, 136 F.Supp.2d 762 (S.D. Ohio 2001), aff'd, 326 F.3d 737 (6th Cir.), reh'g denied, 338 F.3d 534 (6th Cir. 2003), cert. denied, 540 U.S. 1104 (2004), mentions policyholder dividends in the context of an economic substance analysis, as it related to the deduction for interest due on loans made against life insurance policies that were bought by taxpayer on lives of American Electric Power Co., Inc.'s employees pursuant to a corporate-owned life insurance plan (COLI).  See generally id.  The discussion of policyholder dividends was not related to the economic substance analysis, but instead, was described by the court as an added benefit of participating whole life policies over term life insurance policies. See id. at 766-67.

The remaining case to mention policyholder dividends in the context of economic substance, is also in the context of a corporate-owned life insurance plan and is from the United States District Court for the District of Delaware, In re CM Holdings, Inc., 254 B.R. 578 (D. Del. 2000), aff'd, 301 F.3d 96 (3d Cir. 2002)  The District Court analyzed a complex transaction, which involved interest deductions taken by the taxpayer on loans to fund a corporate-owned life insurance plan and determined that the interest deductions were taken pursuant to a sham transaction and not deductible.  In In re CM Holdings, Inc., the plaintiff purchased life insurance policies for 1,430 of its employees and designated itself as the beneficiary of the policies.  Id. at 581.  The COLI VIII policies were "designed to be owned on a broad base of employees, to be financed through a highly leveraged transaction, and to provide the policyholder with a positive cash flow in every year of the policy."  Id. at 581-82.  The court explained the structure of the corporate-owned life insurance plan as follows:

> The COLI VIII policies were designed to be owned on a broad base of employees, to be financed through a highly leveraged transaction, and to provide the policyholder with a positive cash flow in every year of the policy. To achieve these design goals, the designers of the COLI VIII policies incorporated several innovative features in an attempt to comply with the Internal Revenue Code governing life insurance. In doing so, the designers obviously inched toward that invisible line which separates true life insurance from tax driven or tax sheltering investments.

Id. at 581-82.

The insurance company treated nearly all of the premium as an expense charge and returned nearly all of it to the company in the form of a "loading dividend."[35]  Id. at

---

[35] The Third Circuit in its affirmance of the District Court's decision described the procedure of loading dividends to fund the premiums for the COLI plan:

> The payment mechanism for the following four years used a "loading dividend" to fund the premiums.   For those years, in a simultaneous netting transaction occurring on the first day of the policy year:
>
> > (i)  Camelot paid the annual premium plus accrued interest;
> >
> > (ii)  approximately 95% of the annual premium was taken by MBL as an expense charge, while approximately 5% was credited to the policy value;
> >
> > (iii)  approximately 5-8% of the expense charge was set aside to cover MBL's actual expenses;

593.  The court's discussion of policyholder dividends separated legitimate policyholder dividends from the "loading dividends" by the taxpayer.  The court noted the taxpayer argued that the loading dividends were part of a real, not a sham, transaction because the loading dividends were "'policyholder dividends' as defined in I.R.C. § 808, which defines 'policyholder dividend' as 'any dividend or similar distribution to policyholders in their capacity as such.'"  Id. at 617 (quoting 26 U.S.C. § 808(a)) (footnote omitted).  The court concluded that "[t]his argument fails because the § 808 definition of policyholder dividends rests on the assumption that the dividends are real transactions, and not factual shams.  The definition of 'policyholder dividend' as 'dividend or similar distribution' implicitly assumes that the dividends would actually be real transactions." In re CM Holdings, Inc., 254 B.R. at 617.  Noting that the loading dividends were factually shams, the court dismissed the argument that 26 U.S.C. § 808 could be used to determine if the loading dividends were real, dismissing the bootstrapping argument of the taxpayer, and stating, "if the loading dividend falls within the definition of § 808, it must be real, even though § 808 requires the policyholder dividends be real in the first place." In re CM Holdings, Inc., 254 B.R. at 617-18.  The court concluded that 26 U.S.C. § 808 did not make the COLI plan transaction any less of a sham.  Id. On appeal, the United States Court of Appeals for the Third Circuit agreed with the District Court and stated, "The District Court's holding that the COLI transaction as a whole lacked economic substance, and thus was an economic sham, is undoubtedly correct. Thus, we do not reach the issue of whether the separate components of the transaction were factual or economic shams." In re CM Holdings, Inc., 301 F.3d at 108.  The Third Circuit continued, "[h]owever, we must clarify that we do not find the loading dividends to be factual shams. Factual shams are "transactions" that never actually occurred…." Id.  The Third Circuit's explanation, although challenging the District Court's conclusions about the loading dividends being factual shams, nevertheless demonstrates how different the loading dividends in CM Holdings were from the policyholder dividends distributed by the plaintiff, and even further removed from the Dividend Guarantees. The Third Circuit explained that "[a] circular netting transaction, where different loans and payments are deemed to occur simultaneously (and thereby offset each other), is not by definition a factual sham.  As the District Court pointed out, the simultaneous

---

(iv)  approximately 92-95% of the expense charge was immediately returned to Camelot in the form of a "loading dividend;"

(v)  Camelot received a partial withdrawal of policy value in an amount equal to approximately 99% of the accrued loan interest;

(vi)  the loading dividend and partial withdrawal were used to offset payment of the annual premium and accrued loan interest;  and

(vii)  Camelot paid the balance due in cash.

In re CM Holdings, Inc., 301 F.3d at 99-100.

netting of the payment and the loan with the policy value as collateral that occurred in years 1-3 is common in the industry, and is a transaction with economic substance. The loading dividends of years 4-7 were similar simultaneous netting transactions that 'actually occurred,' and are therefore not factual shams." Id.  By contrast, plaintiff paid eligible policyholder dividends from participating policies from the divisible surplus, and in the specific case of the Dividend Guarantees, guaranteed a certain amount of policyholder dividends.

In addition to challenging the defendant's characterizations of economic substance as it applies to the instant case, plaintiff also argued "the government cannot point to a single tax accounting case that denies a taxpayer a deduction that more nearly matches income with related expenses or that prevents a taxpayer from conforming its tax accounting of its liabilities to its true economic position."  In response, defendant cited to Clement v. United States, 217 Ct. Cl. 495, 580 F.2d 422 (1978), cert. denied, 440 U.S. 907 (1979), as evidence of the economic substance doctrine in a tax accounting case in which the timing of a recognized deduction was at issue.  The defendant argued, "[t]he Court upheld the Commissioner's decision [to disallow the acceleration] because the acceleration resulted in a material distortion of income, but the Court also applied the business-purpose requirement to a deduction resulting from the use of tax-accounting rules."  (citing Clement v. United States, 217 Ct. Cl. at 503-04, 580 F.2d at 427).  Clement v. United States should be afforded little weight however, as the Revenue Ruling relied upon by the Court of Claims, Revenue Ruling 75-152, 1975-1 C.B. 144 (1975), Farmer's Deduction for Advance Payment for Livestock Feed, has since been superseded by Revenue Ruling 79-229, 1979-2 C.B. 210 (1979), Advance Payment for Livestock Feed, and applied to farmers electing the cash basis method of accounting.  See Clement v. United States, 580 F.2d at 426.  The business purpose language, on which the defendant relies, comes from the Revenue Ruling, which states in part, "[t]he second test is that the prepayment must be made for a valid business purpose and not merely for tax avoidance."  Rev. Rul. 75-152, 1975-1 C.B. 144.  As the Revenue Rule has been superseded and applied, when issued, specifically to farmers electing the cash basis method of accounting, the Clement does not offer defendant support for its argument that plaintiff needed a non-tax business purpose to adopt the Dividend Guarantees.

The nature of Dividend Guarantees is unique from the typical economic substance transaction analysis which is not applicable to the facts of this case.  Plaintiff should not be precluded from accounting for the Dividend Guarantees in the years in which they were enacted.

## CONCLUSION

For the reasons discussed above, the deductions plaintiff claimed in its amended complaint related to the Dividend Guarantees for tax years 1995, 1996 and 1997 for MassMutual, and the Dividend Guarantee for tax year 1995 for ConnMutual, are allowable.  As noted above, per the parties' stipulation for partial dismissal, plaintiff's claims regarding tax years 1988 through 1994, are confirmed as **DISMISSED**.  Further

proceedings to resolve the remaining issues in the case will be scheduled by separate Order.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

# STATUTORY AND REGULATORY APPENDIX

## Internal Revenue Code (26 U.S.C.)

### SUBTITLE A – INCOME TAXES

### Chapter 1 – Normal Taxes and Surtaxes

\*　　\*　　\*　　\*　　\*

### SUBCHAPTER E. ACCOUNTING PERIODS AND METHODS OF ACCOUNTING

\*　　\*　　\*　　\*　　\*

## SEC. 461  GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

\*　　\*　　\*　　\*　　\*

(h)  CERTAIN LIABILITIES NOT INCURRED BEFORE ECONOMIC PERFORMANCE –

(1)  IN GENERAL. – For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.

(2)  TIME WHEN ECONOMIC PERFORMANCE OCCURS. – Except as provided in regulations prescribed by the Secretary, the time when economic performance occurs shall be determined under the following principles:

(A)  SERVICES AND PROPERTY PROVIDED TO THE TAXPAYER.  \* \* \*

(B)  SERVICES AND PROPERTY PROVIDED BY THE TAXPAYER.  \* \* \*

- 72 -

(C)  WORKERS COMPENSATION AND TORT LIABILITIES OF THE TAXPAYER.  * * *

(D)  OTHER ITEMS. – In the case of any other liability of the taxpayer, economic performance occurs at the time determined under regulations prescribed by the Secretary.

(3)  Exception for certain recurring items. –

(A)  IN GENERAL. – Notwithstanding paragraph (1) an item shall be treated as incurred during any taxable year if –

(i)  the all events test with respect to such item is met during such taxable year (determined without regard to paragraph (1)),

(ii)  economic performance with respect to such item occurs within the shorter of –

(I)  a reasonable period after the close of such taxable year, or

(II)  8½ months after the close of such taxable year,

(iii)  such item is recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which the requirements of clause (i) are met, and

(iv)  either –

(I)  such item is not a material item, or

(II)  the accrual of such item in the taxable year in which the requirements of clause (i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs.

- 73 -

(B) Financial statements considered under subparagraph (A)(iv). – In making a determination under subparagraph (A)(iv), the treatment of such item on financial statements shall be taken into account.

(C) Paragraph not to apply to workers compensation and tort liabilities. – This paragraph shall not apply to any item described in subparagraph (C) of paragraph (2).

(4) All events test. – For purposes of this subsection, the all events test is met with respect to any item if all events have occurred with determine the fact of liability and the amount of such liability can be determined with reasonable accuracy.

(5) Subsection not to apply to certain items. – This subsection shall not apply to any item for which a deduction is allowable under a provision of this title which specifically provides for a deduction for a reserve for estimated expenses.

\*        \*        \*        \*        \*

## Subchapter L. Insurance Companies

## PART I – LIFE INSURANCE COMPANIES

## SEC. 801.  TAX IMPOSED.

(a) Tax Imposed. –

(1) In general. – A tax is hereby imposed for each taxable year on the life insurance company taxable income of every life insurance company.  \* \* \*

\*        \*        \*        \*        \*

(b) Life Insurance Company Taxable Income. – For purposes of this part, the term "life insurance company taxable income" means –

(1) life insurance gross income, reduced by

- 74 -

(2)  life insurance deductions.

*      *      *      *      *

## SEC. 804.  LIFE INSURANCE DEDUCTIONS.

For purposes of this part, the term "life insurance deductions" means –

(1)  the general deductions provided in section 805 * * *

*      *      *      *      *

## SEC. 805.  GENERAL DEDUCTIONS.

(a)  GENERAL RULE. – For purposes of this part, there shall be allowed the following deductions:

*      *      *      *      *

(3)  POLICYHOLDER DIVIDENDS. – The deduction for policyholder dividends (determined under section 808(c)).

*      *      *      *      *

## SEC. 808.  POLICYHOLDER DIVIDENDS DEDUCTION.

(a)  POLICYHOLDER DIVIDEND DEFINED. – For purposes of this part, the term "policyholder dividend" means any dividend or similar distribution to policyholders in their capacity as such.

(b)  CERTAIN AMOUNTS INCLUDED. – For purposes of this part, the term "policyholder dividend" includes –

(1)  any amount paid or credited (including as an increase in benefits) where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management,

(2)  excess interest,

11131499.1

(3)  premium adjustments, and

(4)  experience-rated refunds.

(c)  AMOUNT OF DEDUCTION. – The deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year.

(d)  DEFINITIONS. – For purposes of this section –

(1)  EXCESS INTEREST. – The term "excess interest" means any amount in the nature of interest –

(A)  paid or credited to a policyholder in his capacity as such, and

(B)  in excess of interest determined at the prevailing State assumed rate for such contract.

(2)  PREMIUM ADJUSTMENT. – The term "premium adjustment" means any reduction in the premium under an insurance or annuity contract which (but for the reduction) would have been required to be paid under the contract.

(3)  EXPERIENCE-RATED REFUND. – The term "experience-rated refund" means any refund or credit based on the experience of the contract or group involved.

\*      \*      \*      \*      \*

(f)  COORDINATION OF 1984 FRESH-START ADJUSTMENT WITH ACCELERATION OF POLICYHOLDER DIVIDENDS DEDUCTION THROUGH CHANGE IN BUSINESS PRACTICE. –

(1)  IN GENERAL. – The amount determined under paragraph (1) of subsection (c) for the year of change shall (before any reduction under paragraph (2) of subsection (c)) be reduced by so much of the accelerated policyholder dividends deduction for such year as does not exceed the 1984 fresh-start adjustment of

- 76 -

policyholder dividends (to the extent such adjustment was not previously taken into account under this subsection).

(2) YEAR OF CHANGE. – For purposes of this subsection, the term "year of change" means the taxable year in which the change in business practices which results in the accelerated policyholder dividends deduction takes effect.

(3) ACCELERATED POLICYHOLDER DIVIDENDS DEDUCTION DEFINED. – For purposes of this subsection, the term "accelerated policyholder dividends deduction" means the amount which (but for this subsection) would be determined for the taxable year under paragraph (1) of subsection (c) but which would have been determined (under such paragraph) for a later taxable year under the business practices of the taxpayer as in effect at the close of the preceding taxable year.

(4) 1984 FRESH-START ADJUSTMENT FOR POLICYHOLDER DIVIDENDS. – For purposes of this subsection, the term "1984 fresh-start adjustment for policyholder dividends" means the amounts held as of December 31, 1983, by the taxpayer as reserves for dividends to policyholders under section 811(b) (as in effect on the day before the date of the enactment of the Tax Reform Act of 1984) other than for dividends which accrued before January 1, 1984. * * *

*    *    *    *    *

(7) SUBSECTION NOT TO APPLY TO POLICIES ISSUED AFTER DECEMBER 31, 1983. –

(A) In general. – This subsection shall not apply to any policyholder dividend paid or accrued with respect to a policy issued after December 31, 1983.

*    *    *    *    *

11131499.1

**Treasury Regulations (26 C.F.R.)**

**§ 1.461-4  Economic performance.**

\*     \*     \*     \*     \*

   **(g)  Certain liabilities for which payment is economic performance. –**

      **(1)  In general. –**

         **(i)  Person to which payment must be made.**  In the case of liabilities described in paragraph (g)(2) through (7) of this section, economic performance occurs when, and to the extent that, payment is made to the person to which the liability is owed.  \* \* \*

\*     \*     \*     \*     \*

      **(2)  Liabilities arising under a workers compensation act or out of any tort, breach of contract, or violation of law.**  \* \* \*

      **(3)  Rebates and refunds.**  If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed.  This paragraph (g)(3) applies to all rebates, refunds, and payments or transfers in the nature of a rebate or refund regardless of whether they are characterized as a deduction from gross income, and adjustment to gross receipts or total sales, or an adjustment or addition to cost of goods sold.  In the case of a rebate or refund made as a reduction in the price of goods or services to be provided in the future by the taxpayer, "payment" is deemed to occur as the taxpayer would otherwise be required to recognize income resulting from a disposition at an unreduced price.  See Example 2 of paragraph (g)(8) of this section.  For purposes of determining whether the recurring item

- 78 -

exception of § 1.461-5 applies, a liability that arises out of a tort, breach of contract, or violation of law is not considered a rebate or refund.

   **(4)  Awards, prizes, and jackpots.**  * * *

   **(5)  Insurance, warranty, and service contracts.**  If the liability of a taxpayer arises out of the provision to the taxpayer of insurance, or a warranty or service contract, economic performance occurs as payment is made to the person to which the liability is owed.  See Examples 5 through 7 of paragraph (g)(8) of this section.  For purposes of this paragraph (g)(5) –

   *        *        *        *        *

   **(ii)**  The term "insurance" has the same meaning as is used when determining the deductibility of amounts paid or incurred for insurance under section 162.

   **(6)  Taxes.**  * * *

   **(7)  Other liabilities.**  In the case of a taxpayer's liability for which economic performance rules are not provided elsewhere in this section or in any other Internal Revenue regulation, revenue ruling or revenue procedure, economic performance occurs as the taxpayer makes payments in satisfaction of the liability to the person to which the liability is owed.  This paragraph (g)(7) applies only if the liability cannot properly be characterized as a liability covered by rules provided elsewhere in this section.  * * *

   **(8)  Examples.**  The following examples illustrate the principles of this paragraph (g).  For purposes of these examples, it is assumed that the requirements of the all events test other than economic performance have been met and, except as otherwise provided, that the recurring item exception is not used.

   *        *        *        *        *

## Example 2.  Rebates and refunds.

**(i)**  X corporation, a calendar year, accrual method taxpayer, manufactures and sells hardware products.  X enters into agreements that entitle each of its distributors to a rebate (or discount on future purchases) from X based on the amount of purchases made by the distributor from X during any calendar year.  During the 1992 calendar year, X becomes liable to pay a $2,000 rebated to distributor A.  X pays A $1,200 of the rebate on January 15, 1993, and the remaining $800 on October 15, 1993.  Assume the rebate is deductible (or allowable as an adjustment to gross receipts or cost of goods sold) when incurred.

**(ii)**  If X does not adopt the recurring item exception described in § 1.461-5 with respect to rebates and refunds, then under paragraph (g)(3) of this section, economic performance with respect to the $2,000 rebate liability occurs in 1993.  However, if X has made a proper election under § 1.461-5, and as of December 31, 1992, all events have occurred that determine the fact of the rebate liability, X incurs $1,200 for the 1992 taxable year.  Because economic performance (payment) with respect to the remaining $800 does not occur until October 15, 1993 (more than 8 ½ months after the end of 1992), X cannot use the recurring item exception for this portion of the liability (see § 1.461-5).  Thus, the $800 is not incurred by X until the 1993 taxable year.  If, instead of making the cash payments to A during 1993, X adjusts the price of hardware purchased by A during 1993, X's "payment" occurs as X would otherwise be required to recognize income resulting from a disposition at an unreduced price.

*        *        *        *        *

11131499.1

## § 1.461-5 Recurring item exception.

**(a) In general.** Except as otherwise provided in paragraph (c) of this section, a taxpayer using an accrual method of accounting may adopt the recurring item exception as [sic] method of accounting for one or more types of recurring items incurred by the taxpayer. In the case of "other payment liabilities" described in § 1.461-4(g)(7), the Commissioner may provide for the application of the recurring item exception by regulation, revenue procedure or revenue ruling.

**(b) Requirements for use of the exception.** –

**(1) General rule.** Under the recurring item exception, a liability is treated as incurred for a taxable year if –

**(i)** As of the end of the taxable year, all events have occurred that establish the fact of the liability and the amount of the liability can be determined with reasonable accuracy;

**(ii)** Economic performance with respect to the liability occurs on or before the earlier of –

(A) The date the taxpayer files a timely (including extensions) return for the taxable year; or

(B) The 15th day of the 9th calendar month after the close of that taxable year;

**(iii)** The liability is recurring in nature; and

**(iv)** Either –

(A) The amount of the liability is not material; or

(B) The accrual of the liability for that taxable year results in a better matching of the liability with the income to which it relates then would result from accruing the liability for the taxable year in which economic performance occurs.

- 81 -

\*     \*     \*     \*     \*

**(3)  Liabilities that are recurring in nature.**  A liability is recurring if it can generally be expected to be incurred from one taxable year to the next.  However, a taxpayer may treat such a liability as recurring in nature even if it is not incurred by the taxpayer in each taxable year.  In addition, a liability that has never previously been incurred by a taxpayer may be treated as recurring if it is reasonable to expect that the liability will be incurred on a recurring basis in the future.

\*     \*     \*     \*     \*

**(5)  Matching requirement.**

\*     \*     \*     \*     \*

**(ii)**  In the case of a liability described in paragraph (g)(3) (rebates and refunds), paragraph (g)(4) (awards, prizes, and jackpots), paragraph (g)(5) (insurance, warranty, and service contracts), paragraph (g)(6) (taxes), or paragraph (h) (continuing fees under the Nuclear Waste Policy Act of 1982) of § 1.461-4, the matching requirement of paragraph (b)(1)(iv)(B) of this section shall be deemed satisfied.

**(c)  Types of liabilities not eligible for treatment under the recurring item exception.**  The recurring item exception does not apply to any liability described in paragraph (c) (interest), paragraph (g)(2) (workers compensation, tort, breach of contract, and violation of law), or paragraph (g)(7) (other liabilities) of § 1.461-4.  Moreover, the recurring item exception does not apply to any liability incurred by a tax shelter, as defined in section 461(i) and § 1.448-1T(b).

**(e)  Examples.**  The following examples illustrate the principles of this section:

- 82 -

11131499.1

**Example 1.  Requirements for use of the recurring item exception.**

(i)  Y corporation, a calendar year, accrual method taxpayer, manufactures and distributes video cassette recorders.  Y timely files its federal income tax return for each taxable year on the extended due date for the return (September 15, of the following taxable year).  Y offers to refund the price of a recorder to any purchaser not satisfied with the recorder.  During 1992, 100 purchasers request a refund of the $500 purchase price.  Y refunds $30,000 on or before September 15, 1993, and the remaining $20,000 after such date but before the end of 1993.

(ii)  Under paragraph (g)(3) of § 1.461-4, economic performance with respect to $30,000 of the refund liability occurs on September 15, 1993.  Assume the refund is deductible (or allowable as an adjustment to gross receipts or cost of goods sold) when incurred.  If Y does not adopt the recurring item exception with respect to rebates and refunds, the $30,000 refund is incurred by Y for the 1993 taxable year.  However, if Y has properly adopted the recurring item exception method of accounting under this section, and as of December 31, 1992, all events have occurred that determine the fact of the liability for the $30,000 refund, Y incurs that amount for the 1992 taxable year.  Because economic performance (payment) with respect to the remaining $20,000 occurs after September 15, 1993 (more than 8 ½ months after the end of 1992), that amount is not eligible for recurring item treatment under this section.  Thus, the $20,000 amount is not incurred by Y until the 1993 taxable year.

\*        \*        \*        \*        \*

- 83 -

11131499.1

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on February 20, 2014. Counsel for the appellee are registered ECF users and will be served by the ECF system.

/s/ Arthur T. Catterall
ARTHUR T. CATTERALL
*Attorney*

11131499.1

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   [X]   this brief contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]   this brief uses a monospaced typeface and contains [*state the number of*]        lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [X]   this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> in <u>14-point Century Schoolbook</u>; *or*

   [ ]   this brief has been prepared in a monospace typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


  /s/ Arthur T. Catterall _
Attorney for the Appellant
Dated: February 20, 2014

11131499.1